**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

FILED
SEP 26 2005
U.S. COURT OF
FEDERAL CLAIMS

HIGHMARK, INC., SUCCESSOR IN INTEREST TO PENNSYLVANIA BLUE SHIELD AND SUBSIDIARIES

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

Civil Action No.

## COMPLAINT

Plaintiff Highmark, Inc., through counsel, hereby complains and alleges as follows:

## JURISDICTION

1. Plaintiff brings this complaint under sections 6532 and 7422 of the United States Internal Revenue Code (the "Code") (26 U.S.C. §§ 6532 and 7422) for recovery of federal income taxes erroneously collected from Plaintiff for the 1991 through 1995 tax years.

2. This Court has jurisdiction under sections 1346(a) and 1491 of the Judicial Code (28 U.S.C. §§ 1346(a) and 1491).

## PARTIES

3. Plaintiff Highmark, Inc. ("Highmark") is incorporated as a Pennsylvania nonprofit corporation under the Pennsylvania Nonprofit Corporation Law (15 Pa. C.S. §§ 5101 et. seq.), with its corporate headquarters and mailing address at Suite 922, 120 Fifth Avenue,

Pittsburgh, Pennsylvania 15222. Highmark's employer identification number ("EIN") is 23-1294723.

4. Highmark is the successor in interest to both Veritus, Inc., which did business as Blue Cross of Western Pennsylvania ("Veritus"), and Medical Service Association of Pennsylvania, which did business as Pennsylvania Blue Shield ("PBS"). The claims described in this complaint relate only to PBS.

5. Veritus and PBS were consolidated into Highmark in a statutory consolidation under Pennsylvania law on December 6, 1996.

6. References to Highmark throughout this complaint include references to its predecessor, PBS, where applicable.

7. PBS' EIN is the same as Highmark's EIN (23-1294723).

8. At all times relevant to this complaint, Highmark was subject to Code § 833, under which it was treated as if it were a stock insurance company subject to tax under the provisions of Part II, Subchapter L of the Internal Revenue Code of 1986 (Code §§ 831 through 835) as a calendar-year taxpayer.

9. Defendant is the United States of America.

## GENERAL ALLEGATIONS

10. Highmark seeks to recover a sum of at least $21,329,919, or such other amount as provided by law, plus with interest thereon as provided by law, which sum represents an overpayment by Highmark of federal income tax for its tax years ending December 31, 1991 through December 31, 1995 (the 1991 through 1995 tax years).

11. Highmark timely filed a federal income tax return for each of the 1991 through 1995 tax years with the Internal Revenue Service Center at Philadelphia, Pennsylvania.

12. The full amount of income taxes shown on each of Highmark's federal income tax returns for each of the 1991 through 1995 tax years was paid by Highmark.

13. This action arises out of numerous claims for refund submitted by Highmark. The claims for refund included deductions arising from the loss of intangible assets including Highmark's healthcare coverage contracts and other intangible assets. Only the deductions related to losses with respect to healthcare coverage contracts are at issue in this complaint.

14. Counts One through Five of this complaint arise from refund claims timely filed with the Internal Revenue Service by Highmark for the 1991 through 1995 tax years. The claims arose from losses of intangible assets owned by Highmark, including healthcare coverage contracts with groups and individuals, in the taxable years 1987 through 1996.

15. At all times relevant to this complaint, Highmark was incorporated as a Pennsylvania nonprofit corporation, engaged in the business of providing healthcare coverage to various groups and individuals as an independent licensee of the Blue Cross Blue Shield Association.

16. Prior to January 1, 1987, Highmark was exempt from federal income tax under the provisions of Code § 501(c)(4).

17. As of January 1, 1987, Highmark became a taxable entity under Code § 833(a), as enacted as part of the Tax Reform Act of 1986, Pub. L. No. 99-514, § 1012, 100 Stat. 2085, 2390.

18. At all times during the tax years 1987 through and including 1996, Highmark was an "existing Blue Cross or Blue Shield organization" as defined in Code § 833(c)(2).

19. As an "existing Blue Cross or Blue Shield organization," Highmark was subject to the fresh start basis transition rule in the Tax Reform Act of 1986 § 1012(c)(3)(A)(ii) providing that "for purposes of determining gain or loss, the adjusted basis of any asset held on the 1st day of [its first tax year beginning after December 31, 1986] shall be treated as equal to its fair market value as of such day." This provision is referenced in this complaint as "the Fresh Start Basis Rule." All "existing Blue Cross or Blue Shield organizations" are eligible for the Fresh Start Basis Rule.

