05-1030 T
(Judge Margolis)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HIGHMARK, INC., SUCCESSOR IN INTEREST TO
PENNSYLVANIA BLUE SHIELD AND SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF

EILEEN J. O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
W.C. RAPP
KAREN SERVIDEA
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 616-3423
(202) 514-9440 (Fax)

# TABLE OF CONTENTS

**Page:**


Motion for Summary Judgment . . . . . 1

Brief in Support of United States' Motion for Summary Judgment . . . . . 3

Questions Presented . . . . . 3

Authorities Involved . . . . . 4

Summary of Argument . . . . . 4

Statement . . . . . 8

Argument . . . . . 11

**I. THE FRESH-START BASIS PROVISION DOES NOT APPLY TO THE DEDUCTIONS PLAINTIFF CLAIMS** . . . . . 11

A. The Fresh-Start Basis Does Not Give Plaintiff an Adjusted Basis in Its Healthcare Coverage Contracts . . . . . 11

i. Plaintiff's Interpretation Conflicts with the Fundamental Concept of Tax Basis . . . . . 11

ii. Plaintiff's Interpretation Conflicts with the Broader Statutory Framework and Purpose of § 1012 of the Tax Reform Act . . . . . 14

B. The Fresh-Start Basis Provision Applies Only to Gain or Loss Upon the Sale or Exchange of an Asset . . . . . 16

i. The Provision Does Not Apply to "*Any*" Loss . . . . . 17

ii. "Gain or loss" Generally Refers to Sales, Exchanges, and Other Dispositions of Property . . . . . 19

iii. The Legislative History Shows That the Fresh-Start Basis Is Available for Only Sales and Exchanges . . . . . 19

iv. As Interpreted by Plaintiff, the Fresh-Start Basis Provision Would Not Serve the Purpose for Which It Was Enacted . . . . . 21

## TABLE OF CONTENTS (CONTINUED)

**Page:**

v. Plaintiff's Interpretation of the Fresh-Start Basis Provision Is Inconsistent with the Inapplicability of the Provision to Depreciation Deductions . . . . . . . . . . 23

II. PLAINTIFF IS NOT ENTITLED TO A REFUND BECAUSE IT MADE AN UNAUTHORIZED CHANGE IN ITS METHOD OF ACCOUNTING . . . . . 26

A. Plaintiff Changed from Treating Its Contracts as One Asset to Treating Them as Discrete Assets . . . . . . . . . . . . . 28

B. Plaintiff Changed from Expensing to Capitalizing the Costs of Creating Contracts . . . . . . . . . . . . . . . . . . . . . . . . . 33

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Appendix A: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Internal Revenue Code of 1986 (26 U.S.C.):

§ 162 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
§ 165 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
§ 263 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
§ 446 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2
§ 832 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3
§ 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3
§ 1011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3
§ 1012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4
§ 1016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4

Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085:
§ 1012, 100 Stat. 2085, 2390 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5

Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494:
§ 177, 98 Stat. 494, 709 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-10

Treas. Reg. (26 C.F.R.):

§ 1.446-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-14

## TABLE OF CONTENTS (CONTINUED)


Appendix B (Separately Bound): **<u>Page</u>:**

Declaration of Karen Servidea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-1

Exhibit 1: Plaintiff's Second Amended Response to Defendant's First Set of Requests for Admissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-3

Exhibit 2: Plaintiff's Second Amended Answers to Defendant's First Set of Interrogatories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-33

Exhibit 3: Excerpt from the 1991 Annual Statement of Pennsylvania Blue Shield ("PBS"), attached to PBS's 1991 tax return . . . . . . . . . . . . . . B-61

Exhibit 4: Excerpt from the 1993 Annual Statement of PBS, attached to PBS's 1993 tax return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-68

Exhibit 5: Excerpt from the 1994 Annual Statement of PBS, attached to PBS's 1994 tax return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-81

Exhibit 6: IRS Certificate of Official Record for Highmark, Inc., for tax years 1991through 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-93

Exhibit 7: PricewaterhouseCoopers Valuation Report dated September 10, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B-120

# TABLE OF AUTHORITIES

**Cases**: **Page(s):**

*Aluminum Castings Co. v. Routzahn*, 282 U.S. 92 (1930) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Capital Blue Cross v. Commissioner*, 122 T.C. 224 (2004),
*rev'd* 431 F.3d 117 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Capital Blue Cross v. Commissioner*, 431 F.3d 117 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 5

*Dick v. Office of Personnel Mgmt.*, 216 F.3d 1353 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 20

*Diebold, Inc. v. United States*, 891 F.2d 1579 (Fed. Cir. 1989),
*cert. denied*, 498 U.S. 823 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Federal Home Loan Mortgage Corp. v. Commissioner*, 121 T.C. 129 (2003) . . . . . . . . . . . . . . 25

*FPL Group, Inc. v. Commissioner*, 115 T.C. 554 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Golden State Towel & Linen Serv., Ltd. v. United States*, 373 F.2d 938 (Ct. Cl. 1967) . . . . . . . 28

*INDOPCO, Inc. v. Commissioner*, 503 U.S. 79 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Johnson*, 787 F.2d 1179 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Knight-Ridder Newspapers, Inc. v. United States*, 743 F.2d 781 (11th Cir. 1984) . . . . . . . . . . . 27

*Newark Morning Ledger Co. v. United States*, 507 U.S. 546 (1993) . . . . . . . . . . . . . . . . . . . . . 28

*Nixon v. Missouri Municipal League*, 541 U.S. 125 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Orquera v. Ashcroft*, 357 F.3d 413 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Pelaez & Sons, Inc. v. Commissioner*, 114 T.C. 473 (2000),
*aff'd* 253 F.3d 711 (11th Cir. 2001) (Table) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Public Citizen v. United States Dep't of Justice*, 491 U.S. 440 (1989) . . . . . . . . . . . . . . . . . . . 21

*Public Opinion Publ'g Co. v. Jensen*, 76 F.2d 494 (8th Cir. 1935) . . . . . . . . . . . . . . . . . . . . . . 32

*Reves v. Ernst & Young*, 494 U.S. 56 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## TABLE OF AUTHORITIES (CONTINUED)

**Cases**: **Page(s):**

*Stephens Marine, Inc. v. Commissioner*, 430 F.2d 679 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . 28

*Sterling Fed. Sys., Inc. v. Goldin*, 16 F.3d 1177 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Trigon Insurance Co. v. United States*, 215 F. Supp. 2d 687 (E.D. Va. 2002) . . . . . . . . . . . . . 4, 5

*United States v. Gonzales*, 520 U.S. 1 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statutes:** **Page(s):**

Internal Revenue Code of 1986 (26 U.S.C.):

§ 162 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 34
§ 165 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
§ 167 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
§ 172 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
§ 263 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34
§ 446 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 37
§ 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
§ 832 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34
§ 833 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
§ 954 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
§ 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
§ 1011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19
§ 1012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 14
§ 1016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 34
§ 1223 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
§ 1231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085:
§ 1012, 100 Stat. 2085, 2390 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494:
§ 177, 98 Stat. 494, 709 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

## TABLE OF AUTHORITIES (CONTINUED)

**<u>Miscellaneous</u>**: **<u>Page(s)</u>:**

H.R. Conf. Rep. No. 99-841 (1986),
*reprinted in* 1986 U.S.C.C.A.N. 4075 . . . . . . . . . . . . . . . . . . . . . . 8, 20, 21-22, 25

H.R. Rep. No. 99-426 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Norman J. Singer, *Statutes and Statutory Construction* (6th ed. 2000) . . . . . . . . 13, 14, 21

Revenue Procedure 69-29, 1969-2 C.B. 311 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Revenue Ruling 90-38, 1990-1 C.B. 57 (1990) . . . . . . . . . . . . . . . . . . . . . . . 27, 29, 34-35

Rules of the Court of Federal Claims:
R. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Staff of Joint Comm. on Taxation, 99th Cong., *General Explanation of the Tax Reform Act of 1986* (Joint Comm. Print 1987) . . . . . . . . . . . 8, 20, 22, 25

Treas. Reg. (26 C.F.R.):

§ 1.162-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
§ 1.167(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
§ 1.263(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
§ 1.446-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29, 35

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1030 T
(JUDGE MARGOLIS)

HIGHMARK, INC., SUCCESSOR IN INTEREST TO
PENNSYLVANIA BLUE SHIELD AND SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

UNITED STATES' MOTION FOR SUMMARY JUDGMENT

Defendant, the United States of America, pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"), moves for summary judgment on the grounds that there is no genuine issue as to any material fact and that defendant is entitled to judgment as a matter of law.

In support of its motion, defendant relies on the pleadings, the following brief, and defendant's proposed findings of uncontroverted fact.

Wherefore, defendant prays that the Court grant defendant's motion for summary judgment.

Respectfully submitted,

s/ Karen Servidea
KAREN SERVIDEA
*Attorney of Record*
*United States Department of Justice*
*Tax Division*
*Court of Federal Claims Section*
*Post Office Box 26*
*Ben Franklin Post Office*
*Washington, D.C. 20044*
*Voice: (202) 616-3423*
*Fax: (202) 514-9440*
*Email: karen.e.servidea@usdoj.gov*

EILEEN J. O'CONNOR
*Assistant Attorney General*
DAVID GUSTAFSON
*Chief, Court of Federal Claims Section*
W.C. RAPP
*Senior Trial Attorney*

February 15, 2007
Date

s/ W.C. Rapp
Of Counsel

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1030 T
(JUDGE MARGOLIS)

HIGHMARK, INC., SUCCESSOR IN INTEREST TO
PENNSYLVANIA BLUE SHIELD AND SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

BRIEF FOR THE UNITED STATES IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT

This is an action for the recovery of federal income tax paid for the five taxable years ending December 31, 1991, through December 31, 1995, plus statutory interest thereon.

QUESTIONS PRESENTED

1. Whether the "fresh-start basis" provision of the Tax Reform Act of 1986 is available to shield income from taxation via artificial loss deductions upon the expiration or cancellation of healthcare insurance contracts in the ordinary course of plaintiff's business.

2. Whether plaintiff made an unauthorized change of accounting method in its treatment of the development and termination of healthcare coverage contracts.

## AUTHORITIES INVOLVED

The pertinent portions of the authorities involved are set forth in Appendix A, *infra*.[1]

## SUMMARY OF ARGUMENT

Plaintiff is a Blue Cross/Blue Shield health insurance company. In the instant case, plaintiff claims loss deductions for the termination of various of its insurance contracts. For this purpose, plaintiff claims that, as part of the Tax Reform Act of 1986, plaintiff received a stepped-up basis in the contracts. The Government contends that the basis-adjustment provision invoked by plaintiff does not apply to the claimed deductions, because insurance contracts have no pre-existing cost basis, and because the provision applies only to gain or loss upon the sale or exchange of an asset. The Government also maintains that plaintiff is not entitled to the deductions claimed, because they constitute a change in method of accounting for which plaintiff failed to secure the consent of the Commissioner.

Three published court decisions have addressed the types of deductions claimed by plaintiff in this case. *See Trigon Insurance Co. v. United States*, 215 F. Supp. 2d 687 (E.D. Va. 2002) (holding that, as a legal matter, the taxpayer was entitled to use the basis-adjustment provision for purposes of claiming loss deductions for terminated healthcare coverage contracts but that, as a factual matter, the taxpayer had failed to establish the value of the terminated contracts); *Capital Blue Cross v. Commissioner*, 122 T.C. 224 (2004), *rev'd* 431 F.3d 117 (3d Cir. 2005) (holding that the basis-adjustment provision applies to deductions claimed upon the termination of healthcare coverage contracts but that the taxpayer had failed to establish that the

---

[1] Unless otherwise noted, the term "I.R.C." followed by either a section symbol ("§") or the word "section" shall refer to the Internal Revenue Code of 1986, codified in Title 26 of the United States Code, as amended and in effect during the relevant period.

contracts are capable of being valued separately as individual assets); *Capital Blue Cross v. Commissioner*, 431 F.3d 117 (3d Cir. 2005) (holding that the taxpayer had established that terminated healthcare coverage contracts are capable of separate valuation and that the taxpayer's valuation methodology was reasonable). None of the decisions have addressed the second argument raised in this motion (that plaintiff is not entitled to a refund because it made an unauthorized change in its method of accounting), and, although both trial courts rejected the first argument (that the basis-adjustment provision does not apply to these types of deductions), no appellate court has considered it.[2] Moreover, although both trial courts found the plain language of the basis-adjustment provision to encompass the types of deductions claimed by plaintiff, neither court considered the distinction between the phrase "gain or loss" and the phrase "any loss," as used in the Internal Revenue Code (*see infra* Section I.B.i-ii) or the conflict between plaintiff's interpretation of the provision and the fundamental concept of cost basis (*see infra* Section I.A). *See Trigon*, 215 F. Supp. 2d at 696-701; *Capital*, 122 T.C. at 234-38.

