# DEFENDANT'S EXHIBIT 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HIGHMARK, INC., SUCCESSOR IN INTEREST TO PENNSYLVANIA BLUE SHIELD AND SUBSIDIARIES<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Civil Action No. 05-1030 T<br>Judge Margolis |

**PLAINTIFF'S SECOND AMENDED ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiff Highmark, Inc., Successor in Interest to Pennsylvania Blue Shield, ("PBS"), by and through its undersigned counsel, hereby responds and objects to Defendant the United States' ("Defendant" or "United States") First Set of Interrogatories as follows. Plaintiff reserves the right to supplement its responses.

**GENERAL OBJECTIONS**

1. PBS objects to the United States' First Set of Interrogatories to the extent the United States seeks to impose burdens or requirements on PBS in excess of those imposed by the RCFC.

2. PBS objects to the United States' First Set of Interrogatories on the grounds that they exceed 25 in number including all discrete subparts.

3. PBS objects to the "definitions" in the United States' First Set of Interrogatories on the grounds that they make the interrogatories unduly burdensome to answer and are vague.

4. PBS objects to each and every Interrogatory to the extent that it calls for information that is protected by the attorney-client privilege, the work product doctrine, the self-critical analysis privilege, or any other privilege or protection from disclosure. PBS hereby asserts all such applicable privileges and exemptions. Any disclosure of privileged or protected information in response to any Interrogatory is inadvertent and not intended to waive those privileges.

5. PBS objects to the Interrogatories to the extent they seek information wholly irrelevant to Plaintiff's claims and are not reasonably calculated to lead to the discovery of admissible evidence.

6. PBS objects to the Interrogatories to the extent that Defendant already possesses or has equal access to the information sought.

7. PBS objects to the Interrogatories to the extent that they are overbroad and harassing and any attempt to respond would be unduly burdensome, expensive and/or oppressive.

8. PBS objects to the Interrogatories to the extent that they are vague or ambiguous.

9. Whenever in these responses PBS employs the phrase "subject to and without waiving its objections," PBS is responding to the particular interrogatory as it may be narrowed by PBS's general and specific objections and without waiver of any objections.

10. PBS's responses herein shall not waive or prejudice any objections that PBS may later assert. These General Objections apply to and are incorporated by reference into each of

PBS's specific responses and objections below, and the specific responses and objections set forth below are not to be deemed a waiver, either in whole or in part, of any of these General Objections.

**SPECIFIC RESPONSES AND OBJECTIONS**

**Interrogatory No. 1:**

If plaintiff responds with anything but an unequivocal admission to any request contained in Defendant's Requests for Admissions-Set No. 1:

(a) Quote the phrase, word, or words that plaintiff does not admit;

(b) State in detail each fact that (in plaintiff's view) supports the refusal to admit the clause, phrase, word, or words listed in response to Interrogatory 1(a), identifying all persons who have knowledge of each such fact and describing all documents that support each such fact; and

(c) If plaintiff does not agree with defendant's statement of the subject of the requested admission, fully state plaintiff's view of the facts, and separately set forth the evidence upon which plaintiff relies to support its point of view.

**Answer to Interrogatory No. 1:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and unreasonably cumulative and duplicative of other discovery requests. Subject to and without waiving its objections, PBS answers as follows. Where applicable, and not objectionable on the grounds stated above, PBS has explained the basis of its denials in its Answer to Defendant's Requests for Admissions-Set No. 1, and incorporates those answers herein.

**<u>Interrogatory No. 2:</u>**

State all facts upon which plaintiff relies to support its claim that a tax deductible "loss of intangible assets" occurred as alleged in the complaint.

**<u>Answer to Interrogatory No. 2:</u>**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Subject to and without waiving its objections, PBS answers as follows. During the years at issue, PBS held intangible assets including healthcare coverage contracts that it held since at least January 1, 1987. Each such contract was a valuable asset. In the year the contract terminated or was canceled, there was a closed and completed transaction with respect to that asset. When these contracts terminated or were canceled, PBS sustained a loss. This loss was not compensated for by insurance or otherwise. See also PBS's answer to Interrogatory 3 below.

**<u>Interrogatory No. 3:</u>**

State all facts upon which plaintiff relies to support its claim that each of the contracts referred to in paragraph 24 of the complaint was terminated or cancelled in the year for which plaintiff claims it as a loss.

**<u>Answer to Interrogatory No. 3:</u>**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. Subject to and without waiving its objections, PBS answers as follows. PBS relies on the fact that for each such contract either the subscriber or PBS actually terminated or cancelled the contract in the year in which PBS claims the loss deduction. PBS also relies on the fact that for many, if not all, contracts that were terminated or cancelled, either the subscriber or PBS communicated that fact to the other party. PBS also relies on the fact that it made entries

into the corporate subscriber database and the corporate group database stating the date each such contract was terminated or canceled. PBS also relies on the fact that contemporaneously with the termination or cancellation of a group subscriber, PBS prepares consolidated group activity reports indicating cancellations and other group activity. PBS also prepares four different cancellation reports by agent plan from the Optimum Flow System, which is a nightly electronic file transmission, to process cancelled groups. PBS also relies on the fact that it received and used forms verifying the termination or cancellation dates of the contracts from agent plans. This would include the Group Data Forms ("GDF") which are received from the agent plans for cancellation notification of experience and community-rated groups.

**Interrogatory No. 4:**

Describe the method, assumptions, and calculations by which plaintiff computed the income tax refund claim of $21,329,919 set forth in the prayer for relief in the complaint, including the method, assumptions, and calculations by which plaintiff computed the fair market value on January 1, 1987, of the contracts referred to in paragraph 24 of the complaint.

**Answer to Interrogatory No. 4:**

PBS computed the $21,329,919 set forth in the prayer for relief by identifying the group and individual healthcare coverage contracts that terminated in each of the years at issue, and calculating the fair market value of each such contract as of January 1, 1987. The values were based on the valuation of PBS's subscriber intangibles as described in the report, dated September 10, 1998, prepared by Mr. Michael Wierwille, Valuation Partner at PricewaterhouseCoopers LLP (the "PWC Report"). The PWC Report and supporting documentation describes the methods, assumptions and calculations used to determine fair

market value. These documents previously have been provided to Defendant. Plaintiff notes that the fair market value of the contracts is not necessarily the same amount shown in the PWC Report. Plaintiff will provide what it contends to be the value of such contracts in its expert report(s).

**Interrogatory No. 5:**

Identify all persons and/or organizations that participated in any manner in computing the $21,329,919 amount set forth in the complaint or conducted, at any time, a valuation of the contracts referred to in paragraph 24 of the complaint.

**Answer to Interrogatory No. 5:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome and to the extent that it calls for information that is protected by the attorney-client privilege or the work product doctrine relating to any valuation that was created in anticipation of litigation or is presently being undertaken in connection with this litigation. Subject to and without waiving its objections, PBS answers as follows. Michael Wierwille, Jonathan L. Jacobs, Christina Choe, Lisah Burhan and Jagesh Shah, who were employed by PricewaterhouseCoopers ("PWC") at the time, conducted a valuation of the healthcare coverage contracts held by PBS as of January 1, 1987 and prepared the PWC Report referred to in the answer to Interrogatory 4. These values were used to compute the $21,329,919 amount set forth in the Complaint, based on what were believed to be the healthcare coverage contracts that terminated between 1987 and 1996. Todd Vanerstrom, Paul Fleischacker, David Werner, Lloyd Freeman, James Eagle and Jacqueline Bauer of Highmark, Inc. provided information to PWC for purposes of the valuation. PBS previously had commissioned a valuation of individual subscriber relationships which was

conducted by Ernst & Young in 1995-96. The Ernst & Young valuation report was authored by Lee C. Russell and Charles M. Chubb, Jr.

**Interrogatory No. 6:**

Identify each sale of healthcare coverage contracts to another health insurance or health service provider that plaintiff has made at any time, including the purchaser, the date of the transaction, the number of contracts sold, the terms of the sale, and the method by which plaintiff calculated the amount of consideration for the sale.

