# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HIGHMARK, INC., SUCCESSOR IN INTEREST TO PENNSYLVANIA BLUE SHIELD AND SUBSIDIARIES<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Civil Action No. 05-1030 T<br>Judge Margolis |

## HIGHMARK'S CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff, Highmark, Inc., successor in interest to Pennsylvania Blue Shield and Subsidiaries, pursuant to Rule 56 of the Rules of Court of the Court of Federal Claims, hereby moves for summary judgment on the grounds that there is no genuine issue of material fact and that Highmark is entitled to judgment as a matter of law.

In support of its motion, Highmark relies on the pleadings, the attached brief, plaintiff's proposed findings of uncontroverted fact, and plaintiff's response to defendant's proposed findings of uncontroverted fact accompanying defendant's motion for summary judgment.

WHEREFORE, Highmark prays that the Court grant plaintiff's cross-motion for summary judgment.

Respectfully submitted,

/s/ Arthur Newbold
ARTHUR NEWBOLD
Attorney of Record
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Phone: (215) 994-2624
Fax: (215) 655-2624

Counsel for Plaintiff

Date: April 2, 2007

Of Counsel:

Frederick J. Gerhart
James J. Spadaro, Jr.
David N. Sontag
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

HIGHMARK, INC., SUCCESSOR IN INTEREST TO PENNSYLVANIA BLUE SHIELD AND SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Civil Action No. 05-1030 T
Judge Margolis

**HIGHMARK'S BRIEF IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

QUESTIONS PRESENTED....................1

STATEMENT OF FACTS....................1

ARGUMENT....................4

I. THE PURPOSE OF THE FRESH START BASIS RULE WAS TO TAX BC/BS ORGANIZATIONS ONLY ON GAINS AND INCOME ARISING AFTER JANUARY 1, 1987....................4

II. THE FRESH START BASIS RULE AND CODE SECTION 165 APPLY TO THE DEDUCTIONS PLAINTIFF CLAIMS....................6

A. The Fresh Start Basis Rule Gives the Plaintiff an Adjusted Basis in Its Healthcare Coverage Contracts....................6

B. The Fresh Start Basis Rule Applies for Purposes of Computing Losses Under Code Section 165....................11

1. The Plain and Unambiguous Statutory Language Provides That The Fresh Start Basis Rule Applies to Determine Any Loss, Not Just Losses from Sales or Exchanges....................11

2. The Legislative Purpose and Broader Statutory Framework of the Fresh Start Basis Rule Support Application of the Rule to Determine Any Loss, Not Just Losses from Sales or Exchanges....................15

3. The IRS Has Applied The Fresh Start Basis Rule to Determine the Section 165 Losses of a BC/BS Organization with Respect to Its Intangible Assets....................19

C. Plaintiff Is Entitled to Deductions Arising From Code Section 165 Losses, Which Are Not Equivalent to Depreciation....................21

III. PLAINTIFF DID NOT MAKE AN UNAUTHORIZED CHANGE IN ITS METHOD OF ACCOUNTING....................25

A. Highmark Never Adopted Any Method of Accounting After 1987 With Respect To Section 165 Losses from Cancelled or Terminated Healthcare Coverage Contracts From Which It Could Have "Changed"....................26

1. Filing Amended Income Tax Returns to Claim Previously Omitted Section 165 Losses Does Not Constitute a Change in Method of Accounting....................28

**TABLE OF CONTENTS**
(continued)

**Page**


B. Highmark's Omission of Section 165 Loss Deductions on Its Original Tax Returns Does Not Indicate That Plaintiff Adopted the Methods of Accounting The Defendant Alleges It Did ....................32

1. Highmark Never Treated Its Contracts as One Mass Asset....................32

2. Highmark Has Always Expensed the Costs to Create Its Contracts..........33

CONCLUSION....................36

APPENDIX A (separately bound) .................... A-1

Internal Revenue Code of 1986 (26 U.S.C.):

§ 165 .................... A-1

§ 167 .................... A-1

§ 446 .................... A-10

§ 833 .................... A-10

§ 1011 .................... A-14

§ 1012 .................... A-14

§ 1014 .................... A-14

§ 1053 .................... A-15

§ 4940 .................... A-15

Deficit Reduction Act of 1984, H.R. 4170, 98th Congress, P.L. 98-369, § 177(d) (2), 98 Stat. at 709-12 (1984) .................... A-16

Tax Reform Act of 1986, P.L. 99-514, § 1012, 100 Stat. 2085, 2390 (1986) .................... A-20


/ / /

**TABLE OF CONTENTS**
(continued)

**Page**

Treasury Regulations (26 C.F.R.):

§ 1.165-1(d)(1) .......... A-25

§ 1.165-2(a) .......... A-25

§ 1.446-1(a)(1) .......... A-25

§ 1.1011-1 .......... A-27

APPENDIX B (separately bound) .......... B-1

Declaration of Arthur Newbold .......... B-1

Exhibit 1 September 29, 2003 Statutory Notice of Claim Disallowance for the tax years ended December 31, 1992, December 31, 1993, December 31, 1994, December 31, 1995, and December 31, 1996 .......... B-3

Exhibit 2 Excerpts from PricewaterhouseCoopers Report (2007), "2006 Year in Review: Continuing Developments in the Taxation of Insurance Companies," *available at* http://www.pwc.com/us/eng/tax/ins/2006_insurance_tax_monograph.pdf .......... B-7

Exhibit 3 May 12, 2006 Letter from Internal Revenue Service, LMSB Division to an unnamed Blue Cross/Blue Shield organization (taxpayer identification redacted) .......... B-13

Exhibit 4 Sample Form 906-c (Rev. August 1994), Closing Agreement on Final Determination Covering Specific Matters, sent by the Internal Revenue Service with the May 12, 2006 letter (see Exhibit 3) .......... B-17

Exhibit 5 Excerpt from PricewaterhouseCoopers Valuation Report dated September 10, 1998 .......... B-22

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alcoma Association Inc. v. United States*, 239 F.2d 365 (5th Cir. 1956) .....................................23

*Arnold v. Commissioner*, 86 T.C.M. (CCH) 341 (Sept. 4, 2003) ....................................................9

*Bartlett v. Commissioner*, 114 F.2d 634 (4th Cir. 1940) ..........................................................29

*Burlington Northern Rail Road v. Okla. Tax Commission*, 481 U.S. 454 (1987) .........................12

*Butschky v. United States*, 1981 U.S. Dist. LEXIS 16944 (D. Md. Sept. 28, 1981)......................31

*Capital Blue Cross v. Commissioner*, 122 T.C. 224 (2004),
*rev'd on different ground*, 431 F.3d 117 (3d Cir. 2005) ........................................... *passim*

*Capital Blue Cross v. Commissioner*, 431 F.3d 117 (3d Cir. 2005)..................................... *passim*

*Chiles v. United States*, 843 F.2d 367 (9th Cir. 1988) ..........................................................12

*Commissioner v. Estate of Ridgway*, 291 F.2d 257 (3d Cir. 1961)..............................................12

*Coulter Electronics, Inc. v. Commissioner*, 59 T.C.M. (CCH) 350 (April 10, 1990),
*aff'd without published op.* 943 F.2d 1318 (11th Cir. 1991) ...................................... 30-31

*Cummin v. United States*, 1994 U.S. Dist. LEXIS 6493 (D. N.J. April 28, 1994) ........................31

*Deatherage v. Commissionerr*, 23 T.C.M. (CCH) 1410 (Sept. 8, 1964)........................................9

*Dominion Resources, Inc. v. United States*, 48 F. Supp. 2d 527 (E.D. Va. 1999)..................29, 30

*Echols v. Commissioner*, 950 F.2d 209 (5th Cir. 1991)..............................................................22

*Garrett v. Commissioner*, 73 T.C.M. (CCH) 2799 (May 19, 1997) ..............................................9

*Helvering v. Gordon*, 134 F.2d 685 (4th Cir. 1943) ..................................................................22

*Ithaca Industries, Inc. v. Commissioner*, 17 F.3d 684 (4th Cir. 1994) ..........................................24

*Kentucky Central Life Ins. Co. v. Commissioner*, 57 T.C. 482 (1972)..........................................22

*Maytag v. Commissioner*, 32 T.C. 270 (1959)..........................................................................29

**TABLE OF AUTHORITIES**
(continued)

**FEDERAL CASES**
(continued)

*Newark Morning Ledger Co. v. United States*, 507 U.S. 546 (1993) .................................... 23-24

*Reaver v. Commissioner*, 42 T.C. 72 (1964) ............................................................ 26-27, 28, 32

*Reeve v. Commissioner*, 6 T.C.M. (CCH) 329 (March 27, 1947) ................................................9