20. January 1, 1987, was the first day of Highmark's first tax year beginning after December 31, 1986.

21. On January 1, 1987, Highmark held intangible assets including healthcare coverage contracts.

22. Under each healthcare coverage contract that Highmark held on January 1, 1987, Highmark had a contractual right to receive premiums paid by an employer, sponsor of a group, or an individual in exchange for an obligation to cover or indemnify each enrolled subscriber for specified health care services.

23. Highmark's healthcare coverage contracts as of January 1, 1987, were renewable on a periodic basis. Highmark's healthcare coverage contracts terminated or were canceled when Highmark or an employer, sponsor of the group, or an individual did not renew the contract at the end of the contract term, or when the contract was otherwise terminated by Highmark or the employer, sponsor of the group, or individual.

24. In each tax year 1987 through 1996, there were terminations and cancellations of various healthcare coverage contracts that Highmark had held on January 1, 1987. Each time one of the healthcare coverage contracts terminated or was canceled, the contract

became worthless and lost all usefulness in Highmark's business, and Highmark thereby suffered a loss for which it was not covered by insurance or otherwise compensated.

25. Each healthcare coverage contract that Highmark held on January 1, 1987, was a valuable asset covered by the Fresh Start Basis Rule.

26. Each healthcare coverage contract that Highmark held on January 1, 1987, was a discrete intangible asset that had an ascertainable fair market value on January 1, 1987.

27. Each time one of the healthcare coverage contracts terminated or was canceled, Highmark suffered a loss equal to the fair market value of the contract on January 1, 1987.

28. The losses described in paragraph 24 entitle Highmark to loss deductions under Code § 165, as determined under the Fresh Start Basis Rule.

29. The fair market value, as of January 1, 1987, of each healthcare coverage contract Highmark lost as described above in paragraph 24 can be, and has been, established with reasonable accuracy pursuant to the requirements of the Fresh Start Basis Rule.

30. The aggregate fair market values, as of January 1, 1987, of the blocks of healthcare coverage contracts Highmark lost in each taxable year are at least as follows, in the taxable years 1987 through 1996, or such other amounts determined by law in accordance with the Fresh Start Basis Rule:

| | |
|---|---|
| Tax Year 1987 | $2,232,288 |
| Tax Year 1988 | $2,466,751 |
| Tax Year 1989 | $2,883,796 |
| Tax Year 1990 | $5,933,153 |
| Tax Year 1991 | $50,607,340 |
| Tax Year 1992 | $12,341,374 |
| Tax Year 1993 | $9,753,960 |
| Tax Year 1994 | $11,682,885 |
| Tax Year 1995 | $8,748,047 |
| Tax Year 1996 | $11,053,083 |

31. The losses alleged above for the taxable years 1987 through 1990 form part of Alternative Tax Net Operating Losses under Code § 56(d) that carry forward and result, in whole or in part, in an overpayment of tax that Highmark paid for the tax year 1991.

32. The losses alleged above for the tax year 1996 form part of a net operating loss under Code § 172(c) and an Alternative Tax Net Operating Loss under Code § 56(d) for tax year 1996 that Highmark elected to carry forward and deduct in later years.

33. Each of the claims detailed below satisfies the requirements of Code § 6511.

a. With respect to Highmark's 1991 tax year, Highmark filed its initial claim for refund on September 15, 1995 and filed a revised claim during November 1998. Highmark has neither received a statutory notice of claim disallowance nor executed a Form 2297, Waiver of Statutory Notice of Claim Disallowance. Pursuant to Code § 6532, Highmark may bring suit to recover the amount set forth in that claim after six months from the date of filing the claim have passed. This requirement is satisfied regardless of whether the date of the original claim or revised claim is considered.

b. On September 29, 2003, the Internal Revenue Service (the "IRS") sent Highmark, via certified mail, a Statutory Notice of Claim Disallowance for the tax years ended December 31, 1992, December 31, 1993, December 31, 1994, December 31, 1995, and December 31, 1996 (the "Notice of Disallowance"). This notice is attached as Exhibit A. Pursuant to the Notice of Disallowance, Highmark has two years from the mailing

date (September 29, 2003) of the notice to bring suit to recover the amounts set forth in those claims.