Before 1987, organizations such as plaintiff were exempt from federal income taxes as charitable and social welfare organizations. In 1986, Congress determined that changes in the health insurance market had eliminated the basis for exemption of such "Blues," and revoked their exemptions, beginning in 1987, by the passage of the Tax Reform Act of 1986. Congress

---

[2] The Third Circuit briefly considered and rejected a variation on one of the points raised in the first argument herein. The court dismissed the Commissioner's contention that the fresh-start basis provision does not apply to the claimed deductions *because* of their equivalence to depreciation deductions. *See Capital*, 431 F.3d at 127 n.3. The court did not consider, however, how that equivalence renders the statute ambiguous with respect to its application to non-sale-or-exchange loss deductions. *See infra* Section I.B.v.

expected the newly-taxable Blues to compete on an equal footing with other health insurers. To accomplish this, the Tax Reform Act provided for certain transitional rules.

One such rule dealt with taxation of gain that had accrued while a Blue had been tax-exempt. When a taxpayer sells property its taxable gain is the difference between the amount it receives on the sale, and its tax "basis" in the property (*i.e.*, its cost plus capital expenditures, less depreciation). An organization in plaintiff's position might own real estate, such as a headquarters building or the like, that had been purchased long ago, and which had enjoyed substantial appreciation in value during the time before 1987, when plaintiff was exempt from tax. Believing it to be unfair to tax gains attributable to such pre-1987 appreciation, Congress provided that the basis of such property (for certain purposes, but not others) would be its fair market value as of the date the organization became taxable for the first time. For plaintiff, that magic date was January 1, 1987. As a consequence of this rule, the Blues would pay tax only on appreciation that had occurred *after* 1986.

In the instant case, plaintiff asserts that this provision not only spares plaintiff from tax on pre-1987 appreciation but also gives plaintiff a basis in each and every healthcare contract in force as of January 1, 1987. Plaintiff then claims substantial tax benefits not by overtly deducting that basis upon the sale of one or another of the contracts, nor by claiming depreciation deductions of that basis (a treatment disallowed by the provision). Instead, plaintiff carefully threads this legal needle by claiming deductions of the artificially created basis of each contract when, in the ordinary course of plaintiff's business, the contract ceased to be renewed either by the insured or by plaintiff. Plaintiff claims these deductions as "abandonment losses" under I.R.C. § 165(a).

The "fresh-start basis" language upon which plaintiff relies provides that "[in] the case of any existing Blue Cross or Blue Shield organization . . . (ii) for purposes of determining gain or loss, the adjusted basis of any asset held on the 1st day of [its first taxable year beginning after December 31, 1986,] shall be treated as equal to its fair market value as of such day."[3] Plaintiff contends that this provision operates not just to adjust the basis of property that already had a basis as of January 1, 1987, but also to create basis in property that, because it was neither purchased, nor created via capital expenditures, never had a tax basis. This interpretation of the fresh-start provision conflicts with the fundamental concept that a taxpayer must incur a capital cost to obtain a tax-recognizable basis in an asset. Moreover, by enabling plaintiff to shield substantial amounts of income from taxation via a device unavailable to other health insurers, plaintiff's interpretation undermines Congress's larger purpose in enacting the Tax Reform Act: *repealing* the Blues' tax exemption.

Plaintiff's claim is based also on the premise that the termination of a contract constitutes a "loss" under the fresh-start statute. Interpretation of the phrase "for purposes of determining gain or loss," however, requires resort to the legislative history for two reasons. First, the phrase "gain or loss" is used in the Internal Revenue Code in a variety of contexts, with a variety of particular meanings and applications, and the text of the fresh-start basis provision does not clearly specify one or another of those meanings. Furthermore, the specific reason for the fresh-start basis provision – to shield pre-1987 appreciation from taxation – has no application where the taxpayer has not received potentially taxable consideration in a sale of property. The

---

[3] Tax Reform Act of 1986 ("TRA 1986"), Pub. L. No. 99-514, § 1012 (c)(3)(A)(ii), 100 Stat. 2085, 2394 (1986) (underlining added).

legislative history of the "fresh-start" basis provision makes clear that Congress did not intend the anti-competitive windfall claimed by plaintiff. The provision originated in the Conference Committee, which explained that "[t]he basis step-up is provided solely for purposes of determining gain or loss upon sale or exchange of the assets, not for purposes of determining amounts of depreciation or for other purposes." H.R. Conf. Rep. No. 99-841, at II-350 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4438; *see also* Staff of Joint Comm. on Taxation, 99th Cong., *General Explanation of the Tax Reform Act of 1986*, at 591 (Joint Comm. Print 1987) ("The basis adjustment is provided solely for purposes of determining gain or loss upon sale or exchange of the assets, not for purposes of determining amounts of depreciation or for other purposes").

STATEMENT

At all times relevant to this case, plaintiff was a Pennsylvania nonprofit corporation doing business as an independent licensee of the Blue Cross and Blue Shield Association. Def. Proposed Finding (hereinafter "DPF") 1. As a provider of health insurance, plaintiff is party to healthcare coverage contracts with individual and group subscribers. DPF 2. These contracts obligate plaintiff to pay the healthcare costs of the individual or group members in exchange for the subscriber's payment of an insurance premium. DPF 3.

In the ordinary course of its business, plaintiff incurs various expenses – such as advertising, salaries, actuarial fees to compute premiums, and overhead – to induce potential customers to enter into these contracts, and over the life of each contract, incurs additional expenses to keep the policy in place. DPF 4-5. For purposes of its financial accounting (both as a tax-exempt entity and as a taxable entity), plaintiff treats these as current expenses (not capital

items); and, for purposes of its tax accounting after 1986, plaintiff has treated all these as ordinary expenses (*i.e.*, both its post-1986 expenditures incurred to maintain its pre-1987 contracts, *and* its post-1986 expenditures incurred to solicit and maintain its post-1986 contracts). DPF 6-7.

On plaintiff's income tax returns for the years 1987 through 1994, as originally filed, plaintiff claimed no loss deductions for terminated contracts. DPF 8. Plaintiff claimed such loss deductions for the first time on its amended return for 1991 in September 1995 – nine years after the enactment of the "fresh-start" provision. DPF 9. Subsequently, plaintiff filed an amended return for 1992 and informal refund claims for 1993 and 1994, seeking deductions for terminated healthcare coverage contracts, and claimed similar deductions on its original 1995 return. DPF 10-11. At no time between the filing of its original returns for 1987 through 1994 (none of which claimed loss deductions for healthcare coverage contracts) and the filing of its amended 1991 and 1992 returns, 1993 and 1994 refund claims, or original 1995 return – each of which claimed loss deductions for terminated healthcare coverage contracts – did plaintiff request or secure the consent of the Internal Revenue Service (the "IRS") to this change in its method of accounting. DPF 12-14. On September 29, 2003, the IRS disallowed plaintiff's claimed deductions. Compl. Attach. A. Plaintiff initiated this lawsuit on September 26, 2005. The complaint alleges that "[i]n each tax year 1987 through 1996,[4] there were terminations and cancellations of various healthcare coverage contracts that [plaintiff] held on January 1, 1987" and that "[e]ach time one of the healthcare coverage contracts terminated or was canceled, the

[4] Although the complaint mentions contract terminations that occurred in the year 1996, the complaint neither seeks a refund for that year nor seeks to carry back losses from 1996 to any of the years for which the complaint does seek a refund.

contract became worthless and loss all usefulness in [plaintiff's] business." Compl. ¶ 24. Plaintiff further claims that, for each terminated contract, plaintiff is entitled to a deduction equal to the contract's January 1, 1987, fair market value, as provided by the fresh-start basis provision. Compl. ¶¶ 27-28. The complaint alleges, in particular, that plaintiff is entitled to tax refunds for each of the years 1991 through 1995 for contract terminations that occurred in those years. Compl. ¶¶ 36, 41, 46, 51, 56. In addition, plaintiff seeks to carry forward to 1991 losses from the years 1987 through 1990 arising from contract terminations that occurred during those years. Compl. ¶ 31.

# ARGUMENT

## I

## THE FRESH-START BASIS PROVISION DOES NOT APPLY TO THE DEDUCTIONS PLAINTIFF CLAIMS

### A. The Fresh-Start Basis Provision Does Not Give Plaintiff an Adjusted Basis in Its Healthcare Coverage Contracts

Application of the fresh-start basis provision to plaintiff's healthcare coverage contracts, as to which plaintiff has never incurred a capital cost, would conflict with the fundamental concept of tax basis. It would also undermine Congress's larger purpose in enacting § 1012 of the Tax Reform Act – that is, forcing the Blues to compete on a level playing field with commercial insurers by revoking the Blues' tax exemption – by enabling plaintiff to shield substantial amounts of income from taxation for decades after Congress repealed its exemption. The Court should therefore find that the statute does not apply to the contracts for which plaintiff claims a deduction in this case.

#### i. Plaintiff's Interpretation Conflicts with the Fundamental Concept of Tax Basis

The fresh-start statute provides an "adjusted basis" for assets held as of January 1, 1987. A taxpayer cannot have an "adjusted basis" in an asset unless the property first has a "basis." § 1011(a) ("The adjusted basis . . . shall be the basis (determined under section 1012 or other applicable sections . . . ), adjusted as provided in section 1016"). As set forth in § 1012 of the Code, the fundamental concept of a tax basis is that the taxpayer has incurred a capital cost for the asset. § 1012 ("The basis of property shall be the cost of such property"). If the fundamental requirement of incurring a capital cost is met, then the fresh-start provision allows the taxpayer to increase, or requires the taxpayer to decrease, the cost basis to allow for pre-1987 appreciation

or depreciation in value – *i.e.*, to adjust the cost basis for pre-1987 appreciation or depreciation. The fresh-start basis provision does not apply, however, to assets that had no tax basis in the taxpayer's hands as of January 1, 1987. The nature of plaintiff's costs incurred in connection with the healthcare coverage contracts as self-created assets is such that plaintiff never incurred a capital cost with respect to those contracts. The fresh-start basis provision therefore does not apply to the contracts.

The tax basis of an asset is its cost. § 1012. When a taxpayer purchases an asset from another party, the property will have a basis in the hands of the buyer equal to the purchase price. Plaintiff's insurance contracts, however, are "self-created," not purchased, intangibles. DPF 39. The tax basis of a self-created asset is equal to the capital expenditures incurred in creating it – that is, the costs of creation that the taxpayer capitalized, rather than deducted as ordinary and necessary expenses. Plaintiff, however, did not incur any capital expenditures in creating its healthcare coverage contracts. Like customer lists, subscriber lists, and the like, the contracts came into being in the ordinary course of plaintiff's business, as a consequence of many small expenditures, none of which is allocable to any particular contract. Each year, plaintiff incurs substantial expenses for advertising, a sales staff, actuaries to compute premiums and the like, all aimed at selling insurance. DPF 4. All of those expenditures are deducted by plaintiff currently, and none are capitalized as the cost of producing any particular insurance contract or all of the insurance contracts entered into by plaintiff in a particular year. DPF 6-7, 40. That is how plaintiff accounts for its insurance contracts and such expenses on an ongoing basis, and that is how plaintiff's never-tax-exempt competitors account for – and have always

accounted for – such contracts and such expenses. The contracts for which plaintiff claims a deduction therefore had no pre-existing basis as of January 1, 1987.