**Answer to Interrogatory No. 6:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. PBS further objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows. PBS is unaware of any sale of healthcare coverage contracts to another health insurance or health service provider from 1980 to 1996.

**Interrogatory No. 7:**

Identify each purchase of healthcare coverage contracts from another health insurance or health service provider that plaintiff has made at any time, including the seller, the date of the transaction, the number of contracts bought, the terms of the sale, and the method by which plaintiff calculated the amount of consideration for the purchase.

**Answer to Interrogatory No. 7:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. PBS further objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its

objections, PBS answers as follows. PBS is unaware of any purchase of healthcare coverage contracts from another health insurance or health service provider from 1980 to 1996.

**Interrogatory No. 8:**

Identify each purchase of a company by plaintiff, and each sale of a company by plaintiff, wherein an element of the purchase price was determined or affected by the value of healthcare coverage contracts, including the seller or buyer, the date of the transaction, the number of contracts bought or sold, the terms of the purchase or sale, and the method by which plaintiff calculated the amount of consideration for the purchase or sale.

**Answer to Interrogatory No. 8:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. PBS further objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows. PBS is unaware of any purchase or sale of a company by plaintiff wherein an element of the purchase price was determined or affected by the value of healthcare coverage contracts from 1980 to 1996.

**Interrogatory No. 9:**

Identify each contract referred to in paragraph 24 of the complaint.

**Answer to Interrogatory No. 9:**

As read with the United States' definition of "identify," PBS objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. In addition, the definition of "identify" contains various components that clearly do not relate to an identification of the contracts, but instead appear to seek other substantive information and should be counted as

discrete subparts for the purposes of the limit on the number of interrogatories contained in RCFC 33(a). Subject to and without waiving its objections, PBS answers as follows. The contracts referred to in paragraph 24 of the complaint are identified in the PWC Report, which has already been provided to Defendant (the portion of the PWC Report entitled Pennsylvania Blue Shield Abandonment of Intangible Assets as of January 1, 1987).

**Interrogatory No. 10:**

Describe each insured that, on January 1, 1987, was protected by one of the healthcare coverage contracts referred to in paragraph 24 of the complaint.

**Answer to Interrogatory No. 10:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and unreasonably cumulative and duplicative of other discovery requests. In addition, the United States' definition of "describe" contains various unrelated components that should be counted as discrete subparts for the purposes of the limit on the number of interrogatories contained in RCFC 33(a). Subject to and without waiving its objections, PBS answers as follows. The insureds for which PBS provided health care coverage on January 1, 1987 fall into three categories: (1) experience-rated; (2) community-rated; and (3) direct-pay. Experience-rated insureds are large groups of 100 or more participants, covering geographic areas both within and external to the Commonwealth of Pennsylvania. Premium rates for experience-rated business are based on previous experience regarding utilization of group benefits. Community-rated insureds are small groups with membership typically less than 100 which are geographically concentrated within the Commonwealth of Pennsylvania. These contracts are for participants of

small businesses or persons sharing a common bond that band together to receive benefits at a group rate. Direct-pay insureds are participants who pay directly for coverage and who are not part of an employer's group. Rating and underwriting for community-rated and direct-pay insureds is not based on group-specific experience, but rather on the collective book of business, controlled and executed as per the regulations promulgated by the Pennsylvania Department of Insurance.

**Interrogatory No. 11:**

Describe plaintiff's policies, at all times between January 1, 1977, and January 1, 1987, for dealing with health insurance subscribers who were delinquent on their premium payments and identify the persons primarily responsible for dealing with delinquent health insurance subscribers between January 1, 1977, and January 1, 1987.

**Answer to Interrogatory No. 11:**

During the period from January 1, 1977, for groups that made payments directly to PBS, PBS's policy was to send a letter informing the employer that payment was overdue. The letter was often followed up with one or more phone calls to ascertain the intentions of the employer and status of the payment. After a certain period of time or if no resolution could be made relative to payment a cancellation notice would be sent. Most of these policies and procedures were performed by the PBS billing department. For groups where billing was handled by an agent plan, the agent plan would follow their own policy. The agent plan would then notify PBS of the groups cancellation if the payments could not be obtained.

**<u>Interrogatory No. 12:</u>**

State all factors on which plaintiff relied in setting premium rates for direct pay (individual) healthcare coverage contracts during the period January 1, 1977, through January 1, 1987, and state how each factor was used in setting premium rates.

**<u>Answer to Interrogatory No. 12:</u>**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows.

To set premium rates for individual contracts, PBS considered prior claims experience (as described below), industry data, input from consultants, short and long-term historic trends, and other available inputs and used this information to estimate claims for the upcoming year. Claims experience was pooled by major product (e.g., UCR vs. fee schedule). PBS also considered administrative costs and other elements of retention needed in setting the premiums. These factors also were generally considered by major product to determine premiums for that product, then PBS would consider if the rates among the products were appropriate.

**<u>Interrogatory No. 13:</u>**

State all factors on which plaintiff relied in setting premium rates for group health insurance subscribers of fewer than 100 participants during the period January 1, 1977, through January 1, 1987, and state how each factor was used in setting premium rates.

**Answer to Interrogatory No. 13:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows.

The factors described in PBS's answer to Interrogatory 12 above were also used to set premium rates for group policies, except that rates were set by major product (e.g., UCR vs. Fee Schedule) within line of business (e.g., medical vs. dental). As with direct-pay, experience was pooled by major product.

**Interrogatory No. 14:**

State all factors on which plaintiff relied in setting premium rates for group health insurance subscribers of more than ninety-nine participants during the period January 1, 1977, through January 1, 1987, and state how each factor was used in setting premium rates.

**Answer to Interrogatory No. 14:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows.

Rates were set by an analogous process to that outlined in PBS's answer to Interrogatory 13 with two key differences. First, rates were set using client-specific experience. Second, to the extent that a client's experience was not fully credible, a credibility factor was employed to adjust the portion of a group's experience that fell outside of a predetermined projected loss ratio band.

**Interrogatory No. 15:**

State all factors on which plaintiff relied in setting premium rates for federal employee healthcare coverage contracts during the period January 1, 1977, through January 1, 1987, and state how each factor was used in setting premium rates.

**Answer to Interrogatory No. 15:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows. PBS did not set the premium rates for federal employee health insurance subscription premiums. These rates were established on a national basis for all federal employee enrollees.

**Interrogatory No. 16:**

State whether plaintiff maintains specific records of the amount of profit earned from each healthcare coverage contract and, if so, describe the records so maintained and identify the person currently employed by plaintiff who is most familiar with such records.

**Answer to Interrogatory No. 16:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows for the time period 1980 to the present.

For individual subscriber contracts and small groups, PBS does not keep records of the profit earned from each contract. For experience-rated groups, PBS tracks loss ratios for each group as part of its rating process.

Information regarding loss ratios was historically maintained in the Rate Action File and is currently maintained in the Highmark Pricing System. Robert Cohen is the Highmark employee most familiar with the Rate Action File records and Sheila Fasig is the Highmark employee most familiar with the Highmark Pricing System records.

**Interrogatory No. 17:**

Describe the circumstances in which plaintiff would cancel a healthcare coverage contract during the period January 1, 1977, through January 1, 1987.

**Answer to Interrogatory No. 17:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows.

PBS would cancel a healthcare coverage contract during the period of January 1, 1977 through January 1, 1987 for three basic reasons: (1) at the request of the insured; (2) for non-payment of premiums; and (3) for failure to meet the group underwriting guidelines. The non-payment of premium policies are outlined in the Response to Interrogatory 11. Enforcement of the group underwriting guidelines was delegated to the Blue Cross plans as part of the agency services agreement. Examples of these standard requirements include, but are not limited to: (1) minimum employee participation in the benefit plan (e.g., at least 75% of eligible employees enrolled); or (2) minimum group size (there must be at least two enrolled employees).

**Interrogatory No. 18:**

Describe plaintiff's general practice of marketing health insurance products to former subscribers during the period January 1, 1977, to the present.

**Answer to Interrogatory No. 18:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. PBS further objects to this Interrogatory on the ground that in incorrectly assumes that PBS had a general practice of marketing health insurance to former subscribers.