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ..............................................................15

*Sepulveda v. United States*, 2000 U.S. Dist. LEXIS 17570 (N.D. Ga. Nov. 2, 2000)..................31

*Standard Oil Co. v. Commissioner*, 77 T.C. 349 (1981) ..........................................................30, 31

*Stephens Marine, Inc. v. Commissioner*, 28 T.C.M. (CCH) 199 (Feb. 25, 1969), *aff'd* 430 F.2d 679 (9th Cir. 1970)..................................................................27, 28

*Stephens Marine, Inc. v. Commissioner*, 430 F.2d 679 (9th Cir. 1970) ...............................27, 28

*Trigon Insurance Co. v. United States*, 215 F. Supp. 2d 687 (E.D. Va. 2002)..................... *passim*

*Union Bankers Insurance Co. v. Commissioner*, 64 T.C. 807 (1975) ..........................................6

*West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83 (1991) ................................12, 15

## TABLE OF AUTHORITIES
(continued)

### FEDERAL STATUTES

**Internal Revenue Code of 1986 (26 U.S.C.):**


§ 165 ........ *passim*

§ 167 ........ 21-22

§ 446 ........ 26

§ 833 ........ 18-19

§ 1011 ........ 7, 8

§ 1012 ........ *passim*

§ 1014 ........ 8

§ 1053 ........ 14, 29

§ 4940 ........ 14

Deficit Reduction Act of 1984 § 177(d)(2), H.R. 4170, 98th Congress, P.L. 98-369, 98 Stat. at 709-12 (1984) ........ 14

Tax Reform Act of 1986 § 1012, P.L. 99-514, 100 Stat. 2085, 2390 (1986) ........ *passim*


### FEDERAL REGULATIONS

**Treasury Regulations (26 C.F.R.):**


§ 1.165-1(d)(1) ........ 22

§ 1.165-2(a) ........ 29

§ 1.446-1(a)(1) ........ 26, 28-29, 30

§ 1.1011-1 ........ 7, 8

**TABLE OF AUTHORITIES**
(continued)

**LEGISLATIVE HISTORY**

H.R. Conf. Rep. 814, 99th Cong. 2d Sess. Vol. II (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075 ........ 4-5, 12, 15, 17, 19

**MISCELLANEOUS**

I.R.S. Field Service Advice 200001005 (Sep. 10, 1999) ........ 20

I.R.S. Private Letter Ruling 9852023 (9/28/98) ........ 5, 14

I.R.S. Private Letter Ruling 6709295070A (Sept. 29, 1967) ........ 31

I.R.S. Technical Advice Memorandum 9533003 (May 2, 1995) ........ 20

Revenue Procedure 91-31 § 3.02, 1991-1 C.B. 566 ........ 30

Revenue Procedure 92-20, § 2.01, 1992-1 C.B. 685 ........ 26, 30

Revenue Procedure 97-27 § 2.01(2), 1997-1 C.B. 680 ........ 26, 29, 30

Revenue Ruling 65-297, 1965-2 C.B. 152 ........ 27

Revenue Ruling 68-629, 1968-2 C.B. 154 ........ 9

Revenue Ruling 76-44, 1976-1 C.B. 127 ........ 27

Revenue Ruling 76-411, 1976-2 C.B. 208 ........ 6

Revenue Ruling 90-38, 1990-1 C.B. 57 ........ 26

## QUESTIONS PRESENTED

1. Whether the Fresh Start Basis Rule contained in the Tax Reform Act of 1986 and Internal Revenue Code section 165 apply to the loss deductions Highmark claims for the termination or cancellation of its healthcare coverage contracts.

2. Whether Highmark made an unauthorized change in its method of accounting when it filed amended federal income tax returns to claim loss deductions for the termination or cancellation of its healthcare coverage contracts.

## STATEMENT OF FACTS

Plaintiff, Highmark, Inc. ("Highmark"), the successor to Pennsylvania Blue Shield ("PBS"), is now and on January 1, 1987, was a Blue Cross/Blue Shield ("BC/BS") organization.[1] Prior to January 1, 1987, BC/BS organizations were not subject to federal income tax. Def.'s Proposed Findings of Uncontroverted Fact 1 (hereinafter "DFOF"). In 1986 Congress decided that beginning on January 1, 1987, BC/BS organizations would no longer be tax-exempt and enacted section 1012 of the Tax Reform Act of 1986 (the "Tax Reform Act"). Section 1012 contained a number of provisions designed to transition BC/BS organizations into taxation,

1. Highmark is the successor in interest to both Veritus, Inc., which did business as Blue Cross of Western Pennsylvania ("Veritus"), and Medical Service Association of Pennsylvania, which did business as Pennsylvania Blue Shield ("PBS"). The matters described in this Brief relate only to PBS. References to "the plaintiff" and "Highmark" include its predecessor, PBS, where applicable.

including section 1012(c)(3)(A)(ii), which is the Fresh Start Basis Rule. The Fresh Start Basis Rule provides that "for purposes of determining gain or loss, the adjusted basis of any asset held [by a BC/BS organization] on [January 1, 1987] shall be treated as equal to its fair market value as of such day." Tax Reform Act of 1986, Pub.L.No. 99-514, § 1012(c)(3)(A)(ii), 100 Stat. 2085, 2390 (1986).

On January 1, 1987, Highmark held many tangible and intangible assets, including the valuable relationships with its customers embodied in its healthcare coverage contracts.[2] DFOF 2. The Fresh Start Basis Rule required Highmark to reset the adjusted basis of all of its assets, including its healthcare coverage contracts, to their fair market values on January 1, 1987. In 1987 and thereafter some of Highmark's healthcare coverage contracts were cancelled or terminated. DFOF 9-11. Section 165(a) of the Internal Revenue Code[3] provides that "there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Pursuant to section 165(a), Highmark claimed losses for cancelled or terminated healthcare coverage contracts. Pl.'s Proposed Findings of Uncontroverted Fact 9 (hereinafter "PFOF"). It claimed some of these losses for the first time on its originally filed returns and others for the first time on timely filed amended returns. DFOF 9-11. The tax

2. References to Highmark's healthcare coverage contracts throughout this Brief include reference to the values of its relationships with its customers who are parties to the contracts.

3. All section references are to the Internal Revenue Code of 1986, as amended, unless otherwise indicated.

deductions for losses arising from the cancellation or termination of these contracts result in federal income tax refunds for the 1991 through 1995 tax years.[4]

The Internal Revenue Service ("IRS") disallowed Highmark's claims with respect to its losses, as it did the claims of almost all the other similarly situated BC/BS organizations. PFOF 1. The BC/BS organizations disputed the IRS's decision to disallow these loss claims, and some of these disputes, like this one, resulted in litigation. All of the cases involved the same legal issues. Two cases, *Trigon Insurance Company v. United States* and *Capital Blue Cross v. Commissioner*, have produced three judicial decisions: *Trigon Insurance Co. v. United States*, 215 F. Supp. 2d 687 (E.D. Va. 2002); *Capital Blue Cross v. Commissioner*, 122 T.C. 224 (2004) ("*Capital I*"), *rev'd on different ground*, 431 F.3d 117 (3d Cir. 2005) ("*Capital II*"). Both trial courts ruled in favor of the BC/BS organizations on the principal legal issue, i.e., that the Fresh Start Basis Rule increased each BC/BS organization's basis in its healthcare coverage contracts as of January 1, 1987 to fair market value, and the Third Circuit Court of Appeals approved this holding. *Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 701; *Capital I*, 122 T.C. at 237-38.

Highmark's deadline for filing the Complaint in this case was September 29, 2005, and on September 26, 2005, Highmark started this suit. Thereafter, and after the Third Circuit's decision in *Capital II*, the IRS proffered a national settlement to all of the BC/BS organizations

4. Highmark has claimed refunds for the years 1991 through 1995. For the years 1987 through 1990, and for 1996, Highmark sustained net operating losses and consequently paid no federal income tax. The 1987-1990 losses, which form part of net operating loss carryforwards, along with losses incurred in 1991-1995, result in refunds for the 1991-1995 years. While Highmark claimed some of these losses (for 1995) on its original tax returns, it claimed some for the first time on amended returns.

not currently in litigation. PFOF 2. The settlement offer related to losses identical to those at issue in this case. PFOF 2. In the national settlement offer, the Government agreed that a loss deduction is allowable upon termination of a healthcare coverage contract with respect to which the taxpayer claims a stepped-up basis as a result of the Fresh Start Basis Rule. PFOF 3. The Government allowed the BC/BS organizations to deduct 80 percent of the appraised values of the terminated healthcare coverage contracts at issue, subject to an overall valuation limitation.[5] PFOF 4. However, the Government has declined to make that offer to Highmark and to other BC/BS organizations whose disputes with the IRS had progressed to the litigation stage before the time of the offer.