**COUNT ONE**
**(1991 TAX YEAR)**

34. On or before September 15, 1992, Highmark timely filed a Form 1120, U.S. Corporation Income Tax Return, for the 1991 tax year with the Internal Revenue Service Center at Philadelphia, Pennsylvania, reporting total tax in the amount of $30,256,011. The name, address, and identification number appearing on that return were as follows:

Pennsylvania Blue Shield and Subsidiaries
P.O. Box 890089
Camp Hill, PA 17089
EIN: 23-1294723

35. Highmark paid in full to the Internal Revenue Service Center at Philadelphia, Pennsylvania the tax reported to be due on its 1991 return as follows:

a. $396,193 originally paid for the 1990 tax year and applied as a credit to the 1991 tax year.

b. $3,000,000 of estimated tax paid on or before April 15, 1991.

c. $3,500,000 of estimated tax paid on or before June 15, 1991.

d. $9,500,000 of estimated tax paid on or before September 16, 1991.

e. $11,000,000 of estimated tax paid on or before December 16, 1991.

f. $4,400,000 of tax paid on or before March 16, 1992.

36. During the 1991 tax year, various healthcare coverage contracts held by Highmark on January 1, 1987 were terminated or canceled, causing Highmark to suffer actual losses for which it is entitled to deductions of at least $50,607,340 under Code § 165 for the 1991 tax year.

a. On Highmark's originally filed Form 1120, U.S. Corporation Income Tax Return, for 1991, Highmark did not claim deductions for the losses described in paragraph 36 nor deductions for Alternative Tax Net Operating Loss carryforwards resulting from loss deductions under Code § 165 in the amounts specified in paragraph 30 for prior taxable years.

b. On or before September 15, 1995, Highmark filed a Form 1120X, Amended U.S. Corporation Income Tax Return, for the 1991 tax year with the Internal Revenue Service Center at Philadelphia, Pennsylvania. This Form 1120X made a claim for refund based on, among other items, the losses described in paragraph 36.a.

c. During November 1998, Highmark submitted an informal claim for refund for Highmark's 1991 tax year with Highmark's examination team. This informal claim revised the amount of the deductions claimed in the previously filed Form 1120X based on a revised valuation of the losses with respect to the healthcare coverage contracts.

37. The IRS has not formally granted or denied Highmark's claim for refund for 1991. Highmark neither received a statutory notice of claim disallowance nor executed a Form 2297, Waiver of Statutory Notice of Claim Disallowance.

38. As a result of the IRS' failure to allow the claim for refund with respect to the deduction for losses on the healthcare coverage contracts and Alternative Tax Net Operating Loss carryforwards described in paragraphs 36.a through c above, Highmark overpaid its federal income tax for the 1991 tax year and is entitled to a refund in the

amount of at least $12,824,666, or such other amount as provided by law, plus interest as provided by law.

## COUNT TWO
## (1992 TAX YEAR)

39. On or before September 15, 1993, Highmark timely filed a Form 1120, U.S. Corporation Income Tax Return, for the 1992 tax year with the Internal Revenue Service Center at Philadelphia, Pennsylvania, reporting total tax in the amount of $40,715,744. The name, address, and identification number appearing on that return were as follows:

> Pennsylvania Blue Shield and Subsidiaries
> P.O. Box 890089
> Camp Hill, PA 17089
> EIN: 23-1294723

40. Highmark paid in full to the Internal Revenue Service Center at Philadelphia, Pennsylvania the tax reported to be due on its 1992 return as follows:

a. $1,368,595 originally paid for the 1991 tax year and applied as a credit to the 1992 tax year.

b. $2,800,000 of estimated tax paid on or before April 15, 1992.

c. $8,000,000 of estimated tax paid on or before June 15, 1992.

d. $8,100,000 of estimated tax paid on or before September 15, 1992.

e. $16,000,000 of estimated tax paid on or before December 15, 1992.

f. $6,000,000 of tax paid on or before March 15, 1993.