Plaintiff nonetheless asserts that the fresh-start statute provides plaintiff an adjusted basis in the contracts. The fallacy of plaintiff's argument is that plaintiff interprets the fresh-start provision as providing that the tax basis can consist *entirely* of pre-1987 appreciation in value, without the taxpayer having any initial capital cost basis in the contracts. In thus misconstruing the fresh-start provision, plaintiff's position would render the fresh-start provision inconsistent with the fundamental concept of a *cost* basis. *See* § 1012. It is black-letter law that the provisions of a statute will, if possible, be construed so that they will be consistent, rather than inconsistent, with other statutes dealing with the same subject matter.[5] Under plaintiff's construction of the fresh-start provision, it would be inconsistent with § 1012 of the Code. Therefore, plaintiff's construction must be rejected in favor of the Government's construction, under which no basis would be recognized in the healthcare coverage contracts for which plaintiff has no capital cost.

---

[5] Norman J. Singer, *Statutes and Statutory Construction* § 46.05 at 175-76 (6th ed. 2000) ("The general rule is followed that prior and later statutes dealing with the same subject matter although in apparent conflict, should as far as reasonably possible be construed in harmony with each other so as to allow both to stand and to give force and effect to each" (internal footnote omitted)); *see, e.g.*, *Orquera v. Ashcroft*, 357 F.3d 413, 422 (4th Cir. 2003) (rejecting a statutory interpretation that would have created a conflict between the provision in question and a separate statute on the same subject); *In re Johnson*, 787 F.2d 1179, 1181 (7th Cir. 1986) ("Where two statutes deal with the same subject matter, they are to be read in *pari materia* and harmonized when possible"); *c.f. Sterling Fed. Sys., Inc. v. Goldin*, 16 F.3d 1177, 1185 (Fed. Cir. 1994) ("[A] basic rule of statutory construction is that the whole of the statute should be considered in ascertaining the meaning of language therein").

ii. Plaintiff's Interpretation Conflicts with the Broader Statutory Framework and Purpose of § 1012[6] of the Tax Reform Act

Plaintiff's attempt to apply the fresh-start provision to its healthcare coverage contracts conflicts, not only with the fundamental concept that a taxpayer must incur a capital cost to receive basis in an asset, but also with the remainder of § 1012 of the Tax Reform Act.[7]

The congressional purpose in enacting § 1012 of the Tax Reform Act was to repeal the Blues' tax exemption and make their income subject to taxation. Not only is the statute entitled "Repeal of Tax-Exempt Status for Certain Organizations Providing Commercial-Type Insurance," but the first two of the statute's three subsections amend the Internal Revenue Code to subject the Blues to taxation,[8] leaving the third subsection to address more technical implementation rules, such as the effective date of the statute, organization-specific exemptions, and the basis adjustment at issue here.

---

[6] Coincidentally, the cost-basis rule and the fresh-start basis rule share the same section number (§ 1012) – the former refers to the Internal Revenue Code, however, while the latter refers to the Tax Reform Act of 1986.

[7] Norman J. Singer, *Statutes and Statutory Construction* § 46.05 at 174-75 (6th ed. 2000) ("[T]he general purpose, intent or purport of the whole act shall control, and . . . all the parts be interpreted as subsidiary and harmonious to its manifest object, and if the language is susceptible of two constructions, one which will carry out and the other defeat such manifest object, it should receive the former construction" (internal footnote omitted)); *see, e.g., Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990) ("[T]he phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts").

[8] Subsection (a) amends I.R.C. § 501 as follows: "An organization described in paragraph (3) or (4) of subsection [501] (c) shall be exempt from tax under subsection (a) only if no substantial part of its activities consists of providing commercial-type insurance." TRA 1986, Pub. L. No. 99-514, § 1012(a), 100 Stat. 2085, 2390 (codified as I.R.C. § 501(m)(1)). Subsection (b) adds a new § 833 to the I.R.C., providing that "any existing Blue Cross or Blue Shield organization" shall be "taxable . . . in the same manner as if it were a stock insurance company." TRA 1986, Pub. L. No. 99-514, § 1012(b), 100 Stat. 2085, 2391 (codified as I.R.C. § 833(a)(1), (c)(1)(A)).

The legislative history makes clear this purpose of the statutory framework:

> The committee is concerned that exempt charitable and social welfare organizations that engage in insurance activities are engaged in an activity whose nature and scope is so inherently commercial that tax exempt status is inappropriate. The committee believes that the tax-exempt status of organizations engaged in insurance activities provides an unfair competitive advantage to these organizations. The committee further believes that the provision of insurance to the general public at a price sufficient to cover the costs of insurance generally constitutes an activity that is commercial.
>
> In addition, the availability of tax-exempt status under present law has allowed some large insurance entities to compete directly with commercial insurance companies. For example, the Blue Cross/Blue Shield organizations historically have been treated as tax-exempt organizations described in sections 501(c)(3) or (4). This group of organizations is now among the largest health care insurers in the United States. Other tax-exempt charitable and social welfare organizations engaged in insurance activities also have a competitive advantage over commercial insurers who do not have tax-exempt status.

H.R. Rep. No. 99-426, at 664 (1985). It is apparent that the overriding objective of Congress in passing § 1012 of the Tax Reform Act was to eliminate the competitive imbalance that existed between tax-exempt insurers, such as the Blues, and commercial health insurers.

Plaintiff's interpretation of the fresh-start basis provision would thwart the accomplishment of that objective by enabling plaintiff to shield substantial amounts of income from taxation, by using a device unavailable to its competitors. As interpreted by plaintiff, the fresh-start basis provision would provide plaintiff with millions of dollars of deductions, rendering that much of plaintiff's post-1986 income untaxed. As explained above, plaintiff's use of the fresh-start basis accomplishes this by transforming plaintiff's group healthcare coverage contracts from self-created property, with a zero basis, into assets with a basis of over $303 million. *See* DPF 15. Before application of the fresh-start basis provision, the amount of plaintiff's deduction for the termination of a contract would be zero, since § 165(b) limits the

deduction to the adjusted basis of the property. By invoking the fresh-start basis provision, and by claiming that its group healthcare coverage contracts had a January 1, 1987, fair market value of $303 million, and then claiming loss deductions in that amount spread over the lives of those contracts, plaintiff is able to shield $303 million of post-1986 income from tax. By way of comparison, plaintiff's average taxable income during the period 1991 through 1995 was $88 million per year. DPF 16. Thus, plaintiff's interpretation of the fresh-start basis enables it to shield over three years' worth of income from taxation.

Of course, by effectively postponing the day when plaintiff becomes fully taxable, on a basis equivalent to its always-taxed competitors, allowance of plaintiff's claim in this case perpetuates plaintiff's competitive advantage with respect to those competitors, the very advantage Congress sought to eliminate by enacting § 1012 of the Tax Reform Act of 1986. This competitive advantage will continue until all of the contracts held by plaintiff in 1987 lapse or are terminated. Plaintiff's experts seem to suggest that this may not occur until after 2025. DPF 17. Thus, plaintiff will have contrived to preserve a tax advantage over its competitors for four decades after Congress thought it had imposed tax parity.

B. The Fresh-Start Basis Provision Applies Only to Gain or Loss Upon the Sale or Exchange of an Asset

Even if the fresh-start provision were to apply to basis-less property like plaintiff's healthcare coverage contracts, it would not be available for the type of "loss" deductions plaintiff claims. The text of the fresh-start basis provision does not clearly specify for what purposes it applies. Plaintiff's claim at bar is premised on the proposition that the word "loss" in the fresh-start phrase "gain or *loss*" refers to the same events and transactions that fall within § 165(a), which provides that "[t]here shall be allowed as a deduction any *loss* sustained during the taxable

year and not compensated for by insurance or otherwise." Alleging that the termination of healthcare coverage contracts generates a loss deductible under § 165(a), plaintiff claims deductions equal to the fair market value of each terminated contract as of January 1, 1987. Whatever its superficial appeal, plaintiff's argument ignores the various ways in which Congress has used the word "loss," as well as the congressional purpose behind the transition rules.

i. The Provision Does Not Apply to "*Any* Loss"

Section 165(a), upon which plaintiff relies for its claimed deductions, modifies the word "loss" with the word "any." § 165(a). The fresh-start basis provision refers, instead, to "gain or loss." Given the generally expansive meaning of the word "any," the different phrasing suggests that Congress did not intend the fresh-start basis provision to be co-extensive with § 165(a). *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning"). Had Congress intended to provide a fresh-start basis for all events that are deductible under § 165(a), it could have done so less ambiguously by including the phrase "any loss" in the fresh-start basis provision. Indeed, legislation passed just two years before the Tax Reform Act of 1986 shows Congress not only *could* have done so, but that Congress *has* done so with respect to other extraordinary basis adjustment rules, enacted in a context identical to that of the Tax Reform Act of 1986.

Before 1984, the Federal Home Loan Mortgage Corporation (the "FHLMC") was exempt from federal income taxation. *See* 12 U.S.C. § 1452(d) (1983) (repealed 1984). In 1984, as it would with respect to the Blues in 1986, Congress subjected the FHLMC to taxation for the first time after determining that the rationale for its exemption no longer existed. Deficit Reduction Act of 1984, Pub. L. 98-369, § 177(a)(1), 98 Stat. 494, 709 (1984). As it repealed the FHLMC's

tax exemption, however, Congress was concerned – as it was when it enacted the provision at issue in this case – about the tax treatment of assets acquired before the repeal. To address that concern, Congress gave the FHLMC a fair-market-value basis in its property held on the day it became taxable. That basis-adjustment provision states:

> (2) Adjusted Basis of Assets. –
>
> (A) In General. – Except as otherwise provided in subparagraph (B), the adjusted basis of any asset of the Federal Home Loan Mortgage Corporation held on January 1, 1985, shall–
>
> (i) for purposes of determining *any loss*, be equal to the lesser of the adjusted basis of such asset or the fair market value of such asset as of such date, and
>
> (ii) for purposes of determining any gain, be equal to the higher of the adjusted basis of such asset or the fair market value of such asset as of such date.

Pub. L. 98-369, § 177(d)(2)(A), 98 Stat. 494, 711 (not codified) (emphasis added). The difference in wording between the Blues' fresh-start basis provision and the FHLMC provision is noteworthy. By providing the FHLMC basis adjustment for purposes of determining "any loss" – the exact term used in § 165(a) – Congress strongly suggested that the basis adjustment applies to all § 165(a) events, not just sales and exchanges. By contrast, when it addressed the same concerns upon the repeal of the Blues' exemption, Congress chose different language, providing a basis adjustment for purposes of determining "gain or loss," not "any loss." This difference not only highlights the ambiguity of the provision at issue here as applied to the deductions claimed by plaintiff, but also suggests that Congress intended to provide the Blues with a more limited basis adjustment than one that would apply to "any loss" deductible under § 165(a).

ii. "Gain or Loss" Generally Refers to Sales, Exchanges, and Other Dispositions of Property

The term "loss" in the fresh-start basis provision is part of the phrase "determining gain or loss," which connotes a narrower application than that of § 165(a). The Internal Revenue Code normally uses the phrase "gain or loss" in the context of sales, exchanges, or other dispositions of property, that is, in the context of transactions that – by their nature – may produce either a gain or a loss. *See, e.g.*, § 954(c)(1) (referring to "gains and losses" from the "sale or exchange" of property); § 1231(a) (same); § 1223(2) (referring to "gain or loss from a sale or exchange"); § 172(d)(4)(A) (referring to "gain or loss" from the "sale or other disposition" of property); § 1001(e)(1) (same); § 1011(a) (same); § 1001 (using the heading "Determination of Amount of and Recognition of Gain or Loss" to refer to gain or loss "from the sale or other disposition of property" or "the sale or exchange of property"); § 1011 (using the heading "Adjusted Basis for Determining Gain or Loss" to refer to gain or loss "from the sale or other disposition of property"). If Congress intended the phrase "gain or loss" in the fresh-start basis provision to refer only to gains or losses generated by sales and exchanges, then plaintiff's instant claim must fail. Plaintiff's claimed losses arose when its healthcare contracts lapsed by their terms, and were not renewed, or were cancelled by plaintiff or an insured, again pursuant to the contract terms. In no instance has plaintiff claimed a deduction arising from a transaction that involved a sale or exchange.

iii. The Legislative History Shows That the Fresh-Start Basis Is Available for Only Sales and Exchanges

The purpose of the foregoing analysis is not to persuade the Court that the Government's interpretation of the phrase "gain or loss" in the fresh-start basis provision is the only possible

interpretation. Instead, we seek to make the more limited point that plaintiff's interpretation is not the only meaning that the phrase can possibly have, and that the statute is therefore not clear on its face, as plaintiff contends. Because the statute is susceptible of multiple interpretations – with differing consequences – it is appropriate to consult the legislative history to resolve the ambiguity. *See, e.g.*, *Dick v. Office of Personnel Mgmt.*, 216 F.3d 1353, 1356 (Fed. Cir. 2000) ("Since the statute is ambiguous with respect to its application in this case, we have reviewed the legislative history of the amendment").