Subject to and without waiving its objections, PBS answers as follows. The general practice of marketing to former subscribers was similar to the practice of marketing to any other subscribers. This would include customer calls, customer visits, proposal writing, supported by marketing collateral such as pamphlets describing the various product lines such as Blue Shield 100. Practices for marketing were often shared with agent plan marketing efforts and would combine the collective marketing collateral and capacities of both PBS and the agent plans. Sometimes agent plan and PBS sales personnel would jointly attend sales calls.

Marketing to former subscribers may have taken into consideration previous benefit designs, pricing and administrative processes in better serving the prospective clients' future needs. However, this practice was not limited to former subscribers and would have been a consideration for any prospective subscriber. If an individual subscriber ceased to be a PBS group subscriber and did not become enrolled under a health benefit plan with any other organization, they were offered to elect to become a conversion subscriber. This allowed a subscriber to convert to an individual policy without providing evidence of insurability.

In more recent times starting with the 1990's, marketing practices would include community outreach programs, wellness programs, commercial advertising through coordinated TV radio and print, direct response advertising, surveys and web and internet marketing.

**Interrogatory No. 19:**

List all healthcare coverage contracts plaintiff entered into during the period January 1, 1977, through the present, with an individual or group that was previously covered by one of plaintiff's healthcare coverage contracts before it was terminated or cancelled and, for each such contract, state how much time passed between the termination of the original contract and the execution of the subsequent contract.

**Answer to Interrogatory No. 19:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and unreasonably cumulative and duplicative of other discovery requests. Subject to and without waiving its objections, PBS answers as follows. PBS does not separately compile data on healthcare coverage contracts it entered into from January 1, 1977, through the present, with individuals or groups that were previously covered by one of PBS's healthcare coverage contracts before it was terminated or cancelled.

**Interrogatory No. 20:**

State whether at any time plaintiff has capitalized plaintiff's costs associated with internally developing or otherwise acquiring healthcare coverage contracts and, if not, state all reasons why plaintiff has not capitalized such costs.

**Answer to Interrogatory No. 20:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows. PBS was exempt from

federal income tax prior to January 1, 1987 under the provisions of 26 U.S.C. § 501(c)(4). Accordingly, PBS does not have any Federal income tax records regarding capitalization or non-capitalization of such costs prior to January 1, 1987. Subsequent to January 1, 1987, for Federal income tax purposes, PBS treated the costs associated with internally developing or otherwise acquiring health insurance subscription contracts as required by the Internal Revenue Code. Plaintiff has never purchased or otherwise acquired health insurance contracts so it has not had occasion to treat the costs incurred in such an acquisition as capital or non-capital expenses. Plaintiff further responds that to the best of its knowledge, Plaintiff did not routinely capitalize the costs associated with internally developing or otherwise acquiring healthcare coverage contracts in its financial accounting records and tax returns and that on neither its financial books and records nor its tax returns has the Plaintiff recorded an asset account containing or relating to healthcare coverage contracts, because the financial accounting rules and Internal Revenue Code did not require Plaintiff to do so.

**Interrogatory No. 21:**

Identify and describe the costs plaintiff incurred between 1987 and 1996 in creating, or facilitating the creation of, healthcare coverage contracts.

**Answer to Interrogatory No. 21:**

PBS objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence. As read with the United States' definition of "identify," PBS further objects to this Interrogatory on the grounds that it is vague, overbroad, and unduly burdensome. PBS further objects to the terms "creating" and "facilitating the creation of" as vague and ambiguous. In addition, the United States' definition of "describe" contains various

unrelated components that should be counted as discrete subparts for the purposes of the limit on the number of interrogatories contained in RCFC 33(a). Further, PBS objects to the Interrogatory on the grounds that the term "cost" is vague. Subject to and without waiving its objections, PBS answers as follows (construing "creating" or "facilitating the creation of" as limited to the actual sales (i.e., employer group engagement) and not the preliminary development work (e.g., product design and actuarial analysis) that led to the actual creation of the product(s) that were ultimately sold). The Blue Cross plans were responsible for the Marketing and Sales of the Blue Cross/Blue Shield healthcare plans, as defined in the agency services agreements. Blue Cross Sales Executives were the primary contact with the employer groups, Blue Cross handled the advertising, Blue Cross Underwriting Staff prepared the rate proposal and administered the Underwriting Guidelines and the Blue Cross Membership and Billing area entered the initial enrollment and produced invoices. The cost for these services, along with PBS's share of any applicable commission payments, were "charged back" to PBS under the terms of the respective agency service agreements.

PBS Sales staff performed sales support functions in assisting the Blue Cross Sales Executives at the point of sale as well as ongoing account servicing. These costs included explaining the Health Care, Dental and Vision programs and facilitating the account set-up on the PBS systems. The PBS Rating area prepared the new business quote for the PBS programs and forwarded the rates to the Blue Cross Underwriting area for packaging. The PBS Membership and Billing area would install each new account on the enrollment systems and the PBS Benefit Coding area would code the appropriate benefits into the claims processing system so the account's benefits were administered properly.

**Interrogatory No. 22:**

State whether plaintiff incurred the costs referred to in number 21, supra, in each of the years 1987 through 1996.

**Answer to Interrogatory No. 22:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows. Plaintiff incurred costs in creating or facilitating the creation of healthcare coverage contracts in each of the years 1987 through 1996.

**Interrogatory No. 23:**

State the reason or reasons why plaintiff did not claim deductions for terminated or cancelled healthcare coverage contracts on its original federal income tax returns for the 1987 through 1994 tax years.

**Answer to Interrogatory No. 23:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. PBS further objects to this Interrogatory on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows. In the initial years following the enactment of the Tax Reform Act of 1986 (the "Act"), Plaintiff, as well as other Blue Cross and Blue Shield plans, which had become subject to federal income taxes for the first time in 1987, did not have a complete understanding of the newly applicable tax provisions, including the fresh start basis rule. As PBS came to study

and understand further developments in the law, it engaged Ernst and Young to complete a study aimed at valuing the individual subscriber relationships as of January 1, 1987. PWC later was engaged to value the group subscriber relationships.

**Interrogatory No. 24:**

State the reason or reasons why plaintiff is not seeking a refund of federal income taxes for the 1987 through 1990 tax years based on the termination or cancellation of healthcare coverage contracts.

**Answer to Interrogatory No. 24:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows. The losses based on the termination or cancellation of healthcare coverage contacts for the 1987 through 1990 tax years form part of certain tax attribute carry forwards including, without limitation, net operating loss carry forwards, that carry forward and result, in whole or in part, in an overpayment of tax that Plaintiff paid for the tax year 1991.

**Interrogatory No. 25:**

Describe plaintiff's data management system for membership and claims information as it existed at all times between 1977 and 1996.

**Answer to Interrogatory No. 25:**

PBS objects to this Interrogatory on the grounds that it is vague, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its objections, PBS answers as follows.

There were numerous systems that existed and used by PBS between 1977 and 1996 for both claims and membership processing. Beginning with data management systems for claims, the following systems existed during 1977 and 1996:

1. Regular Business Systems ("RBS") – in 1977 was an outsourced claims system developed and supported by Electronic Data Systems ("EDS"). This system was housed at an EDS facility until 1979 when it was purchased by PBS. PBS supported RBS internally from 1979 until it was decommission in 1997.
2. Optimum System for Claims Adjudication and Reporting ("OSCAR") – is a claims system established as PBS's primary claims adjudication system in 1986. It is still in use. A more detailed overview and flow chart is attached.
3. Complementary – a claims system that processes claims for coinsurance and/or deductibles imposed on a person covered under Medicare, 65 Special (362 and 364 Enrollment)/Signature 65 programs. This system was established in 1976 and is still in use.
4. COMP 1 – Comp 1 was a system to process comprehensive institutional and professional claims. The Comprehensive Program combines facility, medical/surgical, and major medical as a single package of benefits. This data management system, established in the 1980's, was decommissioned in 2003.
5. Concordia - a dental claims processing system established in 1994 with the United Concordia Companies Inc. ("UCCI"), a subsidiary of PBS. This system is a PBS OSCAR clone, running separately and modified for dental claims processing. The system is still in use today.