## ARGUMENT

### I. THE PURPOSE OF THE FRESH START BASIS RULE WAS TO TAX BC/BS ORGANIZATIONS ONLY ON GAINS AND INCOME ARISING AFTER JANUARY 1, 1987

The purpose of the Fresh Start Basis Rule in the Tax Reform Act was to transition BC/BS organizations into their new status as taxable entities by limiting taxation to gains, losses, income, and expense items that economically accrue only *after* January 1, 1987. *See* H.R. Conf. Rep. 814, 99th Cong. 2d Sess. Vol. II at 350, *reprinted in* 1986 U.S.C.C.A.N. 4075, 4437-38 ("The basis adjustment is provided because the conferees believe that such formerly tax-exempt

---

5. The national settlement offer also contemplates that a Closing Agreement will form part of the settlement which will, in effect, determine the taxpayers' section 165 deductions for all future years. PFOF 5. Hence, the agreement permanently settles this issue for the parties to the settlement. PFOF 6. The outcome of this or any other litigation will not affect these settlements. PFOF 7.

organizations should not be taxed on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation."). The Rule accomplishes that purpose by assigning to each asset a BC/BS organization held on January 1, 1987, an adjusted basis equal to that asset's fair market value as of January 1, 1987. Without the Fresh Start Basis Rule, BC/BS organizations would be taxed retroactively on economic value that had accrued while they were tax-exempt entities.

In essence, the Fresh Start Basis Rule gave the BC/BS organizations, as new taxpayers, a "fresh start" by treating them as if they had purchased all their assets for fair market value on January 1, 1987. *See* I.R.S. Priv. Ltr. Rul. 9852023 (9/28/98) (Issue 2) (explaining that a public charity that converted to private foundation status should be given the fresh start basis provided in Code section 4940(c)(4)(B) and "should be treated as, effectively, a new organization when it ceases to be a public charity and is classified as a private foundation"). In general, on the date of the purchase of any asset, a purchaser receives a basis in that asset equal to the purchase price pursuant to section 1012 of the Code. If that purchaser were to sell that asset on the next day, for the same price it had paid, it would realize no gain. Similarly, on January 1, 1987, the Fresh Start Basis Rule gave BC/BS organizations a basis in each of their assets equal to the fair market value of that asset. Therefore, post-January 1, 1987 taxable events (e.g., sales) would capture as taxable gains or losses only changes in the asset's value after that date. Without the Fresh Start Basis Rule, if a BC/BS organization had sold an asset on January 2, 1987, for the same fair market value the asset had had on January 1, it would have been taxed on all the appreciation or depreciation in the value of that asset which had accrued prior to January 1, 1987. That result would have retroactively eliminated the tax-exempt status the BC/BS organization had enjoyed

prior to January 1, 1987. Congress intended to prevent that result with the Fresh Start Basis Rule.

## II. THE FRESH START BASIS RULE AND CODE SECTION 165 APPLY TO THE DEDUCTIONS PLAINTIFF CLAIMS

The Fresh Start Basis Rule provides that "for purposes of determining gain or loss, the adjusted basis of any asset held on [January 1, 1987] shall be treated as equal to its fair market value as of such day." Tax Reform Act § 1012(c)(3)(A)(ii). The phrases "any asset" and "gain or loss" are unambiguous and should be given their plain meaning. Applying any other meaning, such as those the Government proposes in this case, would effectively rewrite the statute.

### A. The Fresh Start Basis Rule Gives the Plaintiff an Adjusted Basis in Its Healthcare Coverage Contracts

The phrase "any asset" in the Fresh Start Basis Rule includes intangible assets such as Highmark's healthcare coverage contracts. *Trigon*, 215 F. Supp. 2d at 696; *see Capital II*, 431 F.3d at 124-127; *Capital I*, 122 T.C. at 234-38; *see also Union Bankers Ins. Co. v. Comm'r*, 64 T.C. 807 (1975), *acq.*, 1976-2 C.B. 3; Rev. Rul. 76-411, 1976-2 C.B. 208. Hence, the Fresh Start Basis Rule increases the basis of each of Highmark's healthcare coverage contracts to the amount of that contract's fair market value as of January 1, 1987. The Government argues that, because Highmark had incurred no capital costs with respect to the contracts prior to January 1, 1987, it had no "cost" basis on that date and therefore could not receive an "adjusted" basis equal to fair market value. The Government's argument is not only in direct conflict with the plain language of the statute and with the opinions of all three courts that have decided this issue, it is inconsistent with basic tax principles. The Code, the Regulations, and the Tax Reform Act are

consistent and unambiguous in their treatment of Highmark's healthcare coverage contracts as assets eligible for stepped-up basis treatment under the Fresh Start Basis Rule.

The crux of this case is whether Highmark's claimed section 165 losses are permissible deductions. Therefore, section 165 and the Code sections to which it refers are the logical starting point for considering the concepts of "loss" and "basis." Section 165(a) of the Code contains the principal statutory authorization for the deductibility of losses, providing that "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(b) of the Code provides that "the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property." Section 1011 of the Code and Treasury Regulation § 1.1011-1 provide, in turn, that the adjusted basis for determining the gain or loss from the sale or other disposition of property shall be the basis (generally determined under section 1012 of the Code) as adjusted "to the extent . . . specifically provided for under applicable provisions of internal revenue laws." Treas. Reg. § 1.1011-1. Hence, the first step in computing whether a taxpayer has realized a loss on the disposition of an asset is to determine the taxpayer's adjusted basis in the asset. This determination begins with the taxpayer's cost basis under Code section 1012.

A taxpayer's Code section 1012 basis in a self-created intangible asset, such as an insurer's basis in an insurance contract with its customers, normally will be zero because the taxpayer deducts the costs of creating the asset when it incurs them. *Capital II*, 431 F.3d at 124. Highmark currently has and has always had a zero cost basis in its self-created healthcare coverage contracts entered into *after* January 1, 1987. Pl.'s Resp. to Def.'s Proposed Findings of

Uncontroverted Fact 33-37, 40 (hereinafter "Pl.'s Resp. DFOF"). With respect to its self-created healthcare coverage contracts entered into *before* January 1, 1987, Highmark likewise had a basis in each contract under section 1012 equal to zero at all times prior to January 1, 1987. On January 1, 1987, however, the Fresh Start Basis Rule (an "applicable provision of internal revenue laws" within the meaning of Treasury Regulation § 1.1011-1), adjusted Highmark's basis in each healthcare coverage contract that it possessed on January 1, 1987, from zero under section 1012 to that contract's fair market value on that date. *See Capital II*, 431 F.3d at 124; *Trigon*, 215 F. Supp. 2d at 701; *Capital I*, 122 T.C. at 237.

Contrary to the Government's position that this result is anomalous or unusual, the provisions of the internal revenue laws frequently reset the basis of assets upon the happening of an event, generally by increasing the basis of an asset from zero to its fair market value on the relevant date. This is a common phenomenon; it occurs whenever a person dies and transfers property to his or her heirs. For example, suppose a taxpayer, through his own efforts, creates a computer software program. He has a cost basis in this self-created asset of zero. When he dies, his heirs inherit the computer software program. Upon transfer to his heirs, Code section 1014 increases the basis of the self-created asset from zero to the fair market value of the software on the date of death. If his heirs later sell that software for less than its date-of-death value, or the software becomes obsolete and therefore worthless, they are entitled to a loss deduction. The Fresh Start Basis Rule parallels the operation of Code section 1014. Specifically, both provisions increase the basis of a zero cost basis asset from zero to that asset's fair market value on a relevant date, and neither requires the taxpayer to incur a capital cost in order to have a fair market value basis in the asset.

The foundation of the Government's argument is that Highmark has *no* basis in its healthcare coverage contracts under Code section 1012. This is wrong. Highmark *does* have a section 1012 basis, the amount of which is zero. A number of courts have held that assets for which a taxpayer has incurred no capital costs have a basis under section 1012, and that basis is zero. *See, e.g., Arnold v. Comm'r*, 86 T.C.M. (CCH) 341 (Sept. 4, 2003) (holding that a taxpayer had a zero basis in his stock and thus proceeds from the sale of that stock were taxable in full); *Deatherage v. Comm'r*, 23 T.C.M. (CCH) 1410 (Sept. 8, 1964) (finding that a school had a zero basis in its assets where it had deducted the costs of those assets as business expenses); *Reeve v. Comm'r*, 6 T.C.M. (CCH) 329 (March 27, 1947) (deciding that because the taxpayer had failed to prove what basis she had in stock acquired by gift, that basis was zero); *Garrett v. Comm'r*, 73 T.C.M. (CCH) 2799 (May 19, 1997) (finding that the taxpayer had a zero basis in his muscle car collection). The IRS has also agreed: "Section 1012 of the Code provides that the basis of property is its cost except as otherwise provided in the Code. Since the taxpayer incurred no cost in making [his own note], its basis to him was zero." Rev. Rul. 68-629, 1968-2 C.B. 154. Therefore, the concept of basis does not have as a prerequisite the expenditure of a capital cost, as the Government contends. An asset can, and frequently does, have a basis of zero. Further adjustment of that basis by another provision of the internal revenue laws, such as the Fresh Start Basis Rule, is consistent with sections 1011 and 1012 of the Code.