41. During the 1992 tax year, various healthcare coverage contracts held by Highmark on January 1, 1987 were terminated or canceled, causing Highmark to suffer actual losses for which it is entitled to deductions of at least $12,341,374 under Code § 165 for the 1992 tax year.

a. On Highmark's originally filed Form 1120, U.S. Corporation Income Tax Return, for 1992, Highmark did not claim deductions for the losses described in paragraph 41.

b. On or before September 13, 1996, Highmark filed a Form 1120X, Amended U.S. Corporation Income Tax Return, for the 1992 tax year with the Internal Revenue Service Center at Philadelphia, Pennsylvania. The Form 1120X made a claim for refund based on, among other items, the losses described in paragraph 41.

c. During November 1998, Highmark submitted an informal claim for refund for Highmark's 1992 tax year with Highmark's examination team. This informal claim revised the amount of the deductions claimed in the previously filed Form 1120X based on a revised valuation of the losses with respect to the healthcare coverage contracts.

42. On examination of the revised 1992 claim for refund, the IRS erroneously determined that the losses described in paragraphs 41.a through c above were not deductible from Highmark's 1992 income, and refused to grant that claim. On September 29, 2003, the IRS sent Highmark, via certified mail, a Statutory Notice of Claim Disallowance that included the tax year ended December 31, 1992. This notice is attached as Exhibit A.

43. As a result of the IRS' denial of the claim for refund with respect to the deduction for losses on the healthcare coverage contracts described in paragraphs 41.a through c above, Highmark overpaid its federal income tax for the 1992 tax year and is entitled to a

refund in the amount of $2,468,275, or such other amount as provided by law, plus interest as provided by law.

**COUNT THREE**
**(1993 TAX YEAR)**

44. On or before September 15, 1994, Highmark timely filed a Form 1120, U.S. Corporation Income Tax Return, for the 1993 tax year with the Internal Revenue Service Center at Philadelphia, Pennsylvania, reporting total tax in the amount of $41,867,883. The name, address, and identification number appearing on that return were as follows:

Pennsylvania Blue Shield and Subsidiaries
P.O. Box 890089
Camp Hill, PA 17089
EIN: 23-1294723

45. Highmark paid in full to the Internal Revenue Service Center at Philadelphia, Pennsylvania the tax reported to be due on its 1993 return as follows:

a. $1,549,369 originally paid for the 1992 tax year and applied as a credit to the 1993 tax year.

b. $10,540,980 of estimated tax paid on or before April 15, 1993.

c. $7,000,000 of estimated tax paid on or before June 15, 1993.

d. $9,200,000 of estimated tax paid on or before September 15, 1993.

e. $13,000,000 of estimated tax paid on or before December 15, 1993.

f. $600,000 of tax paid on or before March 15, 1994.

46. During the 1993 tax year, various healthcare coverage contracts held by Highmark on January 1, 1987 were terminated or canceled, causing Highmark to suffer actual losses for which it is entitled to deductions of at least $9,753,960 under Code § 165 for the 1993 tax year.

a. On Highmark's originally filed Form 1120, U.S. Corporation Income Tax Return, for 1993, Highmark did not claim deductions for the losses described in paragraph 46.

b. On November 25, 1997, Highmark submitted an informal claim for refund for the 1993 tax year with Highmark's examination team. Highmark claimed deductions with respect to the losses described in paragraph 46.a.

c. During November 1998, Highmark submitted a revised informal claim for refund for the 1993 tax year with its examination team. This informal claim revised the amount of the deductions claimed in the prior informal claim based on a revised valuation of the losses with respect to healthcare coverage contracts.

47. On examination of the 1993 claim for refund, as revised, the IRS erroneously determined that the losses described in paragraphs 46.a through c above were not deductible from Highmark's 1993 income, and refused to grant that claim. On September 29, 2003, the IRS sent Highmark, via certified mail, a Statutory Notice of Claim Disallowance that included the tax year ended December 31, 1993. This notice is attached as Exhibit A.

48. As a result of the IRS' denial of the claim for refund with respect to the deduction for losses on the healthcare coverage contracts described in paragraphs 46.a through c above, Highmark overpaid its federal income tax for the 1993 tax year and is entitled to a refund in the amount of $1,950,792, or such other amount as provided by law, plus interest as provided by law.