Section 1012 of the Tax Reform Act was inserted in the House Bill under consideration by the Conference Committee. The committee explained:

> The basis step-up is provided solely for purposes of determining gain or loss upon sale or exchange of the assets, not for purposes of determining amounts of depreciation or for other purposes. The basis adjustment is provided because the conferees believe that such formerly tax-exempt organizations should not be taxed on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation.

H.R. Conf. Rep. No. 99-841, at II-350 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4438; *see also* Staff of Joint Comm. on Taxation, 99th Cong., *General Explanation of the Tax Reform Act of 1986*, at 591 (Joint Comm. Print 1987) ("The basis adjustment is provided solely for purposes of determining gain or loss upon sale or exchange of the assets, not for purposes of determining amounts of depreciation or for other purposes").

Thus, while the statutory language is ambiguous, the legislative history could not be clearer: Congress intended the "fresh-start basis" provision to apply only to sales or exchanges, and not for "other purposes," such as the losses claimed by plaintiff at bar. Plaintiff's claim must therefore fail.

iv. As Interpreted by Plaintiff, the Fresh-Start Basis Provision Would Not Serve the Purpose for Which It Was Enacted

Plaintiff argues that the text of the fresh-start basis provision unambiguously refers to all events that fall under § 165(a). As demonstrated above, that contention does not withstand scrutiny. But plaintiff's interpretation of "gain or loss" should be rejected on the additional independent ground that, as interpreted by plaintiff, the provision fails to serve a rational purpose, and leads to inconsistent results. Application of the fresh-start basis to contract terminations would fail to serve the purpose for which the provision was enacted – that is, to protect pre-1987 appreciation and depreciation from taxation. In contrast to the application of the fresh-start basis provision when a taxpayer sells property (as Congress intended), application of the fresh-start basis provision to the deductions claimed here would *never* have the intended effect of avoiding taxation of pre-1987 appreciation or depreciation.[9]

The Conference Committee explained the reason for the fresh-start basis provision: "The basis adjustment [was] provided because the conferees believe[d] that such formerly tax-exempt organizations should not be *taxed* on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation." *See* H.R. Conf. Rep.

[9] Norman J. Singer, *Statutes and Statutory Construction* § 46.05 at 173 (6th ed. 2000) ("The presumption is that the lawmaker has a definite purpose in every enactment"); *see, e.g., Nixon v. Missouri Municipal League*, 541 U.S. 125, 133 (2004) ("We think that the strange and indeterminate results of using federal preemption to free public entities from state or local limitations is the key to understanding that Congress used 'any entity' with a limited reference to any private entity when it cast the preemption net"); *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 454 (1989) ("Where the literal reading of a statutory term would compel an odd result, we must search for other evidence of congressional intent to lend the term its proper scope. The circumstances of the enactment of particular legislation, for example, may persuade a court that Congress did not intend words of common meaning to have their literal effect" (internal quotation marks and citations omitted)).

No. 99-841, at II-350, *reprinted in* 1986 U.S.C.C.A.N. at 4438 (emphasis added); *see also* Staff of Joint Comm. on Taxation, 99th Cong., *General Explanation of the Tax Reform Act of 1986*, at 591 (Joint Comm. Print 1987) ("The basis adjustment is provided because Congress concluded that such formerly tax-exempt organizations should not be *taxed* on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation" (emphasis added)). In other words, Congress wanted to *tax* the Blues on only the changes in the value of their assets that occurred after the Blues became taxable. As an example, assume that plaintiff had purchased real estate in 1950 for $100,000; that, by 1987, the property had appreciated in value to $150,000; and that, in 1991, plaintiff sold the property for $250,000. Pursuant to the fresh-start basis provision, plaintiff's basis in the property at the time of the sale would be $150,000. Thus, plaintiff would pay tax on only the $100,000 of appreciation accruing between 1987 and 1991. The $50,000 of pre-1987 appreciation would remain tax-free, because it accrued during the time when plaintiff was tax exempt.

Congress's goal of shielding pre-1987 appreciation and depreciation from taxation is applicable, however, only when a Blue Cross organization *receives* something of value upon the disposition of an asset and not, as here, when an insurance contract lapses in the ordinary course of plaintiff's business. Such an event, by its nature, cannot give rise to gain, and thus there can never be any gain that – for fairness sake – must be shielded from tax. Thus, Congress's concern to avoid *taxing* the Blues on pre-1987 appreciation and depreciation is never implicated in the type of "loss" (contract lapses) that forms the basis of plaintiff's claims. Application of the fresh-start basis to plaintiff's claimed deductions would therefore fail to serve the purpose for which the provision was enacted.

v. Plaintiff's Interpretation of the Fresh-Start Basis Provision Is Inconsistent with the Inapplicability of the Provision to Depreciation Deductions

Oddly, while plaintiff claims deductions for the termination of individual healthcare coverage contracts, there is no evidence that plaintiff has ever bought or sold such a property; plaintiff has never accounted for contracts that way (about which, see below); and, in this very case, plaintiff has not valued individual contracts. In fact, plaintiff has always treated its contracts consistent with their being one mass asset. As a consequence, plaintiff's "loss" deductions are indistinguishable from depreciation of the mass asset comprised of plaintiff's subscriber base, and allowance of such deductions therefore contravenes the express congressional intent to preclude application of the fresh-start basis provision to depreciation deductions.

To begin, the serial nature of deductions for terminated contracts and plaintiff's method of valuing the contracts demonstrate that the real "asset" at issue is plaintiff's subscriber base, and that the loss deductions plaintiff claims are functionally equivalent to the depreciation of such asset. Plaintiff is presently claiming a § 165(a) deduction for each group subscriber that existed as of January 1, 1987, whose contract terminated in the years 1987 through 1995. Compl. ¶¶ 24-31. Plaintiff plans to continue claiming such deductions in the years that the remaining contracts that existed on January 1, 1987, terminate. DPF 18. Thus, the § 165(a) deductions plaintiff claims will eventually span the same period of time that would have constituted the useful life of the aggregate group subscriber base. Moreover, the total value of the individual § 165(a) deductions will be equivalent to the fair market value of the aggregate subscriber base as of January 1, 1987 – in other words, the same as the fresh-start basis of the aggregate subscriber base. At the end of the day, plaintiff will have taken its insurance contracts

in force – its primary income-producing asset as of January 1, 1987 – and will have invoked the fresh-start provision to deduct (via loss deductions as the contracts terminate) their entire fair market value, spread over their useful life. Had plaintiff instead claimed entitlement to amortization deductions (explicitly forbidden in Congress's intent), plaintiff would have deducted their fair market value as of January 1, 1987, over the useful life of all of the contracts: There is no difference between these approaches.

The one apparent difference between the § 165(a) deductions claimed by plaintiff and depreciation deductions is that the timing of the individual § 165(a) deductions is controlled by the actual terminations of individual contracts, as opposed to a standardized depreciation schedule. Even that apparent difference, however, is meaningless in light of plaintiff's methodology for valuing the contracts. While plaintiff claims that each healthcare coverage contract was a discrete intangible asset that had an ascertainable fair market value as of January 1, 1987, *see* Compl. ¶ 26, plaintiff actually derived those "discrete" values, not through an analysis of the unique characteristics of each contract, but rather by gathering and averaging data from all (or broad categories) of its contracts. DPF 19-32. The lack of contract-specific data used in its valuation means that the value plaintiff is claiming for each individual contract termination is less a measure of that actual contract's actual value than it is a certain percentage of the value of all of the contracts that existed on January 1, 1987 – just as the amount of a depreciation deduction represents a percentage of the value of the wasting asset. Thus, the timing of individual contract terminations amounts to nothing other than a depreciation schedule for the entire subscriber base asset, and the deductions plaintiff is claiming upon the termination of individual contracts are the functional equivalent of depreciation deductions.

This functional equivalence is problematic for plaintiff in the instant case, because no amount of stretching can possibly make the phrase "for purposes of determining gain or loss" encompass depreciation deductions.[10] And, as a matter of fact, the legislative history makes plain that Congress had no intention of allowing such deductions. The Conference Committee report confirms that the inapplicability of the provision to depreciation deductions was a deliberate decision, not an inadvertent oversight. The report states clearly: "The basis step-up is provided . . . not for purposes of determining amounts of depreciation." H.R. Conf. Rep. No. 99-841, at II-350, *reprinted in* 1986 U.S.C.C.A.N. at 4438; *see also* Staff of Joint Comm. on Taxation, 99th Cong., *General Explanation of the Tax Reform Act of 1986*, at 591 (Joint Comm. Print 1987) ("The basis adjustment is provided . . . not for purposes of determining amounts of depreciation"). Plaintiff's interpretation of the fresh-start basis provision would therefore lead to the odd result that, although taxpayer would not be able to use the basis step-up for depreciating an asset, taxpayer would be able to achieve the same tax effect by dividing the asset into smaller parts and deducting the "discrete" value of each part as it expires.

---

[10] In *Federal Home Loan Mortgage Corp. v. Commissioner*, 121 T.C. 129 (2003), the court held that the basis adjustment provided to the Federal Home Loan Mortgage Corporation applied for purposes of determining depreciation amounts. In reaching that decision, however, the court distinguished the provision at issue here on the grounds that (1) the two basis-adjustment provisions use different wording and (2) the legislative history to the Blue Cross and Blue Shield provision expressly prohibits the use of the basis adjustment for depreciation. *See id.* at 141-42.

II

PLAINTIFF IS NOT ENTITLED TO A REFUND BECAUSE IT MADE AN UNAUTHORIZED CHANGE IN ITS METHOD OF ACCOUNTING

A taxpayer must maintain a consistent method of accounting for its income and deductions. Section 446(e) provides that "a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary." § 446(e). In 1995 (nine years after the statute was enacted), plaintiff, for the first time, claimed deductions for the termination of individual healthcare coverage contracts. This constituted a change in accounting method requiring the consent of the Commissioner. Plaintiff did not request the consent of the Commissioner to this change at any time between the filing of its original 1987 through 1994 income tax returns (none of which claimed these deductions), and the filing of its refund claims for 1991 through 1994 or its original return for 1995, on which plaintiff claimed the deductions at issue in this case. DPF 12-14.[11]

The purpose of requiring a taxpayer to obtain the Service's consent before changing its method of accounting is to enable the IRS to determine whether the change results in distortions

[11] At the same time that it filed its original 1987 return, plaintiff did file an application for a change in accounting method for that year to take advantage of § 1012(c)(3)(A)(i) of the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085, 2394. (Plaintiff's Second Amended Response to Defendant's First Set of Requests for Admissions Nos. 29-30 and attachment (Def. Ex. 2, App. B at B-9 - B-10, B-24 - B-32). That section authorized Blue Cross and Blue Shield organizations to change accounting methods *in 1987* from their pre-1987 financial accounting methods without penalty. Both of the changes in accounting method at issue in this case, however, occurred *after 1987*. That is, plaintiff adopted a method of accounting on its original 1987 through 1994 returns and then changed from that method without securing the Commissioner's consent. The changes at issue therefore do not fall within the terms of plaintiff's 1987 application.

of the taxpayer's income or deductions – such as the omission of items from income, or the doubling of deductions or exclusions – and to make the necessary adjustments to avoid those results. *Diebold, Inc. v. United States*, 891 F.2d 1579, 1583 (Fed. Cir. 1989), *cert. denied*, 498 U.S. 823 (1990). Thus, even a change from an incorrect method to a correct method requires consent. *Id.*; 26 C.F.R. § 1.446-1(e)(2)(i) (1995). The question, therefore, is whether plaintiff's treatment of its healthcare coverage contracts constituted a "method of accounting" that it changed without consent.