6. Automated Claims Expert (ACE) – was established in 1990 as a data warehouse for finalized claims data. The system is fed by a variety of other claims systems including those mentioned above and used to query and report claims information. It is still in use today.

PBS's membership systems consisted of two main systems, the Subscriber Database ("SDB") and the Group Database ("GDB"). Both these data management systems were implemented in 1986. Both are still in use today.

Prior to 1986, groups were managed using paper forms known as "group data forms" ("GDF"). GDF's were color coded, multipart, carbon paper copies filled out by agent plans and sent to the PBS sales area. Sales would review and would add information before sending to the rating area. Rating would process the account and upon completion forward to the group area. Group would create a rolodex card for inventory control and tracking data errors. Errors were marked on the rolodex card and the GDF would be sent back to the agent plan. If there were no errors, the data would be keyed into a mainframe system called the Old Group Database using on-line green screens for tracking and reporting.

After 1986, the group database system ("GDB") maintained and managed data about group customers. The GDB supported PBS's high volume claims transaction processing, ad hoc reporting using robust IMS and DB2 data stores, and backend financial processes.

The GDB was updated in several ways. Initially groups were managed with closing reports. These closing reports are still used, but supplemented with an automated Group Electronic Mail Update System ("GEMUS"). GEMUS was implemented in 1992 to eliminate paper Closing Reports and to improve the timeliness and accuracy of Group Data to the GDB.

GEMUS provided the capability to electronically transfer Group Data from the Agent Plans to PBS and also internally between departments. Other ways to update the GDB include:

1) A mass update system using Account Level Multi Group ("ALMG") which is a user controlled select and update process and an on-request process where a programmer is involved to create hardcoded selects and update logic.

2) Optimum Flow, implemented in 1990, is a nightly electronic file transmission to process canceled groups. PBS receives nightly transmissions from the agent plans for cancelled groups and applies the updates to the GDB.

3) Experienced Rates Monitoring – (established in 1990), applies new rates to experienced rated groups based on input files from the RASP process.

4) Community Rate Generator – (established in 1993), allows actuaries to specify rate factors applicable to benefits and type contracts to apply rates to applicable groups.

The SDB maintained membership enrollment information for subscriber applicants and their dependants by contract. Each record contained contractual data needed to process a claim. The primary source of contract information was the four Agent Plans. Any on-line maintenance performed during the day by the Agent Plan was written to an Activity Log. Using this daily log, contracts were extracted and transmitted to PBS. Each contract transmitted contained subscriber coverage, dependent coverage and historical data. Upon receipt of each transmission, the Subscriber Load and Maintenance programs began the process of editing, converting, and loading of the data to the Subscriber Database. The SDB also has many on-line screens for query and update of subscriber information. The SDB uses mainframe IMS/DB databases and IMS/DC data communications for display.

Prior to 1986, the agents held all the enrollment for PBS. PBS used a query/response system with the agents by sending tapes with enrollment information back and forth. PBS would send a query tape to the Agents weekly, to determine subscriber eligibility, and the Agents would return the tape, weekly, with the responses. After the tapes were received by PBS with the subscriber enrollment information, claims would begin to process through the remainder of the system using this data.

## OATH TO ANSWERS TO INTERROGATORIES

I declare under penalty of perjury that the foregoing Plaintiff's Second Amended Answers to Defendant's First Set of Interrogatories are true and correct to the best of my knowledge, information, and belief:

Todd B. Vanerstrom

Respectfully submitted,

Arthur Newbold
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Phone (215) 994-2624
Fax (215) 655-2624
Counsel for Plaintiff

Date: January 23, 2007

Of Counsel:

Frederick J. Gerhart
James J. Spadaro, Jr.
Andrea M. Kirshenbaum
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

**CERTIFICATE OF SERVICE**

I hereby certify that I have this 23rd day of January, 2007, caused a copy of the foregoing Plaintiff's Answers to Defendant's First Set of Interrogatories to be served by U.S. Mail and facsimile upon the following:

Karen E. Servidea, Esquire
United States Department of Justice
Tax Division
Court of Federal Claims
Section P.O. Box 26
Ben Franklin Station
Washington, DC 20044
(202) 514-9440

Andrea M. Kirshenbaum

# DEFENDANT'S EXHIBIT 3

# PENNSYLVANIA BLUE SHIELD

1991

HOSPITAL, MEDICAL AND DENTAL SERVICE OR INDEMNITY CORPORATIONS — Form

# ANNUAL STATEMENT

For the Year Ended December 31, 1991

OF THE CONDITION AND AFFAIRS OF THE

## MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA

NAIC Group Code: 000 NAIC Company Code: 54771 Employer's ID Number: 23-1294723

Organized under the Laws of the State of Pennsylvania made to th

INSURANCE DEPARTMENT OF THE STATE OF Pennsylvania

PURSUANT TO THE LAWS THEREOF

Incorporated: 09/06/1939 Commenced Business: 04/01/19..

Statutory Home Office: 1800 Center Street, Camp Hill, PA 17089

Main Administrative Office: 1800 Center Street

Camp Hill, PA 17089 (717)763-3151

Mail Address: 1800 Center Street, Camp Hill, PA 17089

Primary Location of Books and Records: 1800 Center Street

Camp Hill, PA 17089 (717)763-3151

Annual Statement Contact Person and Phone Number: Mickey L. Jones (717)763-3178

### OFFICERS **

President: Samuel David Ross, Jr.

Secretary: Walter Fredric Froh

Treasurer: Donald Leroy Fisher

### Vice Presidents

Ralph Robert Tyson M.D. - Chairman of the Board
Ralph John Stalter M.D. - Second Vice-Chairman
John Stewart Brouse
Robert Beverly Edmiston M.D.
Robert Eugene Patterson
Daniel Henry Thomas

Jeffrey John Burdge - First Vice-Chairman
Warren George Weber - Third Vice-Chairman
Everett Franklin Bryant
George Frederick Grode
Thomas Charles Sommers

### DIRECTORS OR TRUSTEES **

William H. Alexander
J. Robert Baum
Jeffrey John Burdge
A. J. Chialastri, D.D.S.
Walter D'Alessio
Frank Defazio
Hershel B. Donald
Gilbert A. Friday, M.D.
William E. Hall, D.D.S.

Doris G. Bartuska, M.D. #
Joseph B. Blood, Jr., M.D.
John A. Carpenter, Esquire
Wilson Bennett Conner, Jr.
Walter J. Dealtrey
Judith R. Diehl
Robert W. Ford, M.D.
Robert L. Gronlund
Steven J. Herceg, M.D.

The DIRECTORS OR TRUSTEES listing is continued on the following page.

State of Pennsylvania
County of Cumberland } ss

Samuel David Ross, Jr. President, Walter Fredric Froh Secretary, Donald Leroy Fisher Treasurer* of the MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA being duly sworn, each for himself deposes and says that they are the above described officers of the said Corporation, and that on the thirty-first day of December last, all of the herein described assets were the absolute property of the said Corporation, free and clear from any liens or claims thereon, except as herein stated, and that this annual statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to is a full and true statement of all the assets and liabilities and of the condition and affairs of the said insurer as of the thirty-first day of December last, and of its income and deductions therefrom for the year ended on that date, according to the best of their information, knowledge and belief, respectively.