Consider the following example, which illustrates the anomalous results to which the Government's position would lead. Suppose in 1985 Highmark had self-developed valuable computer software for which it had expensed all development costs. Assume that the fair market value of this asset was $100 and would remain at this amount until Highmark made further

improvements. To improve the speed and performance of the software, Highmark then purchased a canned program from Microsoft (a betterment or improvement, not a separate asset) for $50, which increased the software's fair market value to $150. In February of 1987, Highmark then sold the improved software for $150. If the purchase from Microsoft had taken place on December 30, 1986, under the Government's theory Highmark would have had a pre-December 31, 1986 capital cost in the software of $50; so the Fresh Start Basis Rule would therefore operate to give Highmark a basis of $150 on January 1, 1987, and Highmark would have had zero gain on the February 1987 sale. No pre-1987 appreciation would be taxed. This result would be consistent with the express intent of Congress. If instead the purchase from Microsoft had taken place two days later, on January 2, 1987, under the Government's theory Highmark would have had no January 1, 1987 basis because it had had no capital cost as of December 31, 1986. Highmark then would have gotten a $50 cost basis on January 2 and would have had a $100 gain if it had sold the software in February. The $100 gain would represent pre-1987 appreciation, which would be taxed in the second example, contrary to the undisputed intent of Congress in passing the Fresh Start Basis Rule. Nonetheless, the Government is arguing that Congress intended this anomalous result.

In sum, Highmark's healthcare coverage contracts are self-created assets, each of which had a pre-existing basis of zero as of January 1, 1987. *See Capital*, 431 F.3d at 124. The Government admits as much. *See* Def.'s Mot. for Summ. J. 15 ("*As explained above*, plaintiff's use of the fresh-start basis accomplished this by transforming plaintiff's group healthcare coverage contracts from self-created property, *with a zero basis*, into assets with a basis of over $303 million." (emphases added)). The Government provides no valid reason why the Fresh

Start Basis Rule would not apply to increase the adjusted basis of these contracts from zero to their fair market values on January 1, 1987.

B. The Fresh Start Basis Rule Applies for Purposes of Computing Losses Under Code Section 165

The Fresh Start Basis Rule unambiguously specifies that it applies for purposes of determining "gain or loss." Tax Reform Act § 1012(c)(3)(A)(ii); *see Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 699; *Capital I*, 122 T.C. at 236. This Court would have to rewrite the statute to give it the meaning the Government urges. *See Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 701; *Capital I*, 122 T.C. at 236. Further, the broader statutory framework and legislative purpose of the Fresh Start Basis Rule require its application to calculate section 165 losses. Finally, the IRS itself has applied the Fresh Start Basis Rule to calculate section 165 losses for software assets that are conceptually indistinguishable from Highmark's healthcare coverage contracts.

1. The Plain and Unambiguous Statutory Language Provides That The Fresh Start Basis Rule Applies to Determine Any Loss, Not Just Losses from Sales or Exchanges

The plain words of the Fresh Start Basis Rule provide that it applies "for the purposes of determining gain or loss." Tax Reform Act § 1012(c)(3)(A)(ii). The statute does not in any way limit the kind of gain or loss to which the Fresh Start Basis Rule applies. Tax Reform Act § 1012(c)(3)(A)(ii); *see Capital II* at 125; *Trigon*, 215 F. Supp. 2d at 697; *Capital I* at 236. The Government nevertheless argues that, because the statutory language does not catalogue the kinds of losses to which the basis step-up applies, this Court should consider the statutory

language ambiguous. The Government suggests there is ambiguity because Congress used the phrase "gain or loss" in the Fresh Start Basis Rule rather than the phrase "any loss," which it used in Code section 165. The Government then goes on to claim that one solitary piece of legislative history, which mentions limiting the applicability of the Fresh Start Basis Rule to "determining gain or loss upon sale or exchange of the assets," H.R. Conf. Rep. No. 99-841, Vol. II at 349-50, should trump the clear language of the statute. Def.'s Mot. for Summ. J. 19-20. This proposed reliance on a wisp of legislative history is misplaced and unjustified.

When interpreting a statute, a court looks first to its language and, only if that statutory language is ambiguous, does the court look to legislative history. *West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98-99 (1991) ("Where [the statute] contains a phrase that is unambiguous – that has a clearly accepted meaning in both legislative and judicial practice – we do not permit it to be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process."). Legislative history can be used only to resolve statutory ambiguity, not to create ambiguity. *Comm'r v. Estate of Ridgway*, 291 F.2d 257, 260 (3d Cir. 1961) (citing *United States v. Shreveport Grain & El. Co.*, 287 U. S. 77, 83 (1932)). The Supreme Court has held that "[u]nless exceptional circumstances dictate otherwise, 'when we find the terms of a statute unambiguous, judicial inquiry is complete.'" *Burlington N.R.R. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987) (citations omitted). The principle that legislative history should not be used to contravene clear statutory language takes on even greater importance in interpreting highly technical income tax laws. *See Chiles v. United States*, 843 F.2d 367, 370 (9th Cir. 1988).

Every court that has addressed this issue is in full agreement: the statutory language of the Fresh Start Basis Rule is clear and unambiguous. *Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 699-701; *Capital I*, 122 T.C. at 236-38. "The common usage of the words 'gain or loss,' without limitation, plainly includes *any* gain or loss." *Trigon*, 215 F. Supp. 2d at 699 (emphasis in original); *accord Capital II*, 431 F.3d at 125; *Capital I*, 122 T.C. at 236. The Government's argument that the term "gain or loss" in the statutory language of the Fresh Start Basis Rule refers only to gains and losses from sales or exchanges of property contradicts the language of the statute. If Congress had intended the phrase "gain or loss" in the Fresh Start Basis Rule to refer only to gains or losses generated by sales and exchanges, Congress would have made this intent explicit in the statutory language. As the *Trigon* court succinctly explains:

> [I]t would have been a simple matter to have included in the statute language such as that which appears in the Conference Report. Congress, however, did not do so and it is not the office of the judiciary to conclude that Congress inadvertently failed to include that significant limitation in the statutory text and then . . . correct that oversight.

*Trigon*, 215 F. Supp. 2d at 700. In prior instances when Congress has intended to limit the applicability of a transitional basis adjustment, it has used specific language to do so. In fact, nothing is more telling than the list of statutes the Government cites in its Brief for use of the term "gain or loss." Def.'s Mot. for Summ. J. 19. The Government fails to inform this Court that in every example it cites Congress explicitly limited the application of the phrase "gain or loss" to a "sale or exchange" or some other plainly-stated limitation. If Congress had intended to limit the application of "gain or loss" in the Fresh Start Basis Rule, it had myriad statutes to serve as examples of how explicitly to do so. The Government's own list of statutes demonstrates this.

Congress has had frequent experience enacting taxation statutes providing for a stepped-up basis. In each instance where it wished to limit the application of the stepped-up basis provisions, Congress did so. In the following examples, unlike with the Fresh Start Basis Rule, Congress explicitly limited that application to gains and either did not apply it or applied it only partially to losses. When the Internal Revenue Code was first enacted in 1913, and Congress decided to exempt from taxation the prior appreciation of assets held on March 1, 1913, it explicitly provided that the fair market value basis adjustment associated with this change would apply only in determining gain on the assets, but not for the purposes of determining loss. *See* Code § 1053. More recently, when Congress eliminated the federal income tax exemption for the Federal Home Loan Mortgage Corporation, it provided that for any asset held on January 1, 1985, the basis for determining gain would be the *greater* of the adjusted basis or the fair market value on that date, while the basis for determining loss would be the *lesser* of such amounts on that date. Deficit Reduction Act of 1984 § 177(d)(2), H.R. 4170, 98th Congress, P.L. 98-369, 98 Stat. at 709-12. Congress provided a similar fresh start basis rule to private foundations when they first became subject to an excise tax on their capital gains and other investment income on January 1, 1970. Congress there allowed private foundations to step up the basis of their assets to fair market value on December 31, 1969, but only for purposes of determining gains, not losses. Code § 4940(c)(4)(B); *see also* I.R.S. Priv. Ltr. Rul. 9852023 (9/28/98) (Issue 2) (extending the fresh start rule in section 4940(c)(4)(B) to a public charity that converted to private foundation status, stating that the charity "should be treated as, effectively, a new organization when it ceases to be a public charity and is classified as a private foundation").