## COUNT FOUR
## (1994 TAX YEAR)

49. On or before September 15, 1995, Highmark timely filed a Form 1120, U.S. Corporation Income Tax Return, for the 1994 tax year with the Internal Revenue Service Center at Philadelphia, Pennsylvania, reporting total tax in the amount of $35,780,069. The name, address, and identification number appearing on that return were as follows:

Pennsylvania Blue Shield and Subsidiaries
P.O. Box 890089
Camp Hill, PA 17089
EIN: 23-1294723

50. Highmark paid in full to the Internal Revenue Service Center at Philadelphia, Pennsylvania the tax reported to be due on its 1994 return as follows:

a. $12,065 originally paid for the 1993 tax year and applied as a credit to the 1994 tax year.

b. $10,500,000 of estimated tax paid on or before April 15, 1994.

c. $10,500,000 of estimated tax paid on or before June 15, 1994.

d. $3,000,000 of estimated tax paid on or before September 15, 1994.

e. $4,000,000 of estimated tax paid on or before December 15, 1994.

f. $7,900,000 of tax paid on or before March 15, 1995.

51. During the 1994 tax year, various healthcare coverage contracts held by Highmark on January 1, 1987 were terminated or canceled, causing Highmark to suffer actual losses for which it is entitled to deductions of at least $11,682,885 under Code § 165 for the 1994 tax year.

a. On Highmark's originally filed Form 1120, U.S. Corporation Income Tax Return, for 1994, Highmark did not claim deductions for the losses described in paragraph 51.

b. On November 25, 1997, Highmark submitted an informal claim for refund for the 1994 tax year with Highmark's examination team. Highmark claimed deductions with respect to the losses described in paragraph 51.

c. During November 1998, Highmark submitted a revised informal claim for refund with Highmark's examination team. This claim revised the amount of the deductions claimed in the prior informal claim based on a revised valuation of the losses with respect to healthcare coverage contracts.

52. On examination of the 1994 claim for refund, as revised, the IRS erroneously determined that the losses described in paragraphs 51.a through c above were not deductible from Highmark's 1994 income, and refused to grant that claim. On September 29, 2003, the IRS sent Highmark, via certified mail, a Statutory Notice of Claim Disallowance that included the tax year ended December 31, 1994. This notice is attached as Exhibit A.

53. As a result of the IRS' denial of the claim for refund with respect to the deduction for losses on the healthcare coverage contracts described in paragraphs 51.a through c above, Highmark overpaid its federal income tax for the 1994 tax year and is entitled to a refund in the amount of $2,336,577, or such other amount as provided by law, plus interest as provided by law.

**COUNT FIVE**
**(1995 TAX YEAR)**

54. On or before September 15, 1996, Highmark timely filed a Form 1120, U.S. Corporation Income Tax Return, for the 1995 tax year with the Internal Revenue Service Center at Philadelphia, Pennsylvania, reporting total tax in the amount of $7,828,563. The name, address, and identification number appearing on that return were as follows:

Pennsylvania Blue Shield and Subsidiaries
P.O. Box 890089
Camp Hill, PA 17089
EIN: 23-1294723

55. Highmark paid in full to the Internal Revenue Service Center at Philadelphia, Pennsylvania the tax reported to be due on its 1995 return as follows:

a. $131,996 originally paid for the 1994 tax year and applied as a credit to the 1995 tax year.

b. $4,000,000 of estimated tax paid on or before April 17, 1995.

c. $4,010,000 of tax paid on or before March 15, 1996.

56. During the 1995 tax year, various healthcare coverage contracts held by Highmark on January 1, 1987 were terminated or canceled, causing Highmark to suffer actual losses for which it is entitled to a deduction of at least $8,748,047 under Code § 165 for the 1995 tax year.

a. On Highmark's originally filed 1995 Form 1120, U.S. Corporation Income Tax Return, Highmark claimed deductions for the losses described in paragraph 56.

b. During November 1998, Highmark submitted an informal claim for refund for the 1995 tax year with Highmark's examination team. This claim

revised the amount of the deductions claimed in the original return based on a revised valuation of the losses with respect to healthcare coverage contracts.

57. On examination of the 1995 claim for refund, the IRS erroneously determined that the losses described in paragraphs 56.a and 56.b above were not deductible from Highmark's 1995 income, and refused to grant that claim. On September 29, 2003, the IRS sent Highmark, via certified mail, a Statutory Notice of Claim Disallowance that included the tax year ended December 31, 1995. This notice is attached as Exhibit A.

58. As a result of the IRS' denial of the claim for refund with respect to the deduction for losses on the healthcare coverage contracts described in paragraphs 56.a and 56.b above, Highmark overpaid its federal income tax for the 1995 tax year and is entitled to a refund in the amount of $1,749,609, or such other amount as provided by law, plus interest as provided by law.