The term "method of accounting" includes not only the overall method of accounting of the taxpayer but also the accounting treatment of any material item. 26 C.F.R. § 1.446-1(e)(2)(ii)(a) (1995). A material item is any item that involves the proper timing for the inclusion of income or the taking of a deduction. *Id.*; *see also Knight-Ridder Newspapers, Inc. v. United States*, 743 F.2d 781, 799 (11th Cir. 1984) (holding that a taxpayer's rebate reserve method was a "material item," because it determined when income would be taxed). The treatment of a material item in the same way in two or more consecutively filed tax returns constitutes a method of accounting. Rev. Rul. 90-38, 1990-1 C.B. 57 (1990). This is true even if the consistent treatment was erroneous. *Id.* For this reason, courts look to a taxpayer's tax returns to determine the taxpayer's method of accounting . *See, e.g., Aluminum Castings Co. v. Routzahn*, 282 U.S. 92, 99 (1930) (relying on "[t]he use of inventories, and the inclusion in the returns of accrual items of receipts and disbursements appearing on petitioner's books" to determine the petitioner's method of accounting). In some cases, such as *Aluminum Castings*, the taxpayer's method of accounting is evidenced by an item reported on the taxpayer's return. The *absence* or *omission* of an item of income or a deduction from a return can also demonstrate

the taxpayer's method of accounting. *See, e.g., Stephens Marine, Inc. v. Commissioner*, 430 F.2d 679, 687 (9th Cir. 1970) (holding that the taxpayer's "failure to report any of [certain] payments as income was more commensurate with the completed contract method of accounting than the accrual method"). Plaintiff's claims here reflect a change of accounting method in two respects:

A. Plaintiff Changed from Treating Its Contracts as One Asset to Treating Them as Discrete Assets

The first unauthorized change of accounting method made by plaintiff was from treating its healthcare coverage contracts as part of one asset – plaintiff's subscriber base – to treating each contract as a discrete asset. Plaintiff first adopted a method of accounting on its original 1987 through 1995 income tax returns by omitting deductions for individual healthcare coverage contract terminations. *See* DPF 8; *see also Stephens Marine, Inc.*, 430 F.2d at 687. In doing so, plaintiff elected to treat all of its healthcare coverage contracts existing as of January 1, 1987, as one, indivisible asset – plaintiff's subscriber base – and consequently to defer recognizing loss from the termination of the contracts until that asset became worthless, or was abandoned or sold. Plaintiff's failure to deduct the value of individual terminated contracts on any of its returns for 1987 through 1994 is consistent with only one method of accounting: one that treats the contracts as part of the larger asset comprising all of plaintiff's subscribers.[12] Moreover, that

[12] The timing of plaintiff's first refund claim in this case also supports the conclusion that plaintiff previously treated the contracts as part of one "mass" asset. Before 1993, customer-based intangible assets, like plaintiff's healthcare coverage contracts, were generally considered to constitute "mass" assets, each individual part of which enjoyed no separate capital standing. *See, e.g., Golden State Towel & Linen Serv., Ltd. v. United States*, 373 F.2d 938, 944 (Ct. Cl. 1967). Plaintiff first claimed deductions for individual contract terminations in 1995 – just two years after the Supreme Court decision in *Newark Morning Ledger Co. v. United States*, 507 U.S. 546 (1993), restricted the application of the mass-asset doctrine to fewer situations, thus

plaintiff treated contract terminations in the same way on eight consecutively filed returns established the consistency of treatment necessary to constitute a method of accounting. *See* Rev. Rul. 90-38.

Plaintiff selectively changed from that accounting method in 1995, when it filed its first refund claim (for 1991), and later when it filed additional refund claims (for 1992 through 1994) and original 1995 income tax return, claiming deductions for *individual* healthcare contract terminations. *See* DPF 9-11. Under its new method of accounting, plaintiff treats each pre-1987 healthcare coverage contract as a discrete asset, rather than as part of the aggregate asset consisting of all of plaintiff's subscribers. As for its post-1986 contracts, plaintiff does not claim loss deductions upon their termination. Thus, its position reflects a self-contradictory method.

The choice to account for the contracts as one mass asset or as separate assets constitutes a method of accounting because it affects the timing of deductions. *See* 26 C.F.R. § 1.446-1(e)(2)(ii)(a) (1995) (providing that a method of accounting includes the proper timing for the inclusion of income or the taking of a deduction). As demonstrated above, because the fresh-start basis provision does not apply to the types of deductions plaintiff claims in this case, and plaintiff neither purchased the contracts nor capitalized the costs of creating them, plaintiff's basis in the contracts is zero for the purposes of this case. Accordingly, plaintiff is not entitled to any deductions, and plaintiff's choice to treat the contracts as one mass asset or multiple assets therefore does not affect the timing of deductions in this particular case. If plaintiff's claim that the fresh-start basis provision applies in these circumstance were correct, and plaintiff therefore had a greater-than-zero basis in the contracts, however, then the choice between multiple-asset

---

permitting depreciation deductions based on the loss of customers for the first time.

and mass-asset treatment *would* affect the timing of deductions. Sooner or later, plaintiff would have the opportunity to deduct the entire adjusted basis of its subscriber base regardless of whether plaintiff treated the contracts as one mass asset or as multiple discrete assets. The timing of those deductions, however, would depend on whether plaintiff accounted for the contracts individually (as it now does) or as parts of a larger asset (as it did originally). Under plaintiff's first method of accounting (the mass-asset method), plaintiff would recover its basis in the contracts when they *all* terminated – that is, when the entire subscriber base became worthless. At the end of the aggregate life of the subscriber base, plaintiff would then deduct its total basis in the contracts. In contrast, under plaintiff's new method of accounting (the multiple-asset method), plaintiff would recover its basis in the contracts in smaller increments distributed throughout the aggregate life of the subscriber base.

To say that plaintiff originally adopted a method of accounting that treated the contracts as one asset is not to claim that plaintiff deliberately chose to delay its recovery of its basis in the contracts until they all terminated. In fact, plaintiff might have made that "choice" without giving it much thought, based on the then-prevailing view that customer relationships really are a "mass" asset – the taxpayer's customer base or goodwill – rather than a collection of discrete assets.[13] Regardless of what caused plaintiff to do so, though, plaintiff in fact treated the contracts as one asset when it omitted deductions for individual contract terminations on its original 1987 through 1994 returns. That treatment affected the timing of deductions and therefore constituted a method of accounting.

---

[13] *See supra* note 12.

Plaintiff's treatment of the contracts as a mass asset instead of as multiple discrete assets is analogous to a type of depreciation treatment that has been held to constitute a method of accounting. Depreciation deductions ordinarily are based on the individual adjusted basis and estimated useful life of a particular asset. *See* § 167. Treasury Regulation § 1.167(a)-7, however, allows a taxpayer to group multiple assets into one account, and to calculate depreciation deductions based on the sum of the assets' bases. *See* 26 C.F.R. § 1.167(a)-7 (2006). In the former case, where the taxpayer treats each depreciable asset separately, upon the retirement of a depreciable asset, the taxpayer recognizes loss equal to the amount of the asset's basis that has not yet been depreciated (minus any salvage value). *See* 26 C.F.R. § 1.167(a)-8(a)(3)(ii). On the other hand, if the taxpayer sets up a multiple-asset account using an average useful life depreciation rate, and then retires (but does not physically abandon) one of the assets in that account, unless the circumstances of the retirement are abnormal, the taxpayer treats the retired asset as having a basis of zero and consequently does not recognize loss. 26 C.F.R. § 1.167(a)-8(a)(3). Rather, the taxpayer generally recovers its basis through depreciation deductions for the entire multiple-asset account. *Id.* Thus, like the choice of whether to treat healthcare coverage contracts as a single asset or multiple assets, the decision to depreciate assets in a multiple-asset account or separately determines when the taxpayer recovers its basis. In Revenue Procedure 69-29, 1969-2 C.B. 311 (1969) (now incorporated into Rev. Proc. 2002-9, 2002-1 C.B. 327, § 2.02(3)(k)), the IRS determined that the grouping of assets that were previously treated as separate assets into a multiple-asset account constituted a change in accounting method requiring the Commissioner's consent. By analogy, the choice of whether to

treat healthcare coverage contracts as one asset or as multiple assets for purposes of recovering plaintiff's basis through § 165(a) deductions constitutes a method of accounting.

Plaintiff's new multiple-asset accounting method is problematic, both because it was not authorized by the Commissioner and because it conflicts with plaintiff's regular practice of deducting its costs of creating such contracts. As explained more fully below, to create new healthcare coverage contracts, plaintiff incurs substantial costs, such as advertising, salaries, travel, equipment, printing, stationery, postage, and telephone usage. DPF 33-34. For purposes of determining its tax liability, plaintiff has always deducted such costs as ordinary and necessary business expenses in the year in which they are incurred. DPF 37. Such treatment is consistent with plaintiff's former mass-asset method of accounting because, under that method, expenditures made to create new contracts are the equivalent of costs incurred to "repair" the mass asset of plaintiff's subscriber base. As some subscribers terminate their contracts, plaintiff must solicit new business to replace the old subscribers and maintain (or "repair") its subscriber base. In general, the costs of repairs that neither add value to nor prolong the life of an asset are deductible under § 162. 26 C.F.R. § 1.162-4; *see also Public Opinion Publ'g Co. v. Jensen*, 76 F.2d 494, 496 (8th Cir. 1935) (holding that, to constitute a currently deductible business expense, money spent by a newspaper company to promote subscriptions "must be in the nature of upkeep [to its circulation structure]" and not for the purpose of increasing circulation). Thus, insofar as plaintiff incurs the above-mentioned expenditures to maintain its pre-existing subscriber base, plaintiff's practice of deducting such expenditures is consistent with its former mass-asset accounting method.

That practice is *inconsistent*, however, with a method of accounting that treats each of plaintiff's healthcare coverage contracts as a separate capital asset. According to plaintiff's new accounting method, expenditures made to create new contracts do not simply maintain or repair plaintiff's subscriber base; rather, they bring into existence new capital assets. As explained by the Supreme Court, "a[n] . . . expenditure that 'serves to create or enhance . . . a separate and distinct' asset should be capitalized under § 263." *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 86 (1992) (quoting *Commissioner v. Lincoln Savings & Loan Ass'n* , 403 U.S. 345, 354 (1971)); *see also* 26 C.F.R. § 1.263(a)-4(b)(1)(iii) (2006) (providing that "[a]n amount paid to create or enhance a separate and distinct intangible asset" must be capitalized"). Thus, under plaintiff's new accounting method, its costs of creating healthcare coverage contracts – *e.g.*, advertising, salaries, travel, equipment, printing, stationery, postage, and telephone usage – should properly be capitalized, rather than deducted in the year in which they are incurred.