[signature] President [signature] Secretary [signature] ~~Treasurer~~ Sr. V.P. and CFO

(See separate, attached certification)
Actuary

Subscribed and sworn to before me this 2nd day of March 1992

[signature: Donna M. Ritter]

(a) Is this an original filing? Yes (X) No ( )
(b) If no: (i) state the amendment number
(ii) date filed
(iii) number of pages attached

* Or ~~corresponding person having charge of the accounts and finances of the Corporation.~~
** Show full name (initials and applicable) and indicate by number sign (#) those officers and directors who did not occupy the indicated position in the previous annual statement

[Stamp: DONNA M. RITTER, Notary Public, Camp Hill PA, Cumberland County, My Commission Expires June 11, 1992]

THIS PAGE INTENTIONALLY LEFT BLANK

| LIABILITIES, RESERVES AND OTHER FUNDS | 1 December 31, 1991 | 2 December 31, 1990 |
|---|---|---|
| 1. Claims unpaid (Part 2A)(Includes provision for retroactive cost adjustments $ 0 ). | 242,192,878 | 246,171,539 |
| 2. Provision for deferred maternity benefits | 0 | 0 |
| 3. Unpaid claims adjustment expenses | 10,634,657 | 9,730,340 |
| 4. Unearned premiums (Part 1A) | 75,146,126 | 55,473,573 |
| 5. Unearned investment income | 0 | 0 |
| 6. (A) Taxes, licenses and fees due or accrued (excluding Federal income taxes) | 561,338 | 373,176 |
| (B) Federal income taxes (excluding deferred taxes) | 6,551,117 | 4,599,265 |
| (C) Other expenses due or accrued | 50,645,346 | 24,154,347 |
| 7. Premium deposits made by applicants rejected or not as yet accepted as members or subscribers | 0 | 0 |
| 8. Borrowed money $ 0 and interest thereon $ 0 | 0 | 0 |
| 9. Amounts withheld or retained for account of others | 2,137,010 | 2,028,794 |
| 9A. Provision for experience rating refunds | 46,078,425 | 36,402,478 |
| 10. Liability for amounts held under uninsured accident and health plans | 0 | 0 |
| 11. Funds held by corporation under reinsurance treaties | 0 | 0 |
| 12A. Unearned premiums on reinsurance in unauthorized companies $ 0 | | |
| 12B. Reinsurance on paid losses $ 0 and on unpaid reported losses $ 0 and on incurred but not reported losses $ 0 recoverable from unauthorized companies $ 0 | | |
| 12C. Paid and unpaid allocated loss adjustment expenses recoverable from unauthorized companies $ 0 | | |
| 12D. Less funds held or retained by corporation for account of such unauthorized companies as per Schedule S, Part 2, Column 6 $ 0 | | |
| 13. Provision for unauthorized reinsurance (Items 12a + 12b + 12c - 12d) | 0 | 0 |
| 14. Other liabilities: | | |
| (A) ACCOUNTS PAYABLE | 52,061,139 | 41,548,002 |
| (B) CHECKS ISSUED IN EXCESS OF FUNDS ON DEPOSIT | 72,483,137 | 83,993,297 |
| (C) JOINT PROGRAMS | 23,597,644 | 41,250,281 |
| (D) CONTROL PLAN FUNDS | 5,458,274 | 0 |
| (E) | 0 | 0 |
| (F) | 0 | 0 |
| (G) | 0 | 0 |
| (H) | 0 | 0 |
| 15. Total liabilities | 586,537,091 | 544,725,592 |
| 16. Reserves and special funds: | | |
| (A) Statutory reserve | 0 | 0 |
| (B) RESERVE FOR DEFERRED MATERNITY BENEFITS | 155,600 | 45,579,000 |
| (C) RESERVE FOR CONTINGENCIES | 419,703,001 | 299,717,547 |
| (D) | 0 | 0 |
| 17. Unassigned funds | 0 | 0 |
| 18. Total reserves and unassigned funds (Page 4, Item 29) | 419,858,601 | 345,296,547 |
| 19. Totals | 1,006,395,692 | 890,022,139 |

## UNDERWRITING AND INVESTMENT EXHIBIT

### PART 1 - PREMIUMS WRITTEN AND EARNED

| Line of Business | 1<br>Direct Business | 2<br>Reinsurance Assumed | 3<br>Reinsurance Ceded | 4<br>Net Premiums Written (1 + 2-3) | 5<br>Unearned Premiums Dec. 31 Previous Year | 6<br>Unearned Premiums Dec. 31 Current Year (Part 1A) | 7<br>Reserve for Rate Credits and Retrospective Returns Based On Experience | 8<br>Total Reserve For Unearned Premiums (6+7) | 9<br>Premiums Ear (4 + 5 - |
|---|---|---|---|---|---|---|---|---|---|
| 1. Hospital .... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 2. Medical ..... | 1,868,174,002 | 0 | 0 | 1,868,174,002 | 63,858,092 | 73,200,736 | 0 | 73,200,736 | 1,843,827. |
| 3. Dental ...... | 234,806,728 | 0 | 0 | 234,806,728 | 1,481,000 | 1,786,701 | 0 | 1,785,701 | 234,502. |
| 4. Other ....... | 711,682,026 | 0 | 0 | 711,682,026 | 138,672 | 160,000 | 0 | 160,000 | 711,641. |
| 5. Totals ...... | 2,808,664,316 | 0 | 0 | 2,808,664,316 | 65,478,673 | 75,146,126 | 0 | 75,146,126 | 2,789,901. |

### PART 1A - UNEARNED PREMIUMS

| | 1<br>Month Effective | 2<br>Premiums in Force Dec. 31 Current Year | 3<br>Fraction Unearned* | 4<br>Amount of Premiums or Fees Unearned |
|---|---|---|---|---|
| **ANNUAL PREMIUMS:** | | | | |
| 1. | ................ January | 0 | 1/24 | 0 |
| 2. | ................ February | 0 | 3/24 | 0 |
| 3. | ................ March | 0 | 5/24 | 0 |
| 4. | ................ April | 0 | 7/24 | 0 |
| 5. | ................ May | 0 | 9/24 | 0 |
| 6. | ................ June | 0 | 11/24 | 0 |
| 7. | ................ July | 0 | 13/24 | 0 |
| 8. | ................ August | 0 | 15/24 | 0 |
| 9. | ................ September | 0 | 17/24 | 0 |
| 10. | ................ October | 0 | 19/24 | 0 |
| 11. | ................ November | 0 | 21/24 | 0 |
| 12. | ................ December | 0 | 23/24 | 0 |
| **SEMI-ANNUAL PREMIUMS:** | | | | |
| 13. | ................ July | 0 | 1/12 | 0 |
| 14. | ................ August | 0 | 3/12 | 0 |
| 15. | ................ September | 0 | 5/12 | 0 |
| 16. | ................ October | 0 | 7/12 | 0 |
| 17. | ................ November | 0 | 9/12 | 0 |
| 18. | ................ December | 0 | 11/12 | 0 |
| **QUARTERLY PREMIUMS:** | | | | |
| 19. | ................ October | 0 | 1/6 | 0 |
| 20. | ................ November | 0 | 3/6 | 0 |
| 21. | ................ December | 0 | 5/6 | 0 |
| **MONTHLY PREMIUMS:** | | | | |
| 22. | ................ December | 0 | 1/2 | 0 |
| 23. | ADVANCED PREMIUMS: | X X X X X X X | 100% | 75,146,126 |
| 24. | TOTALS | 0 | X X X X | 75,146,126 |

*If fractions do not apply, use pro-rata method.