The clear and unambiguous language of the Fresh Start Basis Rule is not limited with respect to gains *or* losses. *Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 699; *Capital I*, 122 T.C. at 237-38. Lack of the word "any" before the phrase "gain or loss" does not limit the breadth of that term. The Government relies on an apparent inconsistency that is created by one passage in the legislative history, not by the text of the statute. *See Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 699; *Capital I*, 122 T.C. at 235-36. As was explained in greater detail above, this Court should look only to the clear and unambiguous language of the Fresh Start Basis Rule. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); *West Virginia Univ. Hosps.*, 499 U.S. at 98-99; *see also Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 699-701; *Capital I*, 122 T.C. at 235-36. Because the Fresh Start Basis Rule applies "for the purposes of determining gain or loss" and explicitly provides no limitation on the types of transactions to which it applies, the legislative history the Government cites is irrelevant. *See Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 699; *Capital I*, 122 T.C. at 236.

2. The Legislative Purpose and Broader Statutory Framework of the Fresh Start Basis Rule Support Application of the Rule to Determine Any Loss, Not Just Losses from Sales or Exchanges

The Government's position that the Fresh Start Basis Rule applies only to losses on sales or exchanges is inconsistent with the stated legislative purpose. *See* H.R. Conf. Rep. 814, 99th Cong. 2d Sess. Vol. II at 350, *reprinted in* 1986 U.S.C.C.A.N. 4075, 4437-38 ("The basis adjustment is provided because the conferees believe that such formerly tax-exempt organizations should not be taxed on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation."). The purpose of the

rule is to base the computation of post-1986 taxable income on amounts of gain or loss that economically accrue after January 1, 1987. Without the Fresh Start Basis Rule, BC/BS organizations would be taxed retroactively on economic value that accrued while the organizations were tax-exempt entities, which would have the effect of denying retroactively their tax-exempt status. Any loss recognized after January 1, 1987, that is attributable to a decline in the value of an asset after that date must be taken into account in determining taxable income or loss in order for the stated Congressional purpose to be achieved. It would thwart that purpose to have one set of basis rules apply to the "sale or exchange" of an asset and another set of rules apply to other forms of disposition. The Government's position would also thwart that purpose by having one set of basis rules apply to the "loss" of some assets, but not to others.

To illustrate the anomalous results that would flow from the Government's position, consider the following hypothetical. Suppose a BC/BS organization had an office building which it acquired in 1985 and owned on January 1, 1987. If the taxpayer sold the office building on January 1, 1994, for a price equal to the building's fair market value on January 1, 1987, the taxpayer would not realize any gain on the sale of the building because it would have been allowed to step up the building's tax basis to its January 1, 1987 fair market value. Under the Government's interpretation, however, if on January 1, 1994, the building was uninsured and was completely destroyed by fire, and if the taxpayer claimed a deduction under section 165 relating to the casualty loss associated with the fire, the taxpayer would not be allowed to use the January 1, 1987 stepped-up basis in the building because the loss was caused by a fire, not by a sale or exchange. Hence, under the Government's interpretation the taxpayer would be taxed on

the pre-1987 appreciation in the building, which is inconsistent with the indisputable purpose of the Fresh Start Basis Rule not to tax such appreciation. *Capital I*, 122 T.C. at 237.

The Government maintains that "Congress's goal of shielding pre-1987 appreciation and depreciation from taxation is applicable . . . only when a Blue Cross organization receives something of value upon the disposition of an asset," because only in such transactions can there be a gain which would be "taxed." Def.'s Mot. for Summ. J. 22. The only support the Government marshals for that proposition is a phrase from a House Conference Report that BC/BS organizations "should not be taxed on [pre-1987] appreciation *or depreciation*." H.R. Conf. Rep. No. 99-841, at II-350, *reprinted in* 1986 U.S.C.C.A.N. at 4438 (emphasis added). That phrase does not make much sense, referring as it does to taxation "on . . . depreciation." The tax law does not "tax" depreciation. Even if it did make sense, it would be in tension with the argument the Government bases upon it – that Congress's goal was to have the Fresh Start Basis Rule apply only when "a Blue Cross organization receives something of value upon the disposition of an asset." That tension underscores the unwisdom of ignoring the words of a statute and wandering off to look for bits of legislative history. Moreover, the Congressional phrase can be harmonized readily with the plain words of the Fresh Start Basis Rule by reading it to mean simply what the statute says, that all assets of a BC/BS organization are given a basis equal to their fair market value on January 1, 1987 regardless of whether that fair market value is greater than or less than the organization's original tax basis.

The Government also claims that application of the Fresh Start Basis Rule to Highmark's healthcare coverage contracts would thwart the overall Congressional purpose of enacting section 1012 of the Tax Reform Act because it would give BC/BS organizations an unintended

unfair advantage over their taxable commercial counterparts. Def.'s Mot. for Summ. J. 14-16. However, while the Government's argument focuses on the broad overall purpose of section 1012 of the Tax Reform Act, i.e., leveling a competitive imbalance between commercial insurers and previously tax-exempt BC/BS organizations, it completely ignores one of the clear Congressional purposes in enacting the entire fabric of rules pursuant to which BC/BS organizations were transitioned into taxable status, including the Fresh Start Basis Rule and Code section 833. Tax Reform Act §§ 1012(b), (c)(3)(A), Pub.L.No. 99-514, 100 Stat. 2085, 2390 (1986). Contrary to the Government's assertions, Def.'s Mot. for Summ. J. 15, Congress intentionally provided the BC/BS organizations with a number of "device[s] unavailable to [the BC/BS organizations'] competitors." *See* Tax Reform Act § 1012(c)(3) (entitled, "Special Rules For Existing Blue Cross Or Blue Shield Organizations"). Each "device" provides advantages to BC/BS organizations over commercial insurers, the extent of which generally decrease over time until they disappear. Thus, Congress deliberately gave the BC/BS organizations several short term tax advantages to help smooth the potentially jarring transition from tax-exempt organizations to taxable entities.

In Code section 833 Congress created one of a series of special rules for BC/BS organizations for tax years beginning on and after January 1, 1987, that do not apply to their commercial insurance company peers. Among other things, Code section 833 provides BC/BS organizations with a special deduction. That deduction, which is computed under section 833(b), is a specified percentage of certain claims and expenses to the extent that that amount exceeds the BC/BS organization's adjusted surplus. The organization is entitled to claim this deduction each year from 1987 until its surplus grows large enough to exceed the percentage of claims and

expenses figure. Congress did not extend this deduction to the BC/BS organizations' commercial insurance company peers. The Government's claim that Congress did not intend to provide BC/BS organizations with any special advantage, any "transition into taxability," is contradicted by the terms and effects of Code section 833.

The Fresh Start Basis Rule provides BC/BS organizations with another advantage over their competitors: stepped-up basis in their assets as of January 1, 1987. As was discussed above, Congress wanted to avoid taxing the value of the Blue Cross/Blue Shield assets already in place prior to January 1, 1987. *See* H.R. Conf. Rep. 814, 99th Cong. 2d Sess. Vol. II at 350, *reprinted in* 1986 U.S.C.C.A.N. 4075, 4437-38. Accordingly, Highmark is claiming deductions only for contracts that were in place on January 1, 1987, and which have since been cancelled or terminated, each with a basis that was stepped up to fair market value as of that date under the explicit mandate of the Fresh Start Basis Rule. Thus, Highmark is not enjoying any improper advantage or unfairly shielding income from tax by deducting losses from the termination of its those contracts. Deduction is the fair result that Congress intended.

### 3. The IRS Has Applied The Fresh Start Basis Rule to Determine the Section 165 Losses of a BC/BS Organization with Respect to Its Intangible Assets

In addition to being inconsistent with the plain statutory text and the legislative purpose, the Government's position squarely contradicts the administrative practice of the IRS. Specifically, the IRS acknowledged that the Fresh Start Basis Rule applied to step up the basis of an intangible asset, computer software, to its fair market value to determine the amount of a

section 165 loss a BC/BS organization recognized. *See* I.R.S. Tech. Adv. Mem. 9533003 (May 2, 1995).[6] The IRS stated:

> Under section 1012(c)(3)(A)(ii) of the Act, Taxpayer received an adjusted basis in the software equal to the fair market value of the software as of January 1, 1987, for purposes of determining gain or loss. That basis should be used in computing the amount of Taxpayer's loss under section 165.