**CONCLUSION**

59. By reason of the foregoing, Highmark has overpaid its federal income tax for the tax years 1991 through 1995.

60. No final action on the claims for refund set forth above has been taken by Congress or by any agency of the United States (other than as described herein) or in any judicial proceeding, including any proceeding in the United States Tax Court.

61. Highmark is the sole owner of this claim and has not assigned or transferred any part of this claim.

WHEREFORE, Highmark prays for judgment against the United States of the sum of $21,329,919, or such other amount as provided by law, representing overpayments in tax, plus

interest thereon as provided by law, and such costs and attorneys' fees as are available, and such other and further relief that this Court deems equitable and proper.

Respectfully submitted,

Arthur Newbold /amk

Arthur Newbold
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103
Phone (215) 994-2624
Fax (215) 655-2624
Counsel for Plaintiff

Date: September 23, 2005

Of Counsel:

Frederick J. Gerhart
James J. Spadaro, Jr.
Andrea M. Kirshenbaum
Alexandra L. Yeadon
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103

**Internal Revenue Service**
Appeals Office
701 Market Street
Suite 2200
Philadelphia PA 19106

**Department of the Treasury**

**Person to Contact:**
Margaret Crouse
Employee ID Number: 23-08357
Tel: 215-597-2177 Ext. 135
Fax: 215-597-7827
**Refer Reply to:**
AP:FE:PA:PHI:MC
**In Re:**
Income
**Claim Amount(s):**
To be determined
**Tax Period(s) Ended:**
12/1992 12/1993 12/1994 12/1995
12/1996

Date: SEP 29 2003

PENNSYLVANIA BLUE SHIELD AND
SUBSIDIARIES
C/O HIGHMARK
120 FIFTH AVE., SUITE 922
PITTSBURGH PA 15222-3001

**Certified Mail**

Pennsylvania Blue Shield:

We are sorry, but we cannot allow the above claim for an adjustment to your tax, for the following reasons:

**See attached statement.**

Our decision is based on provisions of the Internal Revenue laws and regulations. This letter is your legal notice that your claim is fully disallowed.

If you wish to bring suit or proceedings for the recovery of any tax, penalties or other moneys for which this disallowance notice is issued, you may do so by filing such a suit with the United States District Court having jurisdiction, or with the United States Court of Federal Claims. The law permits you to do this within 2 years from the mailing date of this letter. However, if you signed a waiver of the notice of claim disallowance (Form 2297), the period for bringing suit began to run on the date you filed the waiver.

If you have any questions, please contact the person whose name and telephone number are shown above.

Sincerely,

Margaret M. Crouse
Appeals Team Case Leader

Subscriber Contracts

In making this determination of your income tax liability, careful consideration has been given to your informal claim for refund for the taxable years 1987 through 1996. It is determined that the amounts claimed as deductions for abandonment losses are not allowable because it has not been established that any abandonment occurred during the taxable years, or that any losses were sustained. Furthermore, the fair market value of each asset as of the first day of the first taxable year beginning after December 31, 1986, has not been established.

In addition, it is determined that your specific individual contracts with employers and subscribers are components of intangible assets which constitute single indivisible assets, including customer-based intangibles. Accordingly, no current loss deduction is allowable upon the termination or nonrenewal of a single employer or subscriber relationship or similar component of these indivisible assets.

In addition, the basis step-up provided by section 1012(c)(3)(A)(ii) of the Tax Reform Act of 1986 is available solely for purposes of determining gain or loss upon the sale or exchange of assets, not for purposes of determining amounts of depreciation or for other purposes. The basis step-up is not available for annual current deductions based upon the termination or nonrenewal of specific individual employer or subscriber contracts, because such annual current deductions are equivalent to the amortization of the single indivisible assets.

In addition, by enacting section 1012(c)(3)(A)(ii) of the Tax Reform Act of 1986, Congress intended to take away the advantage Blue Cross Blue Shield organizations enjoyed as tax-exempt entities in competing with commercial insurance companies by immediately subjecting such organizations to the payment of federal income taxes to the same extent as commercial insurance providers. The annual current deduction of a portion of the basis step-up would be inconsistent with the intention to remove the competitive advantage of Blue Cross Blue Shield organizations and would effectively delay their taxation on the same basis as commercial insurance companies.