B. Plaintiff Changed from Expensing to Capitalizing the Costs of Creating Contracts

The deductions plaintiff claims in this case constitute a change of accounting method also because they are inconsistent with plaintiff's prior and ongoing treatment of the costs of developing healthcare coverage contracts. Plaintiff's claim is based upon a change in the treatment of costs incurred in creating healthcare coverage contracts – from ordinary and necessary business expenses, *which it claimed on its income tax returns*, to capital expenditures, *which it now seeks to deduct as losses*.

Ordinary and necessary expenses are deductible in the year in which they are incurred. § 162(a); *see also* § 832(c)(1) ("In computing the taxable income of an insurance company . . . ,

there shall be allowed as deductions all ordinary and necessary expenses incurred, as provided in section 162"). Expenses that constitute "capital expenditures" under § 263, however, are not deductible. Section 263(a)(1) defines "capital expenditures" generally as "amount[s] paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." Rather than being currently deducted, capital expenditures are added to the taxpayer's basis in the property. *See* § 1016(a)(1) ("Proper adjustment [to basis] in respect of the property shall in all cases be made for expenditures, receipts, losses, or other items, properly chargeable to capital account"). The taxpayer recovers its capital expenditures for tax purposes when it sells or otherwise disposes of the property, or, if the property is depreciable, it recovers those expenditures via deductions for depreciation or amortization, based on that adjusted basis.

Here, in the years 1987 through 1995, plaintiff incurred substantial costs in creating, or facilitating the creation of, healthcare coverage contracts. DPF 33. Those costs included advertising, salaries (and related expenses), travel, equipment, printing, stationery, postage, and telephone. DPF 34. For purposes of its financial accounting records, plaintiff never capitalized these costs. DPF 35. Rather, consistent with professional financial accounting standards and applicable insurance regulations, plaintiff always wrote off (or "expensed") such costs in the year in which they were incurred. DPF 36. Beginning in 1987, when plaintiff became taxable, plaintiff continued to characterize its costs of creating new contracts as current expenses and, in each of the years 1987 through 1995, plaintiff in fact deducted such costs in determining its tax liability. DPF 37. Plaintiff's treatment of these costs in the same way (as currently deductible expenses) on nine consecutively filed returns was sufficient to establish a "method of accounting." *See* Rev. Rul. 90-38 (holding that "[t]he treatment of a material item in the same

way in determining the gross income or deductions in two or more consecutively filed tax returns represents consistent treatment," thus satisfying the definition of "method of accounting").

Eight years into its new taxable regime, however, plaintiff changed its method of accounting when, as part of its refund claims for 1991 through 1994 and original return for 1995, plaintiff claimed that it had an adjusted basis in each of its healthcare coverage contracts existing on January 1, 1987, equal to the contract's fair market value as of that date. Because plaintiff never purchased any of the contracts at issue (DPF 39), and thus had no cost basis, the fresh-start basis is said to act as basis plaintiff otherwise would have accumulated in the contracts through capital expenditures. Thus, plaintiff effectively changed its characterization of the costs of creating contracts from ordinary and necessary business expenses to capital expenditures.

As explained above, the Treasury Regulations provide that a method of accounting includes the proper timing for the inclusion of income or the taking of a deduction. *See* 26 C.F.R. § 1.446-1(e)(2)(ii)(a) (1995). The characterization of a payment as a currently deductible expense or a capital expenditure affects the timing of the taxpayer's cost recovery, and therefore constitutes a method of accounting. *FPL Group, Inc. v. Commissioner*, 115 T.C. 554, 562 (2000); *Pelaez & Sons, Inc. v. Commissioner*, 114 T.C. 473, 489 (2000), *aff'd* 253 F.3d 711 (11th Cir. 2001) (Table); *see also* 26 C.F.R. § 1.446-1(e)(2)(ii)(b) (1995) ("[A] correction to require depreciation in lieu of a deduction for the cost of a class of depreciable assets which has been treated as an expense in the year of purchase involves the question of the proper timing of an item, and is to be treated as a change in accounting method"). By the same token, plaintiff's change from expensing its costs of creating healthcare coverage contracts to claiming that such

expenses were capital costs for creating a capital asset involves the proper timing of plaintiff's cost recovery. Plaintiff contends that for each of the 1987 through 1995 tax years it is entitled to deduct the current costs it incurred in that year in creating contracts, as well as the "losses" it sustained upon the termination of contracts – *i.e.*, the value attributable to its expenditures in pre-1987 years. DPF 38. Because the amount of loss plaintiff claims in each year – that is, the fair market value of the terminated contracts as of January 1, 1987 – is a substitute for plaintiff's costs of creating the pre-1987 contracts, invoking the fresh-start basis provision effectively shifts the costs of creating the contracts from the year in which the costs were incurred to the year in which the contracts terminate. As a result, plaintiff is essentially claiming deductions in each post-1986 year for both the costs it incurred in that year in creating new contracts as well as the costs it incurred in prior years for creating contracts that have lapsed or terminated.

Plaintiff's position reflects a classic abuse that the change-of-accounting-method rules are designed to prevent, *viz.*, the mismatching of income and expense. When plaintiff became taxable in 1987, it reasonably deducted (as did its competitors) its policy-creating expenses incurred in a given year from its policy revenues in that same year – a fair matching of income and expense. In its position adopted eight years later, however, plaintiff introduced a distortion: It would disregard the current character of such expenses, and would deduct in the same year both its current expenditures and basis generated by expenses incurred in prior, pre-1987 years, thus mismatching pre-1987 expenditures against post-1986 income.

Policy-creating expenses are either ordinary and current expenses that are properly deducted in the year incurred (and matched with that year's income), or they are capital expenditures allocable to capital assets and therefore recoverable in future years. But they

cannot be both, at plaintiff's election. Plaintiff must stick with one method of accounting or secure consent to a change.

Since plaintiff's current claim is predicated upon a change in accounting method for its healthcare coverage contracts, and since plaintiff has not secured the consent of the Commissioner to this change, plaintiff's claim must be denied pursuant to § 446(e) of the Code.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in favor of the United States.

Respectfully submitted,

s/ Karen Servidea
KAREN SERVIDEA
*Attorney of Record*
*United States Department of Justice*
*Tax Division*
*Court of Federal Claims Section*
*Post Office Box 26*
*Ben Franklin Post Office*
*Washington, D.C. 20044*
*Voice: (202) 616-3423*
*Fax: (202) 514-9440*
*Email: karen.e.servidea@usdoj.gov*

EILEEN J. O'CONNOR
*Assistant Attorney General*
DAVID GUSTAFSON
*Chief, Court of Federal Claims Section*
W.C. RAPP
*Senior Trial Attorney*

February 15, 2007
Date

s/ W.C. Rapp
Of Counsel

## APPENDIX A

**Internal Revenue Code of 1986 (26 U.S.C.):**

**§ 162. Trade or business expenses**

**(a) In general.**--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including–

**(1)** a reasonable allowance for salaries or other compensation for personal services actually rendered;

**(2)** traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; and

**(3)** rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

. . . .

**§ 165. Losses**

**(a) General rule.**--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

**(b) Amount of deduction.**--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

. . . .

**§ 263. Capital expenditures**

**(a) General rule.**--No deduction shall be allowed for–

**(1)** Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate.

. . . .

**§ 446. General rule for methods of accounting**

**(a) General rule.**--Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

**(b) Exceptions.**--If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

**(c) Permissible methods.**--Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting–

**(1)** the cash receipts and disbursements method;

**(2)** an accrual method;

**(3)** any other method permitted by this chapter; or

**(4)** any combination of the foregoing methods permitted under regulations prescribed by the Secretary.

**(d) Taxpayer engaged in more than one business.**--A taxpayer engaged in more than one trade or business may, in computing taxable income, use a different method of accounting for each trade or business.

**(e) Requirement respecting change of accounting method.**--Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary.

**(f) Failure to request change of method of accounting.**--If the taxpayer does not file with the Secretary a request to change the method of accounting, the absence of the consent of the Secretary to a change in the method of accounting shall not be taken into account–

**(1)** to prevent the imposition of any penalty, or the addition of any amount to tax, under this title, or

**(2)** to diminish the amount of such penalty or addition to tax.

**§ 832. Insurance company taxable income**

. . . .

**(c) Deductions allowed.**--In computing the taxable income of an insurance company subject to the tax imposed by section 831, there shall be allowed as deductions:

**(1)** all ordinary and necessary expenses incurred, as provided in section 162 (relating to trade or business expenses);

. . . .

**§ 1001. Determination of amount of and recognition of gain or loss**

**(a) Computation of gain or loss.**--The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

**(b) Amount realized.--**The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. In determining the amount realized–

**(1)** there shall not be taken into account any amount received as reimbursement for real property taxes which are treated under section 164(d) as imposed on the purchaser, and

**(2)** there shall be taken into account amounts representing real property taxes which are treated under section 164(d) as imposed on the taxpayer if such taxes are to be paid by the purchaser.

**(c) Recognition of gain or loss.**--Except as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized.

. . . .

**§ 1011. Adjusted basis for determining gain or loss**

**(a) General rule.**--The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)), adjusted as provided in section 1016.

. . . .

**§ 1012. Basis of property--cost**

The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.

**§ 1016. Adjustments to basis**

**(a) General rule.**--Proper adjustment in respect of the property shall in all cases be made–

**(1)** for expenditures, receipts, losses, or other items, properly chargeable to capital account, but no such adjustment shall be made--

**(A)** for taxes or other carrying charges described in section 266, or

**(B)** for expenditures described in section 173 (relating to circulation expenditures),

for which deductions have been taken by the taxpayer in determining taxable income for the taxable year or prior taxable years;

. . . .

(A) by striking out "the special deductions under section 806" and inserting in lieu thereof "the small life insurance company deduction under section 806(a)", and

(B) by adding at the end thereof the following: "For purposes of determining taxable income, the amount of any income, gain, loss, or deduction attributable to the ownership of such stock shall be an amount equal to 46 times the amount of such income, gain, loss, or deduction, divided by 36.8."

(d) TREATMENT OF CERTAIN MARKET DISCOUNT BONDS.—

(1) IN GENERAL.—Notwithstanding the amendments made by subtitle B of title III, any gain recognized by a qualified life insurance company on the redemption at maturity of any bond which was issued before July 19, 1984, and acquired by such company on or before September 25, 1985, shall be subject to tax at the rate of 28 percent.

(2) QUALIFIED LIFE INSURANCE COMPANY.—For purposes of paragraph (1), the term "qualified life insurance company" means any of the following companies: Aetna, Provident Life and Accident, Massachusetts Mutual, Mutual Benefit, Connecticut Mutual, Phoenix Mutual, John Hancock, New England Life, Pennsylvania Mutual, Transamerica, Northwestern, Provident Mutual, Prudential, Mutual of Omaha, and Metropolitan.

**SEC. 1012. REPEAL OF TAX-EXEMPT STATUS FOR CERTAIN ORGANIZATIONS PROVIDING COMMERCIAL-TYPE INSURANCE.**

(a) IN GENERAL.—Section 501 (relating to exemption from tax on corporations, certain trusts, etc.) is amended by redesignating subsection (m) as subsection (n) and by inserting after subsection (l) the following new subsection:

"(m) CERTAIN ORGANIZATIONS PROVIDING COMMERCIAL-TYPE INSURANCE NOT EXEMPT FROM TAX.—

"(1) DENIAL OF TAX EXEMPTION WHERE PROVIDING COMMERCIAL-TYPE INSURANCE IS SUBSTANTIAL PART OF ACTIVITIES.—An organization described in paragraph (3) or (4) of subsection (c) shall be exempt from tax under subsection (a) only if no substantial part of its activities consists of providing commercial-type insurance.

"(2) OTHER ORGANIZATIONS TAXED AS INSURANCE COMPANIES ON INSURANCE BUSINESS.—In the case of an organization described in paragraph (3) or (4) of subsection (c) which is exempt from tax under subsection (a) after the application of paragraph (1) of this subsection—

"(A) the activity of providing commercial-type insurance shall be treated as an unrelated trade or business (as defined in section 513), and

"(B) in lieu of the tax imposed by section 511 with respect to such activity, such organization shall be treated as an insurance company for purposes of applying subchapter L with respect to such activity.