## UNDERWRITING AND INVESTMENT EXHIBIT

### PART 3 - EXPENSES PAID AND INCURRED

| 1<br>Type of Expense | 2<br>Expenses Paid | 3<br>Expenses Unpaid Current Year | 4<br>Expenses Unpaid Previous Year | 5<br>Expenses Incurred 2 + 3 - 4 |
|---|---|---|---|---|
| 1. Claims Processing | 126,137,416 | 25,747,707 | 20,736,801 | 131,148,321 |
| 2. Administrative (not included in Items 1 and 5) | 108,884,896 | 12,944,820 | 10,055,482 | 111,774,234 |
| 3. Soliciting | 25,946,075 | 305,650 | 188,521 | 26,063,204 |
| 4. Total Underwriting Expense | 260,968,386 | 38,998,177 | 30,980,804 | 268,985,759 |
| 5. Investment Expense | 2,051,115 | 82,948 | 55,024 | 2,079,039 |
| 6. Total Expenses | 263,019,501 | 39,081,125 | 31,035,828 | 271,064,798 |

7. Ratio of expense of soliciting subscribers and administrative expenses to net premiums written:

| | Actual | Legal Limit |
|---|---|---|
| (A) Expense of soliciting subscribers: Ratio Item 3, Col. 2 above to Item 5, Col. 4, Part 1.... | 0.92 % | 0.00 % |
| (B) Administrative expenses: Ratio Items (1+2+5), Col. 2 above to Item 5, Col. 4, Part 1....... | 8.44 % | 0.00 % |
| (C) Total expenses: Ratio Item 6, Col. 2 above to Item 5, Col. 4, Part 1.................. | 9.36 % | 0.00 % |

### PART 3A - ANALYSIS OF EXPENSES

| 1 | Incurred Expenses<br>2<br>Claim Adjustment | 3<br>Administrative | 4<br>Soliciting | 5<br>Investment | 6<br>Total | Paid Expenses<br>7<br>Total |
|---|---|---|---|---|---|---|
| 1. Advertising | 0 | 188,904 | 0 | 0 | 188,904 | 189,643 |
| 2. Boards, bureaus and associations | 7,874 | 1,722,070 | 580 | 9 | 1,730,533 | 1,738,920 |
| 3. Salaries | 101,332,648 | 45,106,986 | 981,509 | 100,203 | 147,521,346 | 146,290,249 |
| 4. Employee relations and welfare | 17,673,625 | 8,750,967 | 168,075 | 12,153 | 26,604,810 | 20,705,390 |
| 5. Insurance, except on real estate | 55,456 | 348,021 | 168 | 42,488 | 444,133 | 444,133 |
| 6. Travel and travel items | 868,433 | 2,373,208 | 79,043 | 6,265 | 3,326,949 | 3,306,595 |
| 7. Rent and rent items, including $ 3,728,210 for Corporations's occupancy of its own buildings, less $ 0 received under sublease | 9,904,340 | 1,611,798 | 106,926 | 7,787 | 11,629,860 | 11,660,675 |
| 8. Equipment | 12,958,936 | 13,918,575 | 37,567 | 9,949 | 26,925,017 | 27,359,630 |
| 9. Printing and stationery | 6,954,096 | 4,236,842 | 45,283 | 3,444 | 11,239,666 | 11,092,512 |
| 10. Postage, telephone and telegraph, exchange and express | 21,940,182 | 1,516,498 | 39,700 | 868 | 23,497,248 | 23,641,150 |
| 11. Legal | 39,276 | 393,098 | 0 | 81 | 432,455 | 451,523 |
| 12. Auditing, actuarial and consulting services | 2,522,506 | 4,103,083 | 10,650 | 637,386 | 7,273,625 | 7,036,393 |
| 13. Taxes, licenses and fees: | | | | | | |
| (A) State and local insurance taxes | 0 | 0 | 0 | 0 | 0 | 0 |
| (B) Insurance department licenses and fees | 0 | 30,388 | 0 | 0 | 30,388 | 40,639 |
| (C) Payroll taxes | 8,734,884 | 3,503,868 | 78,259 | 7,392 | 12,324,403 | 12,146,241 |
| (D) Other (excluding federal income and real estate) | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals | 8,734,884 | 3,534,256 | 78,259 | 7,392 | 12,354,791 | 12,186,880 |
| 14. Real estate expenses | 4,128 | 931,746 | 0 | 1,517,981 | 2,453,855 | 2,385,256 |
| 15. Real estate taxes | 0 | 0 | 0 | 784,890 | 784,890 | 784,390 |
| 16. Reimbursements by uninsured accident and health plans | 0 | 0 | 0 | 0 | 0 | 0 |
| 17. Miscellaneous (itemize): | | | | | | |
| (A) CLAIMS INVESTIGATION | 180,363 | 275 | 33 | 0 | 180,671 | 181,798 |
| (B) PROF. RELATIONS | 47,482 | 269,126 | 2,334 | 137 | 319,079 | 310,603 |
| (C) CPOC | 657,660 | 0 | 0 | 0 | 657,660 | 0 |
| (D) HOSP. PLAN SVC. CHG. | 45,985,451 | 56,568,017 | 24,514,088 | 0 | 127,067,556 | 126,820,899 |
| (E) | 0 | 0 | 0 | 0 | 0 | 0 |
| (F) GOVERNMENT | (86,949,889) | (22,494,370) | 0 | (940,264) | (110,384,523) | (110,384,523) |
| (G) OTHER | (11,769,130) | (11,302,856) | 0 | (111,730) | (23,183,716) | (23,183,716) |
| 18. Totals | 131,148,321 | 111,774,234 | 26,063,204 | 2,079,039 | 271,064,798 | 263,019,501 |

# DEFENDANT'S EXHIBIT 4

Pennsylvania
BlueShield

# Annual Statement

1993

79

ENNSYLVANIA

FORM 13

# ANNUAL STATEMENT

OF THE

## MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA

of 1800 CENTER STREET, CAMP HILL

in the State of PENNSYLVANIA

TO THE

Insurance Commissioner

OF THE

COMMONWEALTH OF PENNSYLVANIA

FOR THE YEAR ENDED
DECEMBER 31, 1993

Brandon Insurance Service Co.
Nashville, Tenn.

1993

HOSPITAL, MEDICAL AND DENTAL SERVICE OR INDEMNITY CORPORATIONS

1993

HOSPITAL, MEDICAL AND DENTAL SERVICE OR IND :Y CORPORATIONS Form 13

0000547719318300
MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA Document Code: 381

# ANNUAL STATEMENT

For the Year Ended December 31, 1993

OF THE CONDITION AND AFFAIRS OF THE

# MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA

NAIC Group Code: 000 NAIC Company Code: 54771 Employer's ID Number: 23-1294723

Organized under the Laws of the State of Pennsylvania, made to the

## INSURANCE DEPARTMENT OF THE STATE OF Pennsylvania

PURSUANT TO THE LAWS THEREOF

Incorporated: 09/05/1939 Commenced Business: 04/01/1940

Statutory Home Office: 1800 Center Street, Camp Hill, PA 17089

Main Administrative Office: 1800 Center Street

Camp Hill, PA 17089 (717)763-3151

Mail Address: 1800 Center Street, Camp Hill, PA 17089

Primary Location of Books and Records: 1800 Center Street

Camp Hill, PA 17089 (717)763-3151

Annual Statement Contact Person and Phone Number: Nanette P. Kline (717)730-1845

## OFFICERS

President and C.E.O.: Samuel David Ross, Jr.

Secretary: Walter Fredric Froh

Treasurer: Donald Leroy Fisher

## Vice Presidents

| | |
|---|---|
| John Stewart Brouse - Chief Operating Officer | Everett Franklin Bryant |
| Hershel Bernard Donald - Third Vice- Chairman # | George Frederick Grode |
| Gilbert Anthony Friday, Jr. M.D. - Chairman of the Board | Ralph John Stalter, M.D. - First Vice- Chairman |
| Robert Eugene Patterson | Joseph Anthony Ricci, M.D. |
| Thomas Charles Sommers | Daniel Henry Thomas |
| Warren George Webber - Second Vice- Chairman | |

## DIRECTORS OR TRUSTEES

| | |
|---|---|
| William H. Alexander | Richard D. Baltz, M.D. |
| Doris G. Bartuska, M.D. | J. Robert Baum |
| Joseph B. Blood, Jr., M.D. | Jeffrey John Burdge (Retired 4/14/93) |
| John A. Carpenter, Esquire | A. J. Chialastri, D.D.S. |
| Wilson Bennett Conner (Retired 4/14/93) | Walter D'Alessio |
| Frank DeFazio | Walter J. Dealtrey |
| Carlo J. DiMarco, D.O. | Judith R. Diehl |
| Hershel Bernard Donald | Robert W. Ford, M.D. |

The DIRECTORS OR TRUSTEES listing is continued on the following page.