I.R.S. Tech. Adv. Mem. 9533003 (May 2, 1995). Hence, the Government concluded that the Fresh Start Basis Rule applied to step up the basis of an intangible asset to determine the amount eligible for a deduction as an abandonment loss under Code section 165. *Id.* For this purpose, a section 165 loss on the abandonment of software is indistinguishable from a section 165 loss on the abandonment of a healthcare coverage contract.[7] The Government offers no rationale whatsoever for distinguishing them.

* * *

It is clear from the language of the statute, the legislative intent, the broader statutory framework, and the IRS's own analysis of the statute that application of the Fresh Start Basis Rule is not limited to gain or loss from sales or exchanges. *Trigon*, 215 F. Supp. 2d at 699-701; *Capital II*, 431 F.3d at 125-27; *Capital I*, 122 T.C. at 237-38. As the *Trigon* court explained, the "plain statutory text is fully consistent with the statutory context of the provision at issue and is

---

6. Technical Advice Memoranda are not binding on the IRS, but they are informative of its interpretation of the statute at issue in this litigation.

7. In I.R.S. Field Service Advice 200001005 (Sep. 10, 1999), the IRS concluded that subscriber intangibles of a BC/BS organization similar to the plaintiff's healthcare coverage contracts were not subject to loss deductions under section 165. This position conflicts with the position the IRS took in Technical Advice Memorandum 9533003 and, more importantly, is inconsistent with the final, conclusive position it took in its national settlement proposal. *See* PFOF 2; Pl.'s Ex. 2, 3.

consonant with the purpose of the statute, namely, to prevent any unrealized gain or loss that had accrued while a Blue Cross/Blue Shield organization was exempt from tax from being included in the calculation of tax liability once the company became subject to tax." *Trigon*, 215 F. Supp. 2d at 699; *see Capital II*, 431 F.3d at 125; *Capital I*, 122 T.C. at 237-38. Accordingly, this Court should find that the Fresh Start Basis Rule applies to determine the losses claimed by Highmark.

C. Plaintiff Is Entitled to Deductions Arising From Code Section 165 Losses, Which Are Not Equivalent to Depreciation

As was stated above, in each of its taxable years beginning in 1987, Highmark suffered losses when some of its healthcare coverage contracts were cancelled or terminated. PFOF 8. It determined the January 1, 1987 value of each such lost contract and claimed a loss deduction under Code section 165 in the year of the loss. PFOF 9. The Government asserts that the section 165 deductions Highmark claimed are "indistinguishable from" depreciation. Def.'s Mot. for Summ. J. 23-25. That argument ignores the fundamental distinction between loss deductions under section 165 and depreciation or amortization deductions under section 167. The Government's argument is also inconsistent with the plain meaning and structure of the Code and the explicit language and legislative purpose of the Fresh Start Basis Rule, because it would prevent Highmark from ever taking the Fresh Start Basis Rule into account for purposes of determining a loss on its most important assets.

Section 167 of the Code permits deductions for depreciation and amortization of certain assets with a limited useful life. A taxpayer that purchases an intangible asset for use in its trade or business generally is entitled to amortize the cost of the asset over its estimated useful life, determined as of the date of the acquisition, and subsequent events (e.g., actual terminations) are

irrelevant to the computation of amortization deductions. *Ky. Cent. Life Ins. Co. v. Comm'r*, 57 T.C. 482, 502 (1972), acq., 1972-2 C.B. 1. In contrast to depreciation and amortization deductions, a loss under section 165 may be claimed only after all the facts are known – i.e., after an identifiable event has occurred that establishes the loss. Treas. Reg. § 1.165-1(d)(1). This requirement distinguishes section 165 losses from section 167 amortization: a section 165 loss requires "'some step that irrevocably cuts ties to the asset,' and a [section] 165 'loss is not sustained and is not deductible because of mere decline, diminution or shrinkage of the value of property.'" *Capital II*, 431 F.3d at 127 n. 3 (citations omitted). In short, loss deductions are episodic and take place only when a loss actually occurs, whereas depreciation or amortization deductions are scheduled and periodic and take place regardless of future events. The fact that a taxpayer may claim a deduction under section 165 for a loss involving non-depreciable property further illustrates the difference between loss deductions under section 165 and deductions for depreciation and amortization under section 167. *See* Code § 165(g) (permitting a deduction for worthless securities); *Echols v. Comm'r*, 950 F.2d 209 (5th Cir. 1991) (permitting a deduction for a partnership interest); *Helvering v. Gordon*, 134 F.2d 685 (4th Cir. 1943) (permitting a deduction for land).

As was explained above, the Fresh Start Basis Rule applies for purposes of determining loss under section 165 for assets Highmark held on January 1, 1987, including its healthcare coverage contracts. The Government notes that BC/BS organizations are not permitted to use their basis step-up for depreciation purposes. *See* Def.'s Mot. for Summ. J. 25; Tax Reform Act §1012(c)(3)(A)(ii); *Capital II*, 431 F.3d at 127 n. 3. Highmark, however, is claiming section 165 loss deductions, not depreciation deductions. PFOF 10. Here, with respect to each deduction an

identifiable event—a cancellation or termination of a healthcare coverage contract—has resulted in a termination of the valuable relationship between Highmark and its customer, resulting in a real economic loss. These losses are in form and function section 165 losses and may not be characterized as depreciation deductions.

In *Capital II*, the Third Circuit rejected the Government's present argument as follows:

> We cannot find any legal basis on which to accept the Commissioner's theory. . . . To the extent that [the Commissioner's depreciation argument] is a factual argument, it clearly fails: Capital has not attempted to take a depreciation deduction in order to approximate the average annual loss of contracts; instead it has gone through the extraordinarily laborious exercise of counting cancelled contracts and valuing each one. To the extent that the Commissioner claims that a taxpayer may never take loss deductions when those deductions are economically similar to disallowed depreciation deductions, the argument is novel and unsupported. Instead, the regulations specifically provide that taxpayers may take a § 165 deduction for the loss of nondepreciable property.

431 F.3d at 127 n. 3 (citations omitted). Similarly, in *Alcoma Ass'n Inc. v. United States*, the Fifth Circuit rejected the Government's attempt to limit allowable loss deductions by analogy to depreciation rules. *Alcoma Ass'n Inc.*, 239 F.2d 365, 369 (5th Cir. 1956). This Court should likewise reject the Government's argument here.

The Government's contention that Highmark is essentially depreciating its "real" asset, its subscriber base, and not deducting losses from each individual contract, is nothing more than a thinly-veiled version of its "mass asset" argument. The Government has already made and lost this argument in the *Capital* case. *Capital II*, 431 F.3d at 126-27; *Capital I*, 122 T.C. at 238-40; *see Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 566 (1993) (holding that the mass asset rule does not apply to customer-based intangible assets that have ascertainable useful

lives and can be valued separately from goodwill); *Ithaca Indus., Inc. v. Comm'r*, 17 F.3d 684, 688 (4th Cir. 1994) (holding that the mass asset rule does not apply to assets that can be "maintained only by significant affirmative efforts to add new elements"). Highmark's "subscriber base" (the Government's term, not Highmark's) is not a mass asset.

Each of Highmark's healthcare coverage contracts can be individually valued and do not constitute part of a single indivisible asset. The Government asserts that the manner in which PricewaterhouseCoopers valued those contracts implicitly shows that Highmark considered its subscriber base to be a mass asset because that valuation did not employ "contract-specific data." Def.'s Mot. for Summ. J. 24. That characterization of the PricewaterhouseCoopers valuation methodology is just wrong. In addition, Highmark will produce in this case as an expert witness report a valuation study Deloitte Consulting is conducting which will employ contract-specific data to value each of Highmark's lost healthcare coverage contracts. The healthcare coverage contracts are distinct in fact: each contract has a unique economic value based on its claims history, rate structure, group size, and other characteristics. Moreover, Highmark's contracts cannot regenerate themselves; instead, Highmark must make significant affirmative efforts to acquire new group contracts. Finally, the fact that customers can cancel their contracts at will is not dispositive; an at-will relationship constitutes a valuable asset if it is reasonably likely to continue into the future. *Trigon*, 215 F. Supp. 2d at 715. Thus, Highmark's healthcare coverage contracts do not constitute a mass asset.

For all the reasons stated above, this Court should find that Highmark's claims of loss deductions under section 165 for the termination of its healthcare coverage contracts are not the functional equivalent of depreciation and are permissible under the Fresh Start Basis Rule.

## III. PLAINTIFF DID NOT MAKE AN UNAUTHORIZED CHANGE IN ITS METHOD OF ACCOUNTING

Since becoming a taxable entity on January 1, 1987, Highmark has maintained a consistent method of accounting for its income and deductions. Despite the Government's contentions to the contrary, Highmark has not made a change, let alone an unauthorized change, in its method of accounting.