In addition, since no annual current deductions were claimed for the termination or nonrenewal of specific individual employer or subscriber contracts for two or more consecutive taxable years, such contracts have been treated as single indivisible customer-based intangible assets. This treatment constitutes a method of accounting. The deduction of annual current amounts constitutes a change in method of accounting, which is not allowable without the consent of the Commissioner.

Provider Relationships

In making this determination of your income tax liability, careful consideration has been given to your informal claim for refund for the taxable years 1987 through 1996. It is determined that the amounts claimed as deductions for abandonment losses are not allowable because it has not been established that any abandonment occurred during

the taxable years, or that any losses were sustained. Furthermore, the fair market value of each asset as of the first day of the first taxable year beginning after December 31, 1986, has not been established.

In addition, it is determined that your specific individual contracts with providers and provider organizations are components of intangible assets which constitute single indivisible assets, including supplier-based intangibles. Accordingly, no current loss deduction is allowable upon the termination or nonrenewal of a single provider or provider organization relationship, or similar component of these indivisible assets.

In addition, the basis step-up provided by section 1012(c)(3)(A)(ii) of the Tax Reform Act of 1986 is available solely for purposes of determining gain or loss upon the sale or exchange of assets, not for purposes of determining amounts of depreciation or for other purposes. The basis step-up is not available for annual current deductions based upon the termination or nonrenewal of specific individual provider or provider organization contracts, because such annual current deductions are equivalent to the amortization of the single indivisible assets.

In addition, by enacting section 1012(c)(3)(A)(ii) of the Tax Reform Act of 1986, Congress intended to take away the advantage Blue Cross Blue Shield organizations enjoyed as tax-exempt entities in competing with commercial insurance companies by immediately subjecting such organizations to the payment of federal income taxes to the same extent as commercial insurance providers. The annual current deduction of a portion of the basis step-up would be inconsistent with the intention to remove the competitive advantage of Blue Cross Blue Shield organizations and would effectively delay their taxation on the same basis as commercial insurance companies.

In addition, since no annual current deductions were claimed for the termination or nonrenewal of specific individual provider or provider organization contracts for two or more consecutive taxable years, such contracts have been treated as single indivisible supplier-based intangible assets. This treatment constitutes a method of accounting. The deduction of annual current amounts constitutes a change in method of accounting, which is not allowable without the consent of the Commissioner.

<u>Assembled Workforce</u>

In making this determination of your income tax liability, careful consideration has been given to your informal claim for refund for the taxable years 1987 through 1996. It is determined that the amounts claimed as deductions for abandonment losses are not allowable because it has not been established that any abandonment occurred during the taxable years, or that any losses were sustained. Furthermore, the fair market value of each asset as of the first day of the first taxable year beginning after December 31, 1986, has not been established.

In addition, it is determined that your specific individual contracts with employees are components of intangible assets which constitute single indivisible assets, including

workforce in place intangibles. Accordingly, no current loss deduction is allowable upon the termination or nonrenewal of a single employee relationship or similar component of these indivisible assets.

In addition, by enacting section 1012(c)(3)(A)(ii) of the Tax Reform Act of 1986, Congress intended to take away the advantage Blue Cross Blue Shield organizations enjoyed as tax-exempt entities in competing with commercial insurance companies by immediately subjecting such organizations to the payment of federal income taxes to the same extent as commercial insurance providers. The annual current deduction of a portion of the basis step-up would be inconsistent with the intention to remove the competitive advantage of Blue Cross Blue Shield organizations and would effectively delay their taxation on the same basis as commercial insurance companies.

In addition, the basis step-up provided by section 1012(c)(3)(A)(ii) of the Tax Reform Act of 1986 is available solely for purposes of determining gain or loss upon the sale or exchange of assets, not for purposes of determining amounts of depreciation or for other purposes. The basis step-up is not available for annual current deductions based upon the termination or nonrenewal of specific individual employee contracts, because such annual current deductions are equivalent to the amortization of the single indivisible assets.

In addition, since no annual current deductions were claimed for the termination or nonrenewal of specific individual employee contracts for two or more consecutive taxable years, such contracts have been treated as single indivisible workforce in place intangible assets. This treatment constitutes a method of accounting. The deduction of annual current amounts constitutes a change in method of accounting, which is not allowable without the consent of the Commissioner.