"(3) COMMERCIAL-TYPE INSURANCE.—For purposes of this subsection, the term 'commercial-type insurance' shall not include—

"(A) insurance provided at substantially below cost to a class of charitable recipients,

"(B) incidental health insurance provided by a health maintenance organization of a kind customarily provided by such organizations,

"(C) property or casualty insurance provided (directly or through an organization described in section 414(e)(3)(B)(ii)) by a church or convention or association of churches for such church or convention or association of churches, and

"(D) providing retirement or welfare benefits (or both) by a church or a convention or association of churches (directly or through an organization described in section 414(e)(3)(A) or 414(e)(3)(B)(ii)) for the employees (including employees described in section 414(e)(3)(B)) of such church or convention or association of churches or the beneficiaries of such employees.

"(4) INSURANCE INCLUDES ANNUITIES.—For purposes of this subsection, the issuance of annuity contracts shall be treated as providing insurance."

(b) TREATMENT OF BLUE CROSS AND BLUE SHIELD ORGANIZATIONS AND SIMILAR ORGANIZATIONS.—

(1) IN GENERAL.—Part III of subchapter L of chapter 1 is amended by adding at the end thereof the following new section:

"SEC. 833. TREATMENT OF BLUE CROSS AND BLUE SHIELD ORGANIZATIONS, ETC.

"(a) GENERAL RULE.—In the case of any organization to which this section applies—

"(1) TREATED AS STOCK COMPANY.—Such organization shall be taxable under this part in the same manner as if it were a stock insurance company.

"(2) SPECIAL DEDUCTION ALLOWED.—The deduction determined under subsection (b) for any taxable year shall be allowed.

"(3) REDUCTIONS IN UNEARNED PREMIUM RESERVES NOT TO APPLY.—Subparagraph (B) of paragraph (4) of section 832(b) shall be applied by substituting '100 percent' for '80 percent', and subparagraph (C) of such paragraph (4) shall not apply.

"(b) AMOUNT OF DEDUCTION.—

"(1) IN GENERAL.—Except as provided in paragraph (2), the deduction determined under this subsection for any taxable year is the excess (if any) of—

"(A) 25 percent of the sum of—

"(i) the claims incurred during the taxable year, and

"(ii) the expenses incurred during the taxable year in connection with the administration, adjustment, or settlement of claims, over

"(B) the adjusted surplus as of the beginning of the taxable year.

"(2) LIMITATION.—The deduction determined under paragraph (1) for any taxable year shall not exceed taxable income for such taxable year (determined without regard to such deduction).

"(3) ADJUSTED SURPLUS.—For purposes of this subsection—

"(A) IN GENERAL.—The adjusted surplus as of the beginning of any taxable year is an amount equal to the adjusted surplus as of the beginning of the preceding taxable year—

"(i) increased by the amount of any adjusted taxable income for such preceding taxable year, or

"(ii) decreased by the amount of any adjusted net operating loss for such preceding taxable year.

"(B) SPECIAL RULE.—The adjusted surplus as of the beginning of the organization's 1st taxable year beginning after December 31, 1986, shall be its surplus as of such time. For purposes of the preceding sentence and subsection (c)(3)(C), the term 'surplus' means the excess of the total assets over total liabilities as shown on the annual statement.

"(C) ADJUSTED TAXABLE INCOME.—The term 'adjusted taxable income' means taxable income determined—

"(i) without regard to the deduction determined under this subsection,

"(ii) without regard to any carryforward or carryback to such taxable year, and

"(iii) by increasing gross income by an amount equal to the net exempt income for the taxable year.

"(D) ADJUSTED NET OPERATING LOSS.—The term 'adjusted net operating loss' means the net operating loss for any taxable year determined with the adjustments set forth in subparagraph (C).

"(E) NET EXEMPT INCOME.—The term 'net exempt income' means—

"(i) any tax-exempt interest received or accrued during the taxable year, reduced by any amount (not otherwise deductible) which would have been allowable as a deduction for the taxable year if such interest were not tax-exempt, and

"(ii) the aggregate amount allowed as a deduction for the taxable year under sections 243, 244, and 245.

The amount determined under clause (ii) shall be reduced by the amount of any decrease in deductions allowable for the taxable year by reason of section 832(b)(5)(B) to the extent such decrease is attributable to deductions under sections 243, 244, and 245.

"(4) ONLY HEALTH-RELATED ITEMS TAKEN INTO ACCOUNT.—Any determination under this subsection shall be made by only taking into account items attributable to the health-related business of the taxpayer.

"(c) ORGANIZATIONS TO WHICH SECTION APPLIES.—

"(1) IN GENERAL.—This section shall apply to—

"(A) any existing Blue Cross or Blue Shield organization, and

"(B) any other organization meeting the requirements of paragraph (3).

"(2) EXISTING BLUE CROSS OR BLUE SHIELD ORGANIZATION.—The term 'existing Blue Cross or Blue Shield organization' means any Blue Cross or Blue Shield organization if—

"(A) such organization was in existence on August 16, 1986,

"(B) such organization is determined to be exempt from tax for its last taxable year beginning before January 1, 1987, and

"(C) no material change has occurred in the operations of such organization or in its structure after August 16, 1986, and before the close of the taxable year.

To the extent permitted by the Secretary, any successor to an organization meeting the requirements of the preceding sentence, and any organization resulting from the merger or consolidation of organizations each of which met such require-

ments, shall be treated as an existing Blue Cross or Blue Shield organization.

"(3) OTHER ORGANIZATIONS.—

"(A) IN GENERAL.—An organization meets the requirements of this paragraph for any taxable year if—

"(i) substantially all the activities of such organization involve the providing of health insurance,

"(ii) at least 10 percent of the health insurance provided by such organization is provided to individuals and small groups (not taking into account any medicare supplemental coverage),

"(iii) such organization provides continuous full-year open enrollment (including conversions) for individuals and small groups,

"(iv) such organization's policies covering individuals provide full coverage of pre-existing conditions of high-risk individuals without a price differential (with a reasonable waiting period), and coverage is provided without regard to age, income, or employment status of individuals under age 65,

"(v) at least 35 percent of its premiums are determined on a community rated basis, and

"(vi) no part of its net earnings inures to the benefit of any private shareholder or individual.

"(B) SMALL GROUP DEFINED.—For purposes of subparagraph (A), the term 'small group' means the lesser of—

"(i) 15 individuals, or

"(ii) the number of individuals required for a small group under applicable State law.

"(C) SPECIAL RULE FOR DETERMINING ADJUSTED SURPLUS.—For purposes of subsection (b), the adjusted surplus of any organization meeting the requirements of this paragraph as of the beginning of the 1st taxable year for which it meets such requirements shall be its surplus as of such time."

(2) CLERICAL AMENDMENT.—The table of sections for such part III is amended by adding at the end thereof the following new item:

"Sec. 833. Treatment of Blue Cross and Blue Shield organizations, etc."

(c) EFFECTIVE DATE.—

(1) IN GENERAL.—The amendments made by this section shall apply to taxable years beginning after December 31, 1986.

(2) STUDY OF FRATERNAL BENEFICIARY ASSOCIATIONS.—The Secretary of the Treasury or his delegate shall conduct a study of organizations described in section 501(c)(8) of the Internal Revenue Code of 1986 and which received gross annual insurance premiums in excess of $25,000,000 for the taxable years of such organizations which ended during 1984. Not later than January 1, 1988, the Secretary of the Treasury shall submit to the Committee on Ways and Means of the House of Representatives, the Committee on Finance of the Senate, and the Joint Committee on Taxation the results of such study, together with such recommendations as he determines to be appropriate. The Secretary of the Treasury shall have authority to require the furnishing of such information as may be necessary to carry out the purposes of this paragraph.

(3) SPECIAL RULES FOR EXISTING BLUE CROSS OR BLUE SHIELD ORGANIZATIONS.—

(A) IN GENERAL.—In the case of any existing Blue Cross or Blue Shield organization (as defined in section 833(c)(2) of the Internal Revenue Code of 1986 as added by this section)—

(i) no adjustment shall be made under section 481 (or any other provision) of such Code on account of a change in its method of accounting for its 1st taxable year beginning after December 31, 1986, and

(ii) for purposes of determining gain or loss, the adjusted basis of any asset held on the 1st day of such taxable year shall be treated as equal to its fair market value as of such day.

(B) TREATMENT OF CERTAIN DISTRIBUTIONS.—For purposes of section 833(b)(3)(B), the surplus of any organization as of the beginning of its 1st taxable year beginning after December 31, 1986, shall be increased by the amount of any distribution (other than to policyholders) made by such organization after August 16, 1986, and before the beginning of such taxable year.

(C) RESERVE WEAKENING AFTER AUGUST 16, 1986.—Any reserve weakening after August 16, 1986, by an existing Blue Cross or Blue Shield organization shall be treated as occurring in such organization's 1st taxable year beginning after December 31, 1986.

(4) OTHER SPECIAL RULES.—

(A) The amendments made by this section shall not apply with respect to that portion of the business of Mutual of America which is attributable to pension business.

(B) The amendments made by this section shall not apply to that portion of the business of the Teachers Insurance Annuity Association-College Retirement Equities Fund which is attributable to pension business.

(C) The amendments made by this section shall not apply to—

(i) the retirement fund of the YMCA,

(ii) the Missouri Hospital Association,

(iii) administrative services performed by municipal leagues, and

(iv) dental benefit coverage provided by Delta Dental Plans Association through contracts with independent professional service providers so long as the provision of such coverage is the principal activity of such Association.

(D) For purposes of this paragraph, the term "pension business" means the administration of any plan described in section 401(a) of the Internal Revenue Code of 1954 which includes a trust exempt from tax under section 501(a), any plan under which amounts are contributed by an individual's employer for an annuity contract described in section 403(b) of such Code, any individual retirement plan described in section 408 of such Code, and any eligible deferred compensation plan to which section 457(a) of such Code applies.

**SEC. 176. RECAPTURE OF NET ORDINARY LOSSES UNDER SECTION 1231.**

(a) GENERAL RULE.—Section 1231 (relating to property used in the trade or business and involuntary conversions) is amended by adding at the end thereof the following new subsection: 26 USC 1231.

"(c) RECAPTURE OF NET ORDINARY LOSSES.—

"(1) IN GENERAL.—The net section 1231 gain for any taxable year shall be treated as ordinary income to the extent such gain does not exceed the non-recaptured net section 1231 losses.

"(2) NON-RECAPTURED NET SECTION 1231 LOSSES.—For purposes of this subsection, the term 'non-recaptured net section 1231 losses' means the excess of—

"(A) the aggregate amount of the net section 1231 losses for the 5 most recent preceding taxable years beginning after December 31, 1981, over

"(B) the portion of such losses taken into account under paragraph (1) for such preceding taxable years.

"(3) NET SECTION 1231 GAIN.—For purposes of this subsection, the term 'net section 1231 gain' means the excess of—

"(A) the section 1231 gains, over

"(B) the section 1231 losses.

"(4) NET SECTION 1231 LOSS.—For purposes of this subsection, the term 'net section 1231 loss' means the excess of—

"(A) the section 1231 losses, over

"(B) the section 1231 gains.

"(5) SPECIAL RULES.—For purposes of determining the amount of the net section 1231 gain or loss for any taxable year, the rules of paragraph (4) of subsection (a) shall apply." *Post,* p. 944.

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to net section 1231 gains for taxable years beginning after December 31, 1984. 26 USC 1231 note.

**SEC. 177. REPEAL OF EXEMPTION FROM FEDERAL TAX OF THE FEDERAL HOME LOAN MORTGAGE CORPORATION.**

(a) REPEAL OF EXEMPTION.—Subsection (d) of section 303 of the Federal Home Loan Mortgage Corporation Act (12 U.S.C. 1452(d)) is amended—

(1) by striking out "by the United States,",

(2) by striking out "possession thereof," and inserting in lieu thereof "possession of the United States", and

(3) by striking out the last sentence.