State of Pennsylvania
County of Cumberland } ss

Samuel David Ross, Jr. President and C.E.O., Walter Fredric Froh Secretary, Robert Eugene Patterson Sr. V.P. and C.F.O., of the MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA being duly sworn, each deposes and says that they are the above described officers of the said insurer, and that on the thirty-first day of December last, all of the herein described assets were the absolute property of the said insurer, free and clear from any liens or claims thereon, except as herein stated, and that this annual statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to is a full and true statement of all the assets and liabilities and of the condition and affairs of the said insurer as of the thirty-first day of December last, and of its income and deductions therefrom for the year ended on that date, and have been completed in accordance with the NAIC annual statement instructions and accounting practices and procedures manuals except to the extent that: (1) state law may differ: or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures, according to the best of their information, knowledge and belief, respectively.

President and C.E.O. — Secretary

Sr. V.P. and C.F.O.

Subscribed and sworn to before me this 23rd day of February, 1994

(a) Is this an original filing? Yes (X) No ( )
(b) If no: (i) state the amendment number
(ii) date filed
(iii) number of pages attached

# DIRECTORS OR TRUSTEES (Continued)

Gilbert A. Friday, Jr., M.D.
William E. Hall, D.D.S.
Peter Norman Hillyer, M.D.
Angelo S. Monaco, D.P.M.
Samuel David Ross, Jr. (Ex Officio)
Susan F. Sordoni
Ralph John Stalter, M.D.
William S. Walters, M.D. (Retired 4/14/93)
Warren George Webber

Robert L. Gronlund
Stephen J. Herceg, M.D.
Charles R. McRae, M.D.
Edward J. Resnick, M.D.
Thomas J. Rohner, M.D. #
Gloria J. Schucolsky #
Paul L. Strickler
John M. Wilds #
Shirley V. Young

0000547719318600 Document Code: 186
MEDICAL SERVICE ASSOCIATION OF PENNSYLVANIA

# ACTUARIAL STATEMENT

# ASSETS

| | 1 December 31, 1993 | 2 December 31, 1992 |
|---|---|---|
| 1. Bonds* | 706,276,671 | 577,414,090 |
| 2. Stocks:* | | |
| 2.1 Preferred stocks | | |
| 2.2 Common stocks | 329,158,988 | 246,469,524 |
| 3. Mortgage loans on real estate | 246,707 | |
| 4. Real estate, less $ encumbrances | 49,322,503 | 49,739,102 |
| 5. Collateral loans | | |
| 6.1 Cash on hand and on deposit | 52,205 | 1,231 |
| 6.2 Short-term investments | 173,399,744 | 167,683,465 |
| 7. Aggregate write-ins for invested assets | 2,179,542 | 2,038,567 |
| 7A. Subtotals, cash and invested assets, (Items 1 to 7) | 1,260,636,360 | 1,043,345,979 |
| 8. Uncollected premiums | 84,333,097 | 93,408,892 |
| 9. Amounts receivable relating to uninsured accident and health plans | | |
| 10. Funds held by or deposited with reinsured companies | | |
| 11. Reinsurance recoverables on loss and loss adjustment payments | | |
| 12. Federal income tax recoverable | | |
| 13. Interest and other investment income due and accrued | 15,959,456 | 13,090,226 |
| 14. Receivable from parent, subsidiaries and affiliates | | |
| 15. Electronic data processing equipment | 32,414,255 | 28,666,197 |
| 18. Aggregate write-ins for other than invested assets | 38,139,890 | 85,472,386 |
| 19. Totals (Items 7A to 18) | 1,431,483,058 | 1,263,983,680 |
| **DETAILS OF WRITE-INS AGGREGATED AT LINE 7 FOR INVESTED ASSETS** | | |
| 0701. Deferred Compensation Trust Fund | 2,179,542 | 2,038,567 |
| 0702. | | |
| 0703. | | |
| 0704. | | |
| 0705. | | |
| 0798. Summary of remaining write-ins for Line 7 from overflow page | | |
| 0799. Totals (Lines 0701 through 0705 plus 0798)(Page 2, Line 7) | 2,179,542 | 2,038,567 |
| **DETAILS OF WRITE-INS AGGREGATED AT LINE 18 FOR OTHER THAN INVESTED ASSETS** | | |
| 1801. Accounts Receivable-Agent Plans | | 21,941,681 |
| 1802. Accounts Receivable-Federal Employee Program | 21,015,157 | 22,310,372 |
| 1803. Accounts Receivable-Government Contracts | 919,785 | |
| 1804. Miscellaneous Accounts Receivable | 15,587,409 | 29,038,326 |
| 1805. Joint Programs | 617,539 | 12,182,007 |
| 1898. Summary of remaining write-ins for Line 18 from overflow page | | |
| 1899. Totals (Lines 1801 through 1805 plus 1898)(Page 2, Line 18) | 38,139,890 | 85,472,386 |

NOTE: The items on this page to agree with Exhibit 1, Column 4. The Notes to Financial Statement are an integral part of this statement.
*State basis of valuation. Bonds are valued at amortized cost. Common stocks are valued at market value.

# LIABILITIES, RESERVES & OTHER FUNDS

| | 1 December 31, 1993 | 2 December 31, 1992 |
|---|---|---|
| 1. Claims unpaid (Part 2A, Column 4, Line 5)(Includes provision for retroactive cost adjustments $ ) | 287,781,136 | 312,115,905 |
| 2. Provision for deferred maternity benefits (Part 2B, Line 4, Column 2) | | |
| 3. Unpaid claims adjustment expenses (Part 3, Line 20B, Column 2) | 14,107,618 | 15,050,947 |
| 4. Unearned premiums (Part 1, Column 8) | 66,670,105 | 82,422,308 |
| 5. Unearned investment income (Part 4, Line 9, Column 4) | | |
| 6. (a) Taxes, licenses and fees due or accrued (excluding Federal income taxes) | 813,123 | 649,584 |
| (b) Federal income taxes (excluding deferred taxes) | 4,469,015 | 8,514,740 |
| (c) Other expenses due or accrued | 51,131,512 | 41,657,275 |
| 7. Premium deposits made by applicants rejected or not as yet accepted as members or subscribers | | |
| 8. Borrowed money $ and interest thereon $ | | |
| 9. Amounts withheld or retained for account of others | 3,030,939 | 2,820,527 |
| 10. Liability for amounts held under uninsured accident and health plans | | |
| 11. Funds held by corporation under reinsurance treaties | | |
| 12a. Unearned premiums on reinsurance in unauthorized companies $ | | |
| 12b. Reinsurance on paid losses $ and on unpaid reported losses $ and on incurred but not reported losses $ recoverable from unauthorized companies $ | | |
| 12c. Paid and unpaid allocated loss adjustment expenses recoverable from unauthorized companies $ | | |
| 12d. Less funds held or retained by corporation for account of such unauthorized companies as per Schedule S, Part 2, Column 6 $ | | |
| 13. Provision for unauthorized reinsurance (Lines 12a + 12b + 12c - 12d) | | |
| 14. Aggregate write-ins for other liabilities | 260,680,897 | 230,410,815 |
| 15. Total liabilities | 688,684,345 | 693,642,101 |
| RESERVES AND SPECIAL FUNDS: | | |
| 16. Statutory reserve | | |
| 17. Aggregate write-ins for reserves and special funds | 742,798,713 | 570,341,579 |
| 18. Unassigned funds | | |
| 19. Total reserves and unassigned funds (Page 4, Line 20) | 742,798,713 | 570,341,579 |
| 20. Totals (Lines 15 plus 19) | 1,431,483,058 | 1,263,983,680 |
| **DETAILS OF WRITE-INS AGGREGATED AT LINE 14 FOR OTHER LIABILITIES** | | |
| 1401. Provision for Experience Rating Refunds | 89,499,528 | 70,694,908 |
| 1402. Accounts Payable | 66,304,516 | 68,970,310 |
| 1403. Checks Issued in Excess of Funds on Deposit | 77,571,265 | 54,727,701 |
| 1404. Accounts Payable - Agent Plans | 2,785,905 | |
| 1405. Control Plan Funds | 11,857,737 | 13,711,222 |
| 1498. Summary of remaining write-ins for Line 14 from overflow page | 12,661,946 | 22,306,674 |
| 1499. Totals (Lines 1401 through 1405 plus 1498)(Page 3, Line 14) | 260,680,897 | 230,410,815 |
| **DETAILS OF WRITE-INS AGGREGATED AT LINE 17 FOR RESERVES AND SPECIAL FUNDS** | | |
| 1701. Reserve for Deferred Maternity Benefits | 58,644 | 67,284 |
| 1702. Reserve for Contingencies | 742,740,069 | 570,274,295 |
| 1703. | | |
| 1704. | | |
| 1705. | | |
| 1798. Summary of remaining write-ins for Line 17 from overflow page | | |
| 1799. Totals (Lines 1701 through 1705 plus 1798)(Page 3, Line 17) | 742,798,713 | 570,341,579 |