Highmark properly filed an Application for Change in Accounting Method Under Revenue Procedure 87-51 on Form 3115, with its original tax return for 1987, in accordance with the provisions of the Tax Reform Act. PFOF 11; *see* Tax Reform Act § 1012(c)(3)(A), Pub.L.No. 99-514, 100 Stat. 2085, 2390 (1986). Highmark noted on page two of that Application that it was requesting permission to change and use methods of accounting in compliance with the Tax Reform Act. PFOF 12. Specifically, Highmark stated that "for purposes of determining gain or loss, the adjustment [sic][8] basis of any asset held on January 1, 1987 will be its fair market value as of December 31, 1986 . . . ." Def. Ex. 1, App. B at B-32. "Any asset" includes its intangible assets, such as its healthcare coverage contracts. Thus, Highmark properly put the Government on notice that its accounting actions were in accordance with the requirements of the Tax Reform Act, including stepping up the adjusted basis in its January 1, 1987 assets to fair market value.

---

8. Typographical error – the intended word was "adjusted."

A. Highmark Never Adopted Any Method of Accounting After 1987 With Respect To Section 165 Losses from Cancelled or Terminated Healthcare Coverage Contracts From Which It Could Have "Changed"

Highmark's specific actions at issue in this case do not constitute a change in its method of accounting. Section 446 of the Code requires a taxpayer to compute its income using the method of accounting which it regularly uses to compute its income on its books. Section 446(a). It provides further that a taxpayer who wishes to change its method of accounting must secure the Government's consent before computing its taxable income under the proposed new method. Section 446(e). "Method of accounting" includes not only the taxpayer's overall method of accounting but also the accounting treatment of any material item. Treas. Reg. § 1.446-1(a)(1). Before 1995, Highmark had never claimed losses from its healthcare coverage contracts on its income tax returns. DFOF 9. The Government's entire method of accounting argument is based on the contention that Highmark "adopted a method of accounting" by failing to claim section 165 loss deductions on certain of its original tax returns. Def. Mot. for Summ. J. 28.

The IRS has stated that a taxpayer adopts a method of accounting with respect to an item by consistently treating that item on two or more consecutively filed returns. See Rev. Proc. 97-27 § 2.01(2), 1997-1 C.B. 680 (consistent treatment of a material item on two or more returns can establish a method of accounting); Rev. Proc. 92-20, § 2.01, 1992-1 C.B. 685; Rev. Rul. 90-38, 1990-1 C.B. 57. Hence, an item must be reflected on a return for a method of accounting to have been adopted. In fact, the Tax Court has held that the absence of *any* treatment of an item on a taxpayer's return (as happened here) is too ambiguous to qualify as an election of a method of accounting. *See Reaver v. Comm'r*, 42 T.C. 72, 81 (1964), *nonacq. withdrawn*, 1965-2 C.B. 6

(taxpayers could file an amended return to elect installment method reporting of sales proceeds where previously they "made no conscious election to report the transaction on other than the installment method"); *see also* Rev. Rul. 65-297, 1965-2 C.B. 152, *amplified*, Rev. Rul. 76-44, 1976-1 C.B. 127 (requirements for adoption of or change to installment method). The requirement of an affirmative act is particularly compelling where inferring an election would, as here, saddle Highmark with an erroneous method and would cause the forfeiture of its appropriate loss deductions.

The Government cites only one case as support for the foundation of its method of accounting argument, the proposition that a taxpayer can adopt a method of accounting by its silence or omission, and that case actually says no such thing. That the Government did not discuss the facts or the lower court's decision in the case, *Stephens Marine, Inc. v. Comm'r*, 430 F.2d 679 (9th Cir. 1970), *aff'g* 28 T.C.M. (CCH) 199 (Feb. 25, 1969), is telling.

*Stephens Marine* involved a dispute with a taxpayer regarding whether the taxpayer had used the accrual method of accounting or the completed contract method of accounting (both acceptable methods). *Id.* at 687. The IRS contended that the taxpayer had used the completed contract method, and that the use of that method had not properly reflected income in a year in which the taxpayer had liquidated without having completed certain contracts and without having reported any income from those contracts. *Id.* at 686. To determine which method the taxpayer used, the Tax Court examined both the taxpayer's current treatment of the incomplete contracts and the taxpayer's prior treatment of other contracts, and concluded that the taxpayer employed the completed contract method. *Id.* at 687; *Stephens Marine*, 28 T.C.M. (CCH) 199

(Feb. 25, 1969). The court did not rely on the omission of an amount on the taxpayer's return to conclude that the taxpayer had adopted that method.

Silence or omission is not the adoption of an accounting method. *Reaver*, 42 T.C. at 81. That is especially true in this case because the method the Government contends Highmark adopted is not even a permissible method of accounting. There is no permissible method of accounting under which a taxpayer can choose what its assets are or are not. Further, there is only one permissible method of accounting for Highmark to employ with regard to its healthcare coverage contracts: Highmark must claim section 165 loss deductions for the individual healthcare coverage contracts in the years in which those contracts are terminated or cancelled (i.e., lost). *Stephens Marine* does not support the Government's position that mere silence is sufficient to adopt a method of accounting.

1. Filing Amended Income Tax Returns to Claim Previously Omitted Section 165 Losses Does Not Constitute a Change in Method of Accounting

Before 1995, Highmark did not claim section 165 loss deductions from the termination or cancellation of its healthcare coverage contracts. DFOF 9. It has filed amended returns to claim those loss deductions in the year in which the losses were incurred. DFOF 9-10. This is the only "change" Highmark made regarding treatment of losses from the termination or cancellation of its healthcare coverage contracts. The regulations illustrate, however, that not every change in the treatment of an item constitutes a change in method of accounting. The regulations provide, *inter alia*, that:

> [A] change in method of accounting does not include adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a

> deduction. For example, corrections of items that are deducted as interest or salary, but which are in fact payments of dividends, and of items that are deducted as business expenses, but which are in fact personal expenses, are not changes in method of accounting.

Treas. Reg. § 1.446-1(e)(2)(ii)(b). Thus, a change in method of accounting involves "'when' an item is properly includable and not 'what,' as a substantive matter, is or is not taxable or deductible." *Dominion Resources, Inc. v. United States*, 48 F. Supp. 2d 527, 546 (E.D. Va. 1999), *aff'd*, 219 F.3d 359 (4th Cir. 2000). To determine whether a practice involves timing, "the relevant question is whether the practice permanently changes the amount of the taxpayer's lifetime income. If the practice does not permanently affect the taxpayer's lifetime income, but does or could change the taxable year in which income is reported, it involves timing and therefore is a method of accounting." Rev. Proc. 97-27 § 2.01(1), 1997-1 C.B. 680 (citations omitted).

The plaintiff's losses resulting from the termination or cancellation of its healthcare coverage contracts are separate, distinct losses under Code section 165. Section 165(a) states that the taxpayer shall be allowed a deduction for any loss "sustained during the taxable year" and not compensated for by insurance or otherwise. Code §165(a). The regulations explain similarly that the deduction for abandonment of a business asset "shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained." Treas. Reg. §1.165-2(a). Likewise, the courts have confirmed that a taxpayer is prohibited from claiming the loss in any taxable year other than that in which the asset became worthless or was abandoned. *See, e.g., Bartlett v. Comm'r*, 114 F.2d 634, 638 (4th Cir. 1940); *Maytag v. Comm'r*, 32 T.C. 270, 277 (1959). Hence, regardless of the method of accounting a taxpayer employs, he has no choice as to when to claim a section 165 loss. Accordingly, claiming a section 165 loss, whether

on an initial or amended income tax return, does not involve the question of "'when' an item is properly includable," and therefore is not a change in method of accounting. *Dominion Resources*, 48 F. Supp. 2d at 546; *see* Treas. Reg. §1.446-1(c)(2)(ii).

Also, failure to take a section 165 deduction in the proper year results in the forfeiture of the deduction. If Highmark does not claim a section 165 loss for a healthcare coverage contract in the year it is lost, it will lose the right to that deduction. Thus, the failure to deduct a loss in the period required by Code section 165(a) permanently affects Highmark's lifetime income. *See* Rev. Proc. 97-27 § 2.01(1), 1997-1 C.B. 680; Rev. Proc. 92-20, 1992-1 C.B. 685; Rev. Proc. 91-31 § 3.02, 1991-1 C.B. 566. Highmark's filing of amended returns to claim section 165 deductions reflects only its determination as to "what" is properly deductible and not a change in any method of accounting for determining "when" that item is deductible.