(b) TREATMENT OF DIVIDENDS PAID BY FEDERAL HOME LOAN BANK WHICH ARE ALLOCABLE TO DIVIDENDS FROM THE FEDERAL HOME LOAN MORTGAGE CORPORATION.—Subsection (a) of section 246 (relating to denial of dividends received deduction for dividends from certain corporations) is amended to read as follows: 26 USC 246.

"(a) DEDUCTION NOT ALLOWED FOR DIVIDENDS FROM CERTAIN CORPORATIONS.—

"(1) IN GENERAL.—The deductions allowed by sections 243, 244, and 245 shall not apply to any dividend from a corporation which, for the taxable year of the corporation in which the distribution is made, or for the next preceding taxable year of the corporation, is a corporation exempt from tax under section 501 (relating to certain charitable, etc., organizations) or section 521 (relating to farmers' cooperative associations).

"(2) SUBSECTION NOT TO APPLY TO CERTAIN DIVIDENDS OF FEDERAL HOME LOAN BANKS.—

"(A) DIVIDENDS OUT OF CURRENT EARNINGS AND PROFITS.—In the case of any dividend paid by any FHLB out of earnings and profits of the FHLB for the taxable year in which such dividend was paid, paragraph (1) shall not apply to that portion of such dividend which bears the same ratio to the total dividend as—

"(i) the dividends received by the FHLB from the FHLMC during such taxable year, bears to

"(ii) the total earnings and profits of the FHLB for such taxable year.

"(B) DIVIDENDS OUT OF ACCUMULATED EARNINGS AND PROFITS.—For purposes of subparagraph (A), in the case of any dividend which is paid out of any accumulated earnings and profits of any FHLB, paragraph (1) shall not apply to that portion of the dividend which bears the same ratio to the total dividend as—

"(i) the amount of dividends received by such FHLB from the FHLMC which are out of earnings and profits of the FHLMC—

"(I) for taxable years ending after December 31, 1984, and

"(II) which were not taken into account under subparagraph (A), bears to

"(ii) the total accumulated earnings and profits of the FHLB as of the time such dividend is paid.

For purposes of clause (ii), the accumulated earnings and profits of the FHLB as of January 1, 1985, shall be treated as equal to its retained earnings as of such date.

"(C) DEFINITIONS.—For purposes of this paragraph—

"(i) FHLB.—The term 'FHLB' means any Federal Home Loan Bank.

"(ii) FHLMC.—The term 'FHLMC' means the Federal Home Loan Mortgage Corporation.

"(iii) TAXABLE YEAR OF FHLB.—The taxable year of an FHLB shall, except as provided in regulations prescribed by the Secretary, be treated as the calendar year."

(c) TREATMENT OF NET OPERATING LOSSES OF THE FEDERAL HOME LOAN MORTGAGE CORPORATION.—

26 USC 172.

(1) IN GENERAL.—Subparagraph (H) of section 172(b)(1) (relating to years to which net operating losses may be carried) is amended—

(A) by inserting ", or a net operating loss of the Federal Home Loan Mortgage Corporation for any taxable year beginning after December 31, 1984" after "1981",

(B) by striking out "the FNMA mortgage disposition loss (within the meaning of subsection (i))" in clause (i) and inserting in lieu thereof "the mortgage disposition loss (within the meaning of subsection (i))", and

(C) by striking out "FNMA mortgage disposition loss" in clause (ii) and inserting in lieu thereof "mortgage disposition loss".

(2) CONFORMING AMENDMENT.—Subsection (i) of section 172 is amended—

(A) by striking out "FNMA mortgage disposition loss" each place it appears in paragraphs (1) and (2) (including in

headings) and inserting in lieu thereof "mortgage disposition loss", and

(B) by striking out "FNMA MORTGAGE DISPOSITION LOSS" in the subsection heading and inserting in lieu thereof "MORTGAGE DISPOSITION LOSS OF THE FEDERAL NATIONAL MORTGAGE ASSOCIATION OR THE FEDERAL HOME LOAN MORTGAGE CORPORATION".

(d) EFFECTIVE DATES.— 26 USC 172 note.

(1) IN GENERAL.—The amendments made by this section shall take effect on January 1, 1985.

(2) ADJUSTED BASIS OF ASSETS.—

(A) IN GENERAL.—Except as otherwise provided in subparagraph (B), the adjusted basis of any asset of the Federal Home Loan Mortgage Corporation held on January 1, 1985, shall—

(i) for purposes of determining any loss, be equal to the lesser of the adjusted basis of such asset or the fair market value of such asset as of such date, and

(ii) for purposes of determining any gain, be equal to the higher of the adjusted basis of such asset or the fair market value of such asset as of such date.

(B) SPECIAL RULE FOR TANGIBLE DEPRECIABLE PROPERTY.— In the case of any tangible property which—

(i) is of a character subject to the allowance for depreciation provided by section 167 of the Internal Revenue Code of 1954, and

(ii) is held by the Federal Home Loan Mortgage Corporation on January 1, 1985,

the adjusted basis of such property shall be equal to the lesser of the basis of such property or the fair market value of such property as of such date.

(3) TREATMENT OF PARTICIPATION CERTIFICATES.—

(A) IN GENERAL.—Paragraph (2) shall not apply to any right to receive income with respect to any mortgage pool participation certificate or other similar interest in any mortgage (not including any mortgage).

(B) TREATMENT OF CERTAIN SALES AFTER MARCH 15, 1984, AND BEFORE JANUARY 1, 1985.—If any gain is realized on the sale or exchange of any right described in subparagraph (A) after March 15, 1984, and before January 1, 1985, the gain shall not be recognized when realized but shall be recognized on January 1, 1985.

(4) NO ACCUMULATED EARNINGS AND PROFITS ON JANUARY 1, 1985.—For purposes of the Internal Revenue Code of 1954, the accumulated profits of the Federal Home Loan Mortgage Corporation as of January 1, 1985, shall be treated as zero. 26 USC 1 *et seq.*

(5) ADJUSTED BASIS.—For purposes of this subsection, the adjusted basis of any asset shall be determined under part II of subchapter O of the Internal Revenue Code of 1954.

(6) NO CARRYBACKS FOR YEARS BEFORE 1985.—No net operating loss, capital loss, or excess credit of the Federal Home Loan Mortgage Corporation for any taxable year beginning after December 31, 1984, shall be allowed as a carryback to any taxable year beginning before January 1, 1985.

(7) NO DEDUCTION ALLOWED FOR INTEREST ON REPLACEMENT OBLIGATIONS.—

(A) IN GENERAL.—The Federal Home Loan Mortgage Corporation shall not be allowed any deduction for interest accruing after December 31, 1984, on any replacement obligation.

(B) REPLACEMENT OBLIGATION DEFINED.—For purposes of subparagraph (A), the term "replacement obligation" means any obligation to any person created after March 15, 1984, which the Secretary of the Treasury or his delegate determines replaces any equity or debt interest of a Federal Home Loan Bank or any other person in the Federal Home Loan Mortgage Corporation existing on such date. The preceding sentence shall not apply to any obligation with respect to which the Federal Home Loan Mortgage Corporation establishes that there is no tax avoidance effect.

**SEC. 178. SPECIAL RULE RELATING TO SALES OR EXCHANGES OF CERTAIN ECONOMIC INTERESTS IN COAL BETWEEN RELATED PARTIES.**

26 USC 631.

(a) IN GENERAL.—The last sentence of section 631(c) (relating to disposal of coal or domestic iron ore with a retained economic interest) is amended by inserting "or coal" after "iron ore" each place it appears.

26 USC 631 note.

(b) EFFECTIVE DATES.—

(1) IN GENERAL.—Except as provided in paragraph (2), the amendment made by subsection (a) shall apply to dispositions after September 30, 1985.

(2) SPECIAL RULE FOR FIXED CONTRACTS.—

(A) IN GENERAL.—The amendment made by subsection (a) shall not apply to any disposition of an interest in coal by a person to a related person if such coal is subsequently sold before January 1, 1990, by either such person—

(i) to a person who is not a related person with respect to either such person, and

(ii) pursuant to a qualified fixed contract.

(B) ALLOCATION WHERE MORE THAN 1 CONTRACT.—If, for any taxable year, there is a disposition described in subparagraph (A) which is not specifically allocable to a qualified fixed contract or to a contract which is not a qualified fixed contract, such disposition shall be treated as first allocable to the qualified fixed contract.

(C) QUALIFIED FIXED CONTRACT DEFINED.—The term "qualified fixed contract" means any contract for the sale of coal which—

(i) was entered into before June 12, 1984,

(ii) is binding at all times thereafter, and

(iii) cannot be adjusted to reflect to any extent the increase in liabilities of the person disposing of the coal for tax under chapter 1 of the Internal Revenue Code of 1954 by reason of the amendment made by subsection (a).

26 USC 1 *et seq.*

(D) RELATED PERSON.—For purposes of this paragraph, the term "related person" means a person who bears a relationship to another person described in the last sentence of section 631(c).

**Treas. Reg. (26 C.F.R.) 1.446-1 (1995) General rule for methods of accounting.**

. . . .

(e) Requirement respecting the adoption or change of accounting method.

(1) A taxpayer filing his first return may adopt any permissible method of accounting in computing taxable income for the taxable year covered by such return. See section 446(c) and paragraph (c) of this section for permissible methods. Moreover, a taxpayer may adopt any permissible method of accounting in connection with each separate and distinct trade or business, the income from which is reported for the first time. See section 446(d) and paragraph (d) of this section. See also section 446(a) and paragraph (a) of this section.

(2)

(i) Except as otherwise expressly provided in chapter 1 of the Code and the regulations thereunder, a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. Consent must be secured whether or not such method is proper or is permitted under the Internal Revenue Code or the regulations thereunder.

(ii)

(a) A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. Although a method of accounting may exist under this definition without the necessity of a pattern of consistent treatment of an item, in most instances a method of accounting is not established for an item without such consistent treatment. A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction. Changes in method of accounting include a change from the cash receipts and disbursement method to an accrual method, or vice versa, a change involving the method or basis used in the valuation of inventories (see sections 471 and 472 and the regulations thereunder), a change from the cash or accrual method to a long-term contract method, or vice versa (see s 1.451-3), a change involving the adoption, use or discontinuance of any other specialized method of computing taxable income, such as the crop method, and a change where the Internal Revenue Code and regulations thereunder specifically require that the consent of the Commissioner must be obtained before adopting such a change.

(b) A change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability (such as errors in computation of the foreign tax credit, net operating loss, percentage depletion or investment credit). Also, a change in method of

**<u>Treas. Reg. (26 C.F.R.) 1.446-1 (1995) General rule for methods of accounting (Continued):</u>**

accounting does not include adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a deduction. For example, corrections of items that are deducted as interest or salary, but which are in fact payments of dividends, and of items that are deducted as business expenses, but which are in fact personal expenses, are not changes in method of accounting. In addition, a change in the method of accounting does not include an adjustment with respect to the addition to a reserve for bad debts or an adjustment in the useful life of a depreciable asset. Although such adjustments may involve the question of the proper time for the taking of a deduction, such items are traditionally corrected by adjustments in the current and future years. For the treatment of the adjustment of the addition to a bad debt reserve, see the regulations under section 166 of the Code; for the treatment of a change in the useful life of a depreciable asset, see the regulations under section 167(b) of the Code. A change in the method of accounting also does not include a change in treatment resulting from a change in underlying facts. On the other hand, for example, a correction to require depreciation in lieu of a deduction for the cost of a class of depreciable assets which has been consistently treated as an expense in the year of purchase involves the question of the proper timing of an item, and is to be treated as a change in method of accounting.

(c) A change in an overall plan or system of identifying or valuing items in inventory is a change in method of accounting. Also a change in the treatment of any material item used in the overall plan for identifying or valuing items in inventory is a change in method of accounting.

. . . .