# UNDERWRITING AND INVESTMENT EXHIBIT

| | 1<br>1993 | 2<br>1992 |
|---|---|---|
| **UNDERWRITING INCOME** | | |
| 1. Premiums earned (Part 1, Line 5, Column 9) | 2,934,278,819 | 2,891,711,486 |
| 2. (a) Claims incurred (Part 2, Line 5, Column 5) net of reinsurance ($ ) | 2,517,170,977 | 2,479,708,608 |
| (b) Increase (decrease) in provision for deferred maternity benefits (Part 2B, Line 4, Column 4) | | |
| 3. Expenses incurred (Part 3, Line 19, Column 6): | | |
| (a) Claim adjustment | 161,495,341 | 141,286,656 |
| (b) Administrative | 124,820,593 | 118,469,288 |
| (c) Soliciting | 42,299,418 | 45,132,638 |
| 4. Reinsurance allowances - expense and experience refund | | |
| 5. Total underwriting deductions (Lines 2 through 4) | 2,845,786,329 | 2,784,597,190 |
| 6. Net underwriting gain or (loss) (Line 1 minus Line 5) | 88,492,490 | 107,114,296 |
| **INVESTMENT INCOME** | | |
| 7. Net investment income earned (Part 4,Col 8,Line 14) | 66,947,289 | 63,559,623 |
| 8. Net realized capital gains or (losses) (Part 4A,Col 6,Line 10) | (3,034,266) | 932,572 |
| 9. Net investment gain or (loss) (Line 7 minus Line 8) | 63,913,023 | 64,492,195 |
| **OTHER INCOME** | | |
| 10. Aggregate write-ins for other income | 9,058,354 | 2,851,322 |
| 11. Net gain or (loss) before federal income taxes (Lines 6 + 9 + 10) | 161,463,867 | 174,457,813 |
| 12. Federal income taxes incurred | 41,499,560 | 41,263,584 |
| 13. Net gain or (loss)(to Line 15)(Line 11 minus Line 12) | 119,964,307 | 133,194,229 |
| **RESERVES AND UNASSIGNED FUNDS** | | |
| 14. Reserves and unassigned funds December 31, previous year (Page 4,Col 2,Line 20) | 570,341,579 | 419,858,601 |
| **GAINS AND (LOSSES)** | | |
| 15. Net gain or (loss) (from Line 13) | 119,964,307 | 133,194,229 |
| 16. Net unrealized capital gains or (losses) (Part 4A,Col 6,Line 11) | 46,948,680 | 2,900,876 |
| 17. Change in non-admitted assets (Exhibit 2, Line 6, Col. 3) | (4,510,408) | 14,387,873 |
| 18. Aggregate write-ins for changes to reserves and unassigned funds | 10,054,555 | |
| 19. Change in reserves and unassigned funds for the year (Lines 15 through 18) | 172,457,134 | 150,482,978 |
| 20. Reserves and unassigned funds December 31, current year (Line 14 plus Line 19) | 742,798,713 | 570,341,579 |
| **DETAILS OF WRITE-INS AGGREGATED AT LINE 10 FOR OTHER INCOME** | | |
| 1001. Miscellaneous Income and Expense-Net | 9,058,354 | 2,851,322 |
| 1002. | | |
| 1003. | | |
| 1004. | | |
| 1005. | | |
| 1098. Summary of remaining write-ins for Line 10 from overflow page | | |
| 1099. Totals (Lines 1001 through 1005 plus 1098)(Page 4, Line 10) | 9,058,354 | 2,851,322 |
| **DETAILS OF WRITE-INS AGGREGATED AT LINE 18 FOR CHANGES TO RESERVES AND UNASSIGNED FUNDS** | | |
| 1801. Prior Period Adjustment - Postretirement Health Benefits | 10,054,555 | |
| 1802. | | |
| 1803. | | |
| 1804. | | |
| 1805. | | |
| 1898. Summary of remaining write-ins for Line 18 from overflow page | | |
| 1899. Totals (Lines 1801 through 1805 plus 1898)(Page 4, Line 18) | 10,054,555 | |

# CASH FLOW

| | 1<br>1993 | 2<br>1992 |
|---|---|---|
| 1. Premiums collected net of reinsurance | 2,928,386,728 | 2,887,535,409 |
| 2. Claims and claims adjustment expenses | 2,703,944,416 | 2,546,655,947 |
| 3. Underwriting expenses paid | 166,535,134 | 151,018,404 |
| 4. Other underwriting income (expenses) | | |
| 5. Cash from underwriting (Line 1 - Line 2 - Line 3 + Line 4) | 57,907,178 | 189,861,058 |
| 6. Investment income (net of investment expenses) | 66,898,669 | 67,159,525 |
| 7. Other income (expenses) | 9,058,354 | 2,851,322 |
| 8. Federal income taxes (paid) recovered | (45,545,285) | (39,299,961) |
| 9. Net cash from operations (Line 5 + Line 6 + Line 7 + Line 8) | 88,318,916 | 220,571,944 |
| 10. Proceeds from investments sold, matured or repaid: | | |
| 10.1 Bonds | 63,878,965 | 87,115,606 |
| 10.2 Stocks | 1,575,059,580 | 1,558,079,605 |
| 10.3 Mortgage loans | | |
| 10.4 Real estate | 4,974 | |
| 10.5 Collateral loans | | |
| 10.6 Other invested assets | | |
| 10.7 Net gains or (losses) on cash and short-term investments | | |
| 10.8 Miscellaneous proceeds | | |
| 10.9 Total investment proceeds (Line 10.1 thru 10.8) | 1,638,943,519 | 1,645,195,211 |
| 11. Other cash provided: | | |
| 11.1 Net transfers from affiliates | | |
| 11.2 Borrowed funds received | | |
| 11.3 Capital paid in | | |
| 11.4 Surplus paid in | | |
| 11.5 Other sources | 103,689,798 | 47,731,524 |
| 11.6 Total other cash provided (Line 11.1 thru 11.5) | 103,689,798 | 47,731,524 |
| 12. Total (Line 9 + Line 10.9 + Line 11.6) | 1,830,952,233 | 1,913,498,679 |
| 13. Cost of investments acquired (long-term only): | | |
| 13.1 Bonds | 193,619,047 | 119,709,098 |
| 13.2 Stocks | 1,614,425,174 | 1,659,102,129 |
| 13.3 Mortgage loans | 246,707 | |
| 13.4 Real estate | 854,127 | 46,706 |
| 13.5 Collateral loans | | |
| 13.6 Other invested assets | 140,975 | 373,702 |
| 13.7 Miscellaneous applications | | |
| 13.8 Total investment acquired (Line 13.1 thru 13.7) | 1,809,286,030 | 1,779,231,635 |
| 14. Other cash applied: | | |
| 14.1 Net transfers to affiliates | | |
| 14.2 Borrowed funds repaid | | |
| 14.3 Other applications | 15,898,950 | 73,848,350 |
| 14.4 Total other cash applied (Lines 14.1 thru 14.3) | 15,898,950 | 73,848,350 |
| 15. Total (Line 13.8 + Line 14.4) | 1,825,184,980 | 1,853,079,985 |
| 16. Net change in cash and short-term investments (Line 12 minus Line 15) | 5,767,253 | 60,418,694 |
| **RECONCILIATION** | | |
| 17. Cash and short-term investments: | | |
| 17.1 Beginning of year | 167,684,696 | 107,266,002 |
| 17.2 End of year (Line 16 + Line 17.1) | 173,451,949 | 167,684,696 |