In *Standard Oil Co. v. Commissioner*, the Tax Court held that a taxpayer's determination that certain costs were intangible drilling costs did not involve a change in method of accounting:

> The inquiry before us, in the first instance, concerns *the character* of the payments in issue, though our decision on that issue ricochets quickly into the timing issue. In reality, petitioner has no choice . . . in determining whether to deduct the costs before us. In such cases, the strictures of section 446(e) do not apply.

*Standard Oil*, 77 T.C. 349, 383 (1981), *acq.*, 1989-2 C.B. 1 (citations omitted) (emphasis in original). Similarly, in *Coulter Electronics, Inc. v. Commissioner*, the Tax Court explained:

> [T]here is no timing issue to which section 446 is applicable [when] the determination of timing will automatically follow from the outcome of the character issue. . . . Although there is a timing consequence to the outcome of the characterization, it is automatically determined by the characterization and no change of accounting within the meaning of section 446 is involved.

*Coulter Electronics*, 59 T.C.M. (CCH) 350 (April 10, 1990), *affd. without published op.* 943 F.2d 1318 (11th Cir. 1991). Highmark's determination that termination or cancellation of healthcare coverage contracts were section 165 losses "concerns the character" of the losses, not the timing of the losses. *See Standard Oil*, 77 T.C. at 383. "The determination of timing . . . automatically follow[s] from" this characterization because section 165 mandates that such losses be claimed in the year in which they occurred. *Coulter Electronics*, 59 T.C.M. (CCH) 350 (April 10, 1990). Accordingly, under the reasoning of the courts in *Standard Oil* and *Coulter Electronics*, Highmark's claims of section 165 losses on its amended tax returns do not constitute a change in Highmark's method of accounting.

Finally, there is no legal or other authority to suggest that the filing of an amended tax return to claim a section 165 loss in the appropriate year constitutes a change in method of accounting. A number of reported cases have considered the deductibility of section 165 losses that have been claimed on amended returns and in none of those cases did the Government take the position or even suggest that an amended return results in a change in method of accounting. *See, e.g., Sepulveda v. United States*, 2000 U.S. Dist. LEXIS 17570 (N.D. Ga. Nov. 2, 2000); *Cummin v. United States*, 1994 U.S. Dist. LEXIS 6493 (D. N.J. April 28, 1994); *Butschky v. United States*, 1981 U.S. Dist. LEXIS 16944 (D. Md. Sept. 28, 1981). Moreover, the IRS has suggested that taxpayers file amended returns to claim section 165 losses without requiring that a change in method of accounting be approved. *See* I.R.S. Priv. Ltr. Rul. 6709295070A (Sept. 29, 1967). Simply filing an amended return to claim a section 165 loss in the correct year is not a change in method of accounting.

B. Highmark's Omission of Section 165 Loss Deductions on Its Original Tax Returns Does Not Indicate That Plaintiff Adopted the Methods of Accounting The Defendant Alleges It Did

1. Highmark Never Treated Its Contracts as One Mass Asset

The Government's suggestion that Highmark changed its method of accounting in 1995 from treating its healthcare coverage contracts as part of one mass asset to treating each contract as a discrete asset is unfounded both legally and factually and is a regurgitation of the "mass asset" argument that Highmark refuted above. First, a taxpayer is not entitled to self-define what its assets are or are not; the law provides what its assets are. In this case the law provides that each healthcare coverage contract is a separate asset. See Part II.C, *supra*. Further, as was stated above, the fact that Highmark amended its tax returns because it had omitted a deduction for the value of terminated healthcare coverage contracts does not suggest that it had previously made an affirmative election to treat the healthcare coverage contracts as one mass asset. See *Reaver*, 42 T.C. at 81. Moreover, Highmark will show by the Deloitte Consulting valuation that each healthcare coverage contract Highmark held on January 1, 1987 and lost in a subsequent year had a separate value.

Finally, the Government is merely confusing different concepts by repeating its suggestion that Highmark is depreciating its healthcare coverage contracts by treating all of its healthcare coverage contracts as one mass asset. As was stated above, Highmark has claimed losses under section 165 of the Code, not depreciation or amortization deductions under section 167 of the Code, for amounts it lost through the termination of its healthcare coverage contracts.

There is no legal authority to suggest these loss deductions are the functional equivalent of depreciation deductions. *Capital*, 431 F.3d at 127 n. 3. *See supra* at Part II.C.

2. Highmark Has Always Expensed the Costs to Create Its Contracts

Highmark has not in the past capitalized the costs of developing or maintaining its healthcare coverage contracts and currently continues to deduct such costs. Pl.'s Resp. DFOF 40. The Government argues that by determining the basis of its pre-1987 contracts under the Fresh Start Basis Rule, Highmark is somehow changing the way it treats the costs it incurs to maintain or develop contracts. This is not so. Prior to January 1, 1987, Highmark was not subject to tax, but for its financial accounting purposes deducted expenses incurred in developing and maintaining its healthcare coverage contracts. After January 1, 1987, Highmark continued to do exactly the same thing, for both book and tax purposes. The only change was that Highmark adjusted the basis of the healthcare coverage contracts it held on January 1, 1987, in accordance with the Fresh Start Basis Rule. That fresh start basis has nothing to do with any costs Highmark incurred or how such costs were treated. The basis is simply the contract's fair market value on January 1, 1987. Apart from the fact that the Fresh Start Basis Rule results in a positive adjusted basis in contracts created before January 1, 1987, Highmark treats all of its healthcare coverage contracts precisely the same way, whether they were created before or after January 1, 1987. For those healthcare coverage contracts created after January 1, 1987, the adjusted basis remains at zero, and for the healthcare coverage contracts created before January 1, 1987, the adjusted basis remains at the fair market value as of January 1, 1987, as mandated by the Fresh Start Basis Rule.

This specific "change of method of accounting" argument the Government makes is another way for it to argue that the Fresh Start Basis Rule does not apply to Highmark's healthcare coverage contracts because it had no pre-January 1, 1987 capital costs with respect to those contracts it held. The Government maintains that the fair market value basis for the contracts the Fresh Start Basis Rule provides is somehow "a substitute for plaintiff's costs of creating the pre-1987 contracts." Def.'s Mot. for Summ. J. 36. It is not. Rather, it is the amount Congress mandated and has no relationship to any expended cost. For the reasons stated herein, and for all the reasons stated in Part II, *supra*, the Government's argument fails.

Finally, the Government suggests that expensing the costs of creating and maintaining its post-January 1, 1987 contracts while at the same time claiming section 165 losses for the terminations of contracts Highmark held on January 1, 1987 is somehow an impermissible double-counting or mismatch of income and expense. This argument ignores the fact that each contract is a separate asset. Suppose, for example, on January 1, 1987, Highmark had purchased a piece of accounting software from Microsoft which became obsolete and worthless in a later year, when Highmark wrote off and deducted the cost on its tax return. In that same later year, Highmark incurred research and development expenses in the attempt to develop new claims-tracking software and currently deducted those expenses. Highmark's accounting for its purchase from Microsoft and its accounting for its research and developments costs would have been separate from and unrelated to each other. And there would have been no mismatching of income and expense because the economic expenditures and losses would have related to separate assets. In the same way, Highmark's separate accounting for separate healthcare coverage contracts results in no mismatch of income or expense.

The fact that Highmark had to amend its tax returns to claim loss deductions omitted on its original returns does not mean that Highmark is capitalizing expenses related to any contract. Rather, it is deducting the losses it incurred as a result of a termination of each contract when that contract terminated. Accordingly, Highmark has never changed its method of accounting with regard to those assets.

///

## CONCLUSION

For all of the reasons set forth above, plaintiff Highmark requests that this Court deny the Government's Motion for Summary Judgment and grant Highmark's Cross-Motion for Partial Summary Judgment. Both Motions put identical issues before the Court. If the Court grants Highmark's Cross-Motion, the only issue left for trial will be the fair market value of certain of Highmark's healthcare coverage contracts as of January 1, 1987.

Respectfully submitted,

/s/ Arthur Newbold
ARTHUR NEWBOLD
Attorney of Record
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Phone: (215) 994-2624
Fax: (215) 655-2624

Counsel for plaintiff

Date: April 2, 2007

Of counsel:

Frederick J. Gerhart
James J. Spadaro, Jr.
David N. Sontag
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

CERTIFICATE OF SERVICE

I certify that service of the foregoing document has, this 2nd day of April, 2007, been made on the Defendant's attorney electronically, and by mailing a copy thereof to the following address:

Karen E. Servidea, Esquire
U.S. Department of Justice
Tax Division Court of Federal Claims Section, JCB/8804
555 4th Street, N.W.
Washington, D.C. 20001

David N. Sontag