**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| HIGHMARK, INC., SUCCESSOR IN INTEREST TO PENNSYLVANIA BLUE SHIELD AND SUBSIDIARIES,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | Civil Action No. 05-1030 T<br>Judge Margolis |

**HIGHMARK'S REPLY BRIEF IN SUPPORT OF ITS**

**CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

I. HIGHMARK IS ENTITLED TO LOSS DEDUCTIONS FOR THE TERMINATION OR CANCELLATION OF ITS HEALTHCARE COVERAGE CONTRACTS ..... 1

A. The Different Statutory Scheme At Issue in *Flannery* and *Ludington* Makes the Holdings of Those Cases Inapplicable in This Case ..... 2

B. Congress's Subsequent Actions After the Supreme Court's Decisions in *Flannery* and *Ludington* Show an Uncertainty and Ambiguity That Did Not Exist in 1986 ..... 4

C. The Language the Court Used in *Flannery* and *Ludington* Should Be Considered Only As Applying in Each Instance to the Case Before the Court ..... 7

II. THE FRESH-START BASIS RULE GIVES HIGHMARK AN ADJUSTED BASIS IN ITS HEALTHCARE COVERAGE CONTRACTS ..... 8

A. The Internal Revenue Code Allows Loss Deductions for Highmark's Terminated Contracts ..... 8

B. The Defendant's Interpretation Would Lead to Anomalous Results and the Taxation of Pre-1987 Appreciation ..... 10

C. Congress Intended the Fresh Start Basis Rule to Apply to All of Highmark's Assets in Existence on January 1, 1987, Including Its Healthcare Coverage Contracts ..... 11

III. RELYING ON THE LEGISLATIVE HISTORY TO INTERPRET THE UNAMBIGUOUS FRESH START BASIS RULE IS INAPPROPRIATE ..... 12

A. The Phrase "Gain or Loss" Is Not Ambiguous ..... 13

B. The Purpose of the Fresh Start Basis Rule is Consistent With Application of the Rule to the Types of Losses Highmark Claims ..... 14

C. The Defendant's Repetitious Analogy to Depreciation Deductions Is Another Attempt to Find Ambiguity Where None Exists ..... 15

IV. HIGHMARK DID NOT MAKE AN UNAUTHORIZED CHANGE IN ITS METHOD OF ACCOUNTING ..... 17

A. Highmark Has Never Treated Its Contracts as One Mass Asset ..... 18

B. Highmark Has Always Expensed the Costs to Create its Contracts ..... 19

**TABLE OF CONTENTS**
(continued)

**Page**

CONCLUSION ........ 20

APPENDIX (separately bound) ........ A-1

Internal Revenue Code of 1986 (26 U.S.C.):

§ 165 ........ A-1

§ 1001 ........ A-1

§ 1011 ........ A-2

§ 1012 ........ A-2

§ 1014 ........ A-2

§ 1053 ........ A-3

§ 1231 ........ A-3

§ 7806 ........ A-4

Deficit Reduction Act of 1984, H.R. 4170, 98th Congress, P.L. 98-369, § 177(d) (2), 98 Stat. at 709-12 (1984) ........ A-5

Income Tax Law of 1913 § II.D., P.L. 63-16, 38 Stat. 114, 166 (1913) ........ A-9

Revenue Act of 1916 §§ 2(c), 5(a), P.L. 64-271, 39 Stat. 756, 758-59 (1916) ........ A-11

Revenue Act of 1918 §§ 202(a)(1), 214(a)(5), P.L. 65-254, 40 Stat. 1057, 1060, 1067 (1919) ........ A-14

Revenue Act of 1921 § 202(b), P.L. 67-98, 42 Stat. 227, 229-30 (1921) ........ A-17

Revenue Act of 1924 § 204(b), P.L. 68-176, 43 Stat. 253, 259-60 (1924) ........ A-19

Revenue Act of 1934 § 113(a)(14), P.L. 73-216, 48 Stat. 680, 708-09 (1934) ........ A-22

Tax Reform Act of 1986, P.L. 99-514, § 1012, 100 Stat. 2085, 2390 (1986) ........ A-26

H.R. Conf. Rep. 179, 68th Cong. 1st Sess. (1924) at 18 ........ A-31

H.R. Conf. Rep. 814, 99th Cong. 2d Sess. Vol. II (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075 ........ A-35

**TABLE OF CONTENTS**
(continued)

**Page**

Treasury Regulation (26 C.F.R.) § 1.83-4(b)(1) ........ A-44

Declaration of Arthur Newbold ........ A-45

Exhibit 1 – Letters dated April 26, 2007 and April 30, 2007 from David Sontag to Karen Servidea regarding documents produced by Highmark to the Government ........ A-46

Exhibit 2 – Affidavit of Todd B. Vanerstrom of Highmark, Inc. ........ A-51

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519 (1947) ............13, 14

*Burlington N.R.R. v. Okla. Tax Commissioner*, 481 U.S. 454 (1987) ..........................................13

*Capital Blue Cross v. Commissioner*, 122 T.C. 224 (2004),
*rev'd on different ground*, 431 F.3d 117, 125 (3d Cir. 2005) .................................. *passim*

*Capital Blue Cross v. Commissioner*, 431 F.3d 117 (3d Cir. 2005) ................................... *passim*

*Diebold, Inc. v. United States*, 891 F.2d 1579 (Fed. Cir. 1990) .................................................19

*United States v. Flannery*, 268 U.S. 98 (1925) ......................................................................... *passim*

*Golden State Towel & Linen Serv., Ltd. v. United States*, 373 F.2d 938 (Ct. Cl. 1967)................16

*Goodrich v. Edwards*, 255 U.S. 527, 535 (1921) ..........................................................................3

*McCaughn v. Ludington*, 268 U.S. 106 (1925)........................................................................ *passim*

*Newark Morning Ledger Co. v. United States*, 507 U.S. 546 (1993) ....................................16, 18

*Reaver v. Commissioner*, 42 T.C. 72 (1964)...............................................................................17, 19

*Stephens Marine, Inc. v. Commissioner*, 28 T.C.M. (CCH) 199 (Feb. 25, 1969) ........................17

*Trigon Insurance Co. v. United States*, 215 F. Supp. 2d 687 (E.D. Va. 2002)...................... *passim*

*West Virginia Univ. Hospitals., Inc. v. Casey*, 499 U.S. 83 (1991)...............................................13

### FEDERAL STATUTES

**Internal Revenue Code of 1986 (26 U.S.C.):**

§ 165 ......................................................................................................... *passim*

§ 1001 ..........................................................................................................3

§ 1011 ..........................................................................................................3, 10

§ 1012 ..........................................................................................................5, 10

§ 1014 ..........................................................................................................9

§ 1053 ..........................................................................................................5, 6

§ 7806 ..........................................................................................................13

Deficit Reduction Act of 1984, H.R. 4170, 98th Congress, P.L. 98-369, § 177(d)(2), 98 Stat. at 709-12 (1984) ....................5, 6

Income Tax Law of 1913 § II.D., P.L. 63-16, 38 Stat. 114, 166 (1913) ....................2

Revenue Act of 1916 §§ 2(c), 5(a), P.L. 64-271, 39 Stat. 756, 758-59 (1916) ....................2

Revenue Act of 1918 §§ 202(a), 214(a)(5), P.L. 65-254, 40 Stat. 1057, 1060, 1067 (1919) ....................2, 3, 4

Revenue Act of 1921 § 202(b), P.L. 67-98, 42 Stat. 227, 229-30 (1921) ....................4, 6

Revenue Act of 1924 § 204(b), P.L. 68-176, 43 Stat. 253, 259-60 (1924) ....................5

Revenue Act of 1934 § 113(a)(14), P.L. 73-216, 48 Stat. 680, 708-09 (1934) ....................5, 6

Tax Reform Act of 1986 § 1012, P.L. 99-514, 100 Stat. 2085, 2390 (1986) .................... *passim*

## LEGISLATIVE HISTORY

H.R. Conf. Rep. 179, 68th Cong. 1st Sess. (1924) ....................5

H.R. Conf. Rep. 814, 99th Cong. 2d Sess. Vol. II (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075 ....................14

## FEDERAL REGULATIONS

**Treasury Regulations (26 C.F.R.):**

§ 1.83-4(b)(1) ....................9

## MISCELLANEOUS

I.R.S. Technical Advice Memorandum 9533003 (May 2, 1995) ....................1, 7, 11

## ARGUMENT

### I. HIGHMARK IS ENTITLED TO LOSS DEDUCTIONS FOR THE TERMINATION OR CANCELLATION OF ITS HEALTHCARE COVERAGE CONTRACTS

Highmark is claiming loss deductions to which it is entitled under Code section 165 and section 1012(c)(3)(A)(ii) of the Tax Reform Act of 1986 (the "Tax Reform Act"), the Fresh Start Basis Rule. The Fresh Start Basis Rule provides, in straightforward fashion, that a Blue Cross/Blue Shield ("BC/BS") organization's basis in its assets, for purposes of determining gain or loss, is the fair market value of those assets on January 1, 1987. The Internal Revenue Service, the Third Circuit Court of Appeals, the Tax Court, and a United States District Court have all consistently held that the basis of a BC/BS organization's intangible assets, including healthcare coverage contracts, is their January 1, 1987 fair market value for purposes of claiming loss deductions under Internal Revenue Code section 165.[1] *See Capital Blue Cross v. Comm'r*, 122 T.C. 224, 237-38 (2004) ("*Capital I*"), *rev'd on different ground*, 431 F.3d 117, 125 (3d Cir. 2005) ("*Capital II*"); *Trigon Insurance Co. v. United States*, 215 F. Supp. 2d 687, 701 (E.D. Va. 2002); I.R.S. Tech. Adv. Mem. ("TAM") 9533003 (May 2, 1995). The defendant asserts that all of these prior determinations were wrong.

In its Response/Reply Brief, the defendant raises, for the first time in any context in which this issue has been considered, Supreme Court case law that discusses the Revenue Act of 1918: *United States v. Flannery*, 268 U.S. 98 (1925) and *McCaughn v. Ludington*, 268 U.S. 106 (1925). The Government's superficial analysis of these cases makes them seem relevant. Closer analysis, however, reveals that they have no bearing on this case. First, *Flannery* and *Ludington*

---

1. All section references are to the Internal Revenue Code of 1986, as amended, unless otherwise indicated.

concern a different basis step-up rule (Section 202(a) of the Revenue Act of 1918) from that involved here. Moreover, the holdings of these cases result from a statutory scheme (or, rather, the absence of one) that bears no resemblance to the statutory scheme applicable in the instant case. Next, Congress's constant revision of the basis step-up rule at issue in *Flannery* and *Ludington*, and its reliance on these revisions when it enacted a different basis step-up provision in 1984, demonstrates Congress's conscious intent for the Fresh Start Basis Rule to be different from the 1918 basis step-up provision. Finally, the holdings of *Flannery* and *Ludington* are specific to the facts involved in those cases, which are not comparable to the facts in this case.

A. The Different Statutory Scheme At Issue in *Flannery* and *Ludington* Makes the Holdings of Those Cases Inapplicable in This Case

The federal income tax was first enacted in 1913. The Revenue Act of 1913 provided that only income accruing after the effective date of the Act – March 1, 1913 – would be subject to tax. Income Tax Law of 1913 § II.D., P.L. 63-16, 38 Stat. 114, 166. Congress did not provide basis rules for determining gain or loss on the sale or other disposition of property, however, until the 1916 Revenue Act. Revenue Act of 1916, §§ 2(c), 5(a), P.L. 64-271, 39 Stat. 756, 758-59 (1916). Two years later, in the 1918 Revenue Act Congress amended this basis rule by combining the two basis provisions covering gains and losses in the 1916 Revenue Act into one section:

> [F]or the purposes of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, the basis shall be . . . (1) In the case of property acquired before March 1, 1913, the fair market price or value of such property as of such date . . .

Revenue Act of 1918 § 202(a)(1), P.L. 65-254, 40 Stat. 1057, 1060 (1919). The 1918 Revenue Act also provided "[t]hat in computing net income there shall be allowed as deductions: . . . (5) [l]osses sustained during the taxable year and not compensated for by insurance or otherwise,

if incurred in any transaction entered into for profit, though not connected with the trade or business." *Id.* at § 214(a)(5), 40 Stat. 1057, 1067. These basis and loss provisions from the 1918 Revenue Act are the provisions at issue in *Flannery* and *Ludington*.

The Government claims that the basis and loss provisions in the 1918 Revenue Act and the Fresh Start Basis Rule and Code section 165, respectively, are "functionally identical," but this characterization is simply wrong. While the words of the two provisions are substantially similar, the defendant neglects to mention that in 1918 there were no underlying statutory provisions defining gain, loss, or adjusted basis analogous to sections 1001 and 1011 of the modern Code. Thus, the Supreme Court in *Flannery* and *Ludington* was writing on a clean slate without any statutory framework for determining how a loss should be calculated. The Fresh Start Basis Rule presents an entirely different situation because its interpretation is governed by detailed, self-limiting definitions of loss and basis that did not exist in 1918. *See* Pl.'s Cross-Mot. Br. at 6-7 (detailing the overlap of Code section 165, Code section 1011, and the Fresh Start Basis Rule). Simply stated, the Court in *Flannery* interpreted a statutory scheme that no longer exists. Moreover, in *Flannery* the Supreme Court was just beginning to interpret constitutional principles regarding the recognition of gain or loss.[2] Now, the explicit provisions of the Code mandate that the basis for determining loss deductions under section 165 for assets held by a BC/BS organization prior to January 1, 1987 be the adjusted basis provided in the Fresh Start Basis Rule, i.e., fair market value as of January 1, 1987. The difference between the

---

2. For example, in *Flannery* the Court referred back to its 1921 decision in *Goodrich v. Edwards*, in which it applied a gloss on the term "gain" based on constitutional principles that the tax could not be imposed on the difference between the stock sales price and its stepped down, March 1, 1913 value basis, because to do so would tax capital investment. *Flannery*, 268 U.S. at 102-03 (citing *Goodrich*, 255 U.S. 527, 535 (1921)). In the absence of a statutory definition of what a loss was, the Court in *Flannery* adopted a symmetrical construction for the term "loss." *Flannery*, 268 U.S. at 103-04.

1918 Revenue Act, which contains no definition of "loss," and the 1986 Fresh Start Basis Rule and 1986 Code, which do, is crucial.

In summary, while the words of the basis and loss deduction provisions in the 1918 Revenue Act are similar to those of the Fresh Start Basis Rule and section 165(a), respectively, the comparison ends there. If the 1986 statutory framework had existed in 1918, the Supreme Court could not have interpreted the language of the 1918 Revenue Act as it did in *Flannery* and *Ludington*. Accordingly, the Court's reasoning in these cases says nothing about how the Fresh Start Basis Rule should be interpreted, and the holdings of these cases are inapplicable to the instant case.

B. Congress's Subsequent Actions After the Supreme Court's Decisions in *Flannery* and *Ludington* Show an Uncertainty and Ambiguity That Did Not Exist in 1986

After 1918 Congress continued to revise the 1913 basis step-up provision, doing so three times over the next 16 years. (In total, Congress revised the 1913 basis step-up provision four times in a span of 18 years. In contrast, in the more than 20 years since Congress passed the Fresh Start Basis Rule in 1986, Congress has yet to revise it. The Fresh Start Basis Rule does not have the same kind of ambiguity and uncertainty that the 1913 basis step-up provision had.) First, the Revenue Act of 1921 altered the basis provisions to provide one formula for calculating gains and one formula for calculating losses on sales or dispositions of pre-March 1, 1913 assets. Revenue Act of 1921 § 202(b), P.L. 67-98, 42 Stat. 227, 229-30 (1921). Specifically, it provided that for purposes of determining gain on pre-taxable period assets, the basis would be the higher of fair market value or adjusted basis, and for purposes of determining loss, the basis would be the lower of fair market value or adjusted basis.

Later, the Revenue Act of 1924 further changed the basis rules, swinging the pendulum back in favor of the taxpayer. Congress eliminated the dual-basis rules for gain and for loss and provided, instead, that the basis for pre-March 1, 1913 property would be the greater of cost basis or fair market value on March 1, 1913, for purposes of determining gain or loss from a sale or other disposition of the asset. Revenue Act of 1924 § 204(b), P.L. 68-176, 43 Stat. 253, 259-60 (1924). The House Ways and Means Committee Report on the 1924 Act explained: "This provision changes the existing law in the interests of the taxpayer. It simplifies exceedingly the rule in effect under the present law without appreciable loss to the Treasury." H.R. Rep. 179, 68th Cong. 1st Sess. (1924) at 18.

In 1934 the pendulum swung back against the taxpayer, but not quite as far as it had reached in 1921. Specifically, the 1934 Revenue Act provided that the basis for determining gains on the sale or other disposition of property of pre-March 1, 1913 assets would be the higher of cost or the March 1, 1913 fair market value. Revenue Act of 1934 § 113(a)(14), P.L. 73-216, 48 Stat. 680, 708-09 (1934). The 1934 Revenue Act basis provision was later codified into Code section 1053 and is still applicable today. Neither the 1934 Revenue Act nor current Code section 1053 mentions losses, so a taxpayer uses an asset's cost for basis when determining a loss, pursuant to Code section 1012.

Fifty years later, in 1984, two years before enacting the Fresh Start Basis Rule at issue here, Congress passed another basis step-up provision. Specifically, when Congress subjected the Federal Home Loan Mortgage Corporation ("Freddie Mac") to federal income taxation for the first time in the Deficit Reduction Act of 1984, section 177(d)(2), P.L. 98-369, 98 Stat. at 709-12 (1984) (the "Deficit Reduction Act"), it provided a special basis rule for assets Freddie Mac held on the effective date of the Deficit Reduction Act. Obviously aware of the history of

the first basis step-up provision, Congress limited the basis step-up for Freddie Mac as it had for all new taxpayers in the 1921 Revenue Act: for purposes of determining gain on pre-taxable period assets, the basis would be the higher of fair market value or adjusted basis, and for purposes of determining loss, the basis would be the lower of fair market value or adjusted basis. Deficit Reduction Act § 177(d)(2). It is important to note that Congress *did not* choose to model the language for the Freddie Mac fresh-start basis provision on the most recent formulation of the 1913 fresh-start basis provision contained in the 1934 Revenue Act and section 1053 of the Code. The only rational explanation for this is that Congress did not want to treat Freddie Mac as it had treated all new 1913 taxpayers from 1934 on. Rather, Congress intentionally chose to model the Deficit Reduction Act's basis provision after the 1921 Revenue Act.

When Congress enacted the Fresh Start Basis Rule two years after having enacted the Deficit Reduction Act, however, it did not use the language it had used in the Freddie Mac fresh-start basis provision (or even section 1053 of the Code). It chose a different statutory framework. Rather than having two different dual-basis rules for gains and losses, Congress simply stated that the fair market value as of the relevant date (January 1, 1987) would be used for determining the basis for gain or loss. The only conclusion to be drawn here is that Congress did not want the distinction inherent in the Deficit Reduction Act or section 1053 to be in the Fresh Start Basis Rule. Because the Fresh Start Basis Rule is a qualitatively different basis provision from those of the Deficit Reduction Act and section 1053, it is clear that Congress did not intend to restrict application of the fair market value basis step-up in any specific instances. Congress, unrestrained by Code section 1053, the Deficit Reduction Act, or the *Flannery* and *Ludington* rationales, decided that "for purposes of determining gain or loss, the adjusted basis of any asset held [by a BC/BS organization] on [January 1, 1987] shall be treated as equal to its fair

market value as of such day." Tax Reform Act of 1986, § 1012(c)(3)(A)(ii).[3] Accordingly, the Supreme Court case law that arose out of the early revenue laws and its limited application of the fair market value basis step-up for determination of losses on pre-March 1, 1913 assets are inapplicable to the Fresh Start Basis Rule.

C. The Language the Court Used in *Flannery* and *Ludington* Should Be Considered Only As Applying in Each Instance to the Case Before the Court

The *Flannery* and *Ludington* cases are historical artifacts from the early days of the Code and should be ignored. Both consider the gain or loss on a sale of stock purchased prior to March 1, 1913. Hence, *Flannery* and *Ludington* are inapposite to the instant case, as Highmark is not claiming deductions based on stock purchased prior to March 1, 1913, and sold for more or less than its purchase price under the Revenue Act of 1918. Highmark has not found a single case involving any of the 1913 basis step-up provisions that has dealt with termination or cancellation of self-created intangible assets, including healthcare coverage contracts. Only three decisions appear to have dealt with such assets in relation to *any* basis step-up provision: *Trigon*; *Capital I*; and, *Capital II*. The courts in all three of the cases concluded that the Fresh Start Basis Rule increased each BC/BS organization's basis in its healthcare coverage contracts as of January 1, 1987 to fair market value. *See Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 701; *Capital I*, 122 T.C. at 237-38.

3. The IRS has explicitly stated that an asset's fair market value as of January 1, 1987, "should be used in computing the amount of [the taxpayer's] loss under section 165." I.R.S. Tech. Adv. Mem. 9533003 (May 2, 1995).

## II. THE FRESH-START BASIS RULE GIVES HIGHMARK AN ADJUSTED BASIS IN ITS HEALTHCARE COVERAGE CONTRACTS

As was explained in Highmark's Cross-Motion for Partial Summary Judgment, the Fresh Start Basis Rule applies to adjust the basis of each of Highmark's healthcare coverage contracts from zero to the contract's fair market value as of January 1, 1987. *See Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 701; *Capital I*, 122 T.C. at 237-38. Specifically, the Fresh Start Basis Rule provides that "for purposes of determining gain or loss, the adjusted basis of any asset held on [January 1, 1987] shall be treated as equal to its fair market value as of such day." Tax Reform Act § 1012(c)(3)(A)(ii). The phrase "any asset" in the Fresh Start Basis Rule includes intangible assets such as Highmark's healthcare coverage contracts. *Trigon*, 215 F. Supp. 2d at 696; *see Capital II*, 431 F.3d at 124-127; *Capital I*, 122 T.C. at 234-38.

### A. The Internal Revenue Code Allows Loss Deductions for Highmark's Terminated Contracts

The Government reiterates its argument that, because Highmark incurred no capital costs with respect to the contracts entered into prior to January 1, 1987, it had no "cost" basis on that date and therefore could not receive an "adjusted" basis equal to fair market value. As was explained in Highmark's Cross-Motion, the Government's argument is in direct conflict with the plain language of the statute and the opinions of all three courts that have decided this issue, and it is inconsistent with the Code, the Regulations, and the Tax Reform Act. *See* Pl.'s Cross-Mot. Br. at 6.

The defendant disingenuously states that "plaintiff has failed to point to any circumstance in which the Internal Revenue Code provides an upward adjustment from a zero basis without the expenditure of capital." Def.'s Reply Br. at 8. That is not so. For example, as was discussed in Plaintiff's Cross-Motion (Pl.'s Cross-Mot. Br. at 8), the treatment of property acquired from a

decedent is an example of where the Code provides an upward adjustment from a zero basis without the expenditure of capital. Code section 1014. The defendant's attempt to distinguish this example on the basis of a "tax cost" is baseless. First, a capital outlay is not a prerequisite to obtain a positive basis in property inherited from a decedent. *Id.* (Even if the decedent received the property as a gift, the heir receives a stepped-up basis.) The defendant gives an example of an estate paying an estate tax based on the fair market value of the property as of the date of death as a tax cost that serves as some sort of proxy for the capital cost, which the defendant claims is necessary. How can the payment of an *estate* tax by one taxpayer (the estate) give a basis in an asset to a different taxpayer (the heir) for the purpose of *income* tax? There is no connection between paying an estate tax and receiving a stepped-up basis in the property; the freestanding income tax provision of Code section 1014 has nothing to do with the estate tax laws. This is made even clearer by the fact that, because of their size or other characteristics, the overwhelming majority of estates in the United States do not attract an estate tax, yet the recipients of property from these estates still receive their property with a stepped-up basis without having incurred a "tax cost" or other capital outlay.

Another example is where a taxpayer receives stock or other property as compensation for the performance of services. Treasury Regulation section 1.83-4(b)(1) provides that such a taxpayer receives a positive basis equal to the fair market value of the property as of the date received. The fair market value of the property is considered in the calculation of the taxpayer's gross income, which may or may not result in the taxpayer's payment of an income tax. Yet the taxpayer receives a fair market value basis in the property despite the fact that the taxpayer did not incur a capital cost, a tax cost, or any other type of cost, to receive it.

The concept of basis does not have as a prerequisite the expenditure of a capital cost or a "tax cost," as the defendant contends. Positive adjustment of a zero basis asset by another provision of the internal revenue laws, such as the Fresh Start Basis Rule, not only is consistent with, but also is required by, sections 1011 and 1012 of the Code.

B. The Defendant's Interpretation Would Lead to Anomalous Results and the Taxation of Pre-1987 Appreciation

The defendant's justification for its interpretation of the applicability of the Fresh Start Basis Rule, with its attempted analogies to annual reporting conventions and distinctions between sales and abandonment of self-created assets, is nonsensical. In its Cross-Motion Highmark explained how the defendant's interpretation of the Fresh Start Basis Rule would cause Highmark to incur a tax on pre-1987 appreciation. *See* Pl.'s Cross-Mot. Br. at 9-10. The taxation of pre-1987 appreciation is contrary to the undisputed intent of Congress in passing the Fresh Start Basis Rule. Nonetheless, the defendant is arguing that Congress intended this anomalous result.

The defendant states that under its interpretation of Highmark's position, "pre-1987 appreciation is used to shield from appropriate taxation the income plaintiff earned after January 1, 1987, income which is completely unrelated to the terminating contracts." Def.'s Reply Brief at 11. But what is wrong with that? Under the internal revenue laws, there never is a connection between a loss and the income it shelters. All income against which losses are offset is completely unrelated to the losses themselves. For instance, a business may suffer losses in 2006 because of a building contractor's breach of a 2004 contract, and these losses would offset income that the business generated from merchandise sales in 2006. The loss from the breach of contract bears no relation to the merchandise sales, yet the loss offsets the income. Closer still to the facts of this case, if after 1986 Highmark had *sold* a pre-1987 asset for less than its January 1,

1987 fair market value, it would unquestionably be entitled to that loss. Yet that loss would bear no relationship to the post-1986 income against which it was offset. The defendant's conjured images of income inappropriately shielded from taxation is out of touch with reality.

In addition, rather than highlighting an "absurdity," the defendant's analogy between Highmark's healthcare coverage contracts and basic office supplies proves Highmark's point that all assets are the same and therefore should be treated in the same way. The Fresh Start Basis Rule, on its face, applies to *any* asset. Tax Reform Act § 1012(c)(3)(A)(ii) ("[F]or purposes of determining gain or loss, the adjusted basis of *any* asset . . . ." (emphasis added)). The defendant points to no reason why the Fresh Start Basis Rule would not apply to office supplies, as it applies to software. TAM 9533003. The Government also offers no rationale whatsoever for distinguishing the software at issue in TAM 9533003 from office supplies or from Highmark's healthcare coverage contracts. Hence, by the defendant's own analogy, the Fresh Start Basis Rule applies to determine the basis of Highmark's healthcare coverage contracts as of January 1, 1987. As the defendant highlights, failure to treat these assets in the same way would be irrational.

C. Congress Intended the Fresh Start Basis Rule to Apply to All of Highmark's Assets in Existence on January 1, 1987, Including Its Healthcare Coverage Contracts

Application of the Fresh Start Basis Rule is in accord with the express legislative purpose of section 1012 of the Tax Reform Act – to avoid taxing Highmark on unrealized appreciation or depreciation that accrued when Highmark was a tax-exempt entity. *See* Pl.'s Cross-Mot. Br. at 15-19. The defendant's argument, that Congress did not intend for the Fresh Start Basis Rule to apply to the deductions to which Highmark is entitled, assumes its conclusion. Highmark dealt with the defendant's circular argument in its Cross-Motion . *Id.* While the Government states

confidently that Congress did not intend for the Fresh Start Basis Rule to provide BC/BS organizations with "millions of dollars worth of deductions," Def.'s Reply Brief at 12, Highmark notes that the defendant cites no support for this assertion. Congress's expectation of how much the applicable deductions under the Fresh Start Basis Rule would equal is unknown and unknowable. Moreover, its expectation is irrelevant to the interpretation of its clearly worded statute.

In response to the defendant's argument that, unlike the tax advantages found in subsection 1012(b) of the Tax Reform Act of 1986, the "Special Rules" found in subsection 1012(c)(3) are "technical in nature," Highmark challenges the defendant to find a provision anywhere within the internal revenue laws that is not "technical in nature." Def.'s Reply Brief at 13. Further, it simply cannot be denied that the entire statutory scheme of section 1012 of the Tax Reform Act provides advantages to BC/BS organizations, specifically including deductions to which other taxpayers are not entitled. Congress intended these advantages to assist them in their transition from non-taxable to taxable status and did not extend them to the commercial insurer counterparts of the BC/BS organizations.

The defendant continues to provide no valid reason why the Fresh Start Basis Rule would not apply to increase the adjusted basis of these contracts from zero to their fair market values on January 1, 1987.

## III. RELYING ON THE LEGISLATIVE HISTORY TO INTERPRET THE UNAMBIGUOUS FRESH START BASIS RULE IS INAPPROPRIATE

As was stated in Highmark's Cross-Motion, every court that has considered this issue is in full agreement: the statutory language of the Fresh Start Basis Rule is clear and unambiguous. *Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 699-701; *Capital I*, 122 T.C. at 236-38. The Supreme Court has held that "[u]nless exceptional circumstances dictate otherwise, 'when

we find the terms of a statute unambiguous, judicial inquiry is complete.'" *Burlington N.R.R. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987) (citations omitted); *see also West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98-99 (1991) (explaining that unambiguous phrases cannot "be expanded or contracted by the statements of individual legislators or committees during the course of the enactment process"). This Court would have to rewrite the statute to give it the meaning the defendant urges. *See Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 701; Capital I, 122 T.C. at 236. The defendant fails to offer any new explanation of why resort to the legislative history would be justified in this instance. Hence, the defendant's continued reliance on legislative history to interpret the unambiguous Fresh Start Basis Rule remains inappropriate.

A. The Phrase "Gain or Loss" Is Not Ambiguous

As the court in *Trigon* explained, "[t]he common usage of the words 'gain or loss,' without limitation, plainly includes *any* gain or loss." *Trigon*, 215 F. Supp. 2d at 699 (emphasis in original); *accord Capital II*, 431 F.3d at 125; *Capital I*, 122 T.C. at 236. The Government's argument that the term "gain or loss" in the statutory language of the Fresh Start Basis Rule refers only to gains and losses from sales or exchanges of property contradicts the language of the statute. If Congress had intended the phrase "gain or loss" in the Fresh Start Basis Rule to refer only to gains or losses generated by sales and exchanges, Congress would have made this intent explicit in the statutory language. The defendant's reliance on *headings* of provisions, rather than on the provisions themselves, to find ambiguity nullifies its argument. As the Supreme Court has said, "headings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis." *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947); *see also* Code section 7806(b). In other words, "the title of a statute and the heading of a section cannot

limit the plain meaning of the text." *Bhd. of R.R. Trainmen*, 331 U.S. at 528-29 (citations omitted). Moreover, the use of the phrase "gain or loss" in the Code sections the defendant cited logically supports Highmark's position that the phrase encompasses all types of gain or loss. While the headings in all of the defendant's examples use the same general, all-encompassing phrase, "gain or loss," the meaning of the term "gain or loss" is limited in a different way in the *text* of each corresponding statute. There are no such limitations in the text of the statute at issue here, and such limitations cannot be read into the Fresh Start Basis Rule.

The defendant inexplicably posits that "when confronted with a type of loss . . . that does not fall within *all* recognized categories of loss, a court must consider the legislative history of the provision to determine its intended scope." Def.'s Reply Br. at 15-16 (emphasis added). This would lead the Court to look to the legislative history for every statute pertaining to "loss," as *no* type of loss would fit into *all* recognized categories of loss.

B. The Purpose of the Fresh Start Basis Rule is Consistent With Application of the Rule to the Types of Losses Highmark Claims

The undisputed purpose of the Fresh Start Basis Rule is to base the computation of post-1986 taxable income on amounts of gain or loss that economically accrue after January 1, 1987. Def.'s Reply Br. at 16-17 (citing H.R. Conf. Rep. No. 99-841, at II-350 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4438 ("The basis adjustment is provided because the conferees believe that such formerly tax-exempt organizations should not be taxed on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation.")). Without the Fresh Start Basis Rule, BC/BS organizations would be taxed retroactively on economic value that accrued while the organizations were tax-exempt entities, which would have the effect of denying retroactively their tax-exempt status. Any loss recognized after January 1, 1987, that is attributable to a decline in the value of an asset after that

date must be taken into account in determining taxable income or loss in order for the stated Congressional purpose to be achieved. The defendant's statement that this purpose is "applicable . . . only when a BC/BS organization *receives something of value* upon the disposition of an asset and not, as here, when a contract lapses in the ordinary course of business" (Def.'s Reply Br. at 17) is unsupported and inconsistent with the clear language of the statute. Repeating an unsupported position and emphasizing the point with italics does not make the position true.

The defendant's attempt to distinguish the "burning building" hypothetical in Highmark's Cross-Motion is ineffectual. That hypothetical did not originate with Highmark. It came from the Tax Court's decision in *Capital I*. *Capital I*, 122 T.C. at 237. Like the Tax Court in *Capital*, this Court should find that the burning building hypothetical illustrates why the Fresh Start Basis Rule must apply to the losses Highmark claims and, accordingly, should dismiss the defendant's arguments to the contrary.

C. The Defendant's Repetitious Analogy to Depreciation Deductions Is <u>Another Attempt to Find Ambiguity Where None Exists</u>

As was stated in Highmark's Cross-Motion, each of Highmark's healthcare coverage contracts constitutes a separate asset that can be individually valued. *See* Pl.'s Cross-Mot. Br. at 21-24. They do not constitute part of a single indivisible asset. *See Capital II*, 431 F.3d at 127 n. 3. In fact, the defendant admits that Highmark's section 165 loss deduction claims are "not legally or factually . . . depreciation deductions." Def.'s Reply Br. at 18. Nonetheless, the defendant continues to repeat arguments it has already made and lost in the *Capital* case, *Capital II*, 431 F.3d at 126-27, *Capital I*, 122 T.C. at 238-40, in an attempt here to find ambiguity in a statute that is clear, unambiguous, and plain on its face according to all the courts that have considered it. *See Capital II*, 431 F.3d at 125; *Trigon*, 215 F. Supp. 2d at 701; *Capital I*, 122

T.C. at 237-38. In addition, the defendant's factual characterizations of Highmark's healthcare coverage contracts continue to be just plain wrong.

The Government's assertion that Highmark's "method of valuing the contracts at issue renders the occurrence of the losses that plaintiff claims little more than a depreciation schedule for the value attributable to the entire subscriber base" is ridiculous. Def.'s Reply Br. at 18. This statement conveniently ignores the fact that the timing and amount of loss deductions have absolutely no relationship to a depreciation or amortization schedule and the fact that significant contracts are expected never to terminate.

The defendant's reliance on *Golden State Towel & Linen Serv., Ltd. v. United States*, 373 F.2d 938 (Ct. Cl. 1967) to argue that precedent in this Circuit holds that customer-based intangibles are properly considered as single assets, disregards subsequent, controlling Supreme Court case law. *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 566 (1993) held that the mass asset rule does not apply to customer-based intangible assets that have ascertainable useful lives and can be valued separately from goodwill. Highmark will demonstrate at trial that each of its contracts has a separately ascertainable value.[4] It has no need to demonstrate a useful life, as it is not claiming depreciation, but rather a section 165 loss upon cancellation or termination. In short, Highmark will show that each of its healthcare coverage contracts is a separate asset.

---

4. The defendant's statements regarding the information Highmark has about the healthcare coverage contracts for which it claims loss deductions is misleading and wrong. First, the types of information the Government says Highmark does not have (e.g., subscribers' payment patterns) are irrelevant to the valuation of these contracts. Moreover, the Government's assertion that "plaintiff has provided no evidence that it has more contract-specific information than that used in the PricewaterhouseCoopers report" is disingenuous. Highmark has provided over 20 electronic and manipulable files with data about the contracts at issue here, much of which PricewaterhouseCoopers did not use in the preparation of its report. *See* Ex. 1 (App. at A-46 through A-50).

## IV. HIGHMARK DID NOT MAKE AN UNAUTHORIZED CHANGE IN ITS METHOD OF ACCOUNTING

As was explained in Highmark's Cross-Motion, since January 1, 1987, Highmark has never changed its method of accounting. *See* Pl.'s Cross-Mot. Br. at 35. The defendant's entire method of accounting argument is dependent upon its assertion that "[t]he *absence* or *omission* of an item of income or a deduction from a return can also demonstrate the taxpayer's method of accounting." Def.'s Mot. for Summ. J. at 27-28. In its original Brief, the defendant cited one case as an example of authority for this proposition, *Stephens Marine, Inc. v. Comm'r*, 28 T.C.M. (CCH) 199 (Feb. 25, 1969), *aff'd* 430 F.2d 679 (9th Cir. 1970). In its response, Highmark clearly distinguished this case as inapplicable. *See* Pl.'s Cross-Mot. Br. at 27-28. That the defendant has neither attempted to explain *Stephens Marine* nor cited any additional "examples" of support for its position that silence can evidence the election of a method of accounting is telling. As was explained in Highmark's Cross-Motion , the Tax Court has held that the absence of *any* treatment of an item on a taxpayer's return (as happened here) is too ambiguous to qualify as an election of a method of accounting. *See Reaver v. Comm'r*, 42 T.C. 72, 81 (1964), *nonacq. withdrawn*, 1965-2 C.B. 3 (taxpayers could file an amended return to elect installment method reporting of sales proceeds where previously they "made no conscious election to report the transaction on other than the installment method"). Despite the defendant's claims to the contrary, *Reaver* makes it clear that an affirmative act is required to "elect" a method of accounting. The defendant cites no authority for the position that *not treating* an item (as opposed to consistently treating an item) can evidence the election of a method of accounting.

The defendant's assertion that there is only one explanation for Highmark's failure to claim loss deductions for termination or cancellation of its healthcare coverage contracts from 1987 to 1994 until 1995 (Def.'s Reply Br. at 27) is inaccurate speculation. Highmark did not

claim these losses until 1995 for a number of reasons not relevant here, see Affidavit of Todd Vanerstrom ¶ 5 (Ex. 2, App. at A-52), but none of these reasons was that Highmark was treating its healthcare coverage contracts as a mass asset. Highmark has never treated its healthcare coverage contracts as a mass asset. *Id.* at ¶ 4. Highmark's silence from 1987 to 1994 regarding section 165 loss deductions from the termination and cancellation of its healthcare coverage contracts cannot be construed as an election to treat these contracts as a single mass asset.

A. <u>Highmark Has Never Treated Its Contracts as One Mass Asset</u>

Highmark showed in its Cross-Motion that it never treated its healthcare coverage contracts as one mass asset or changed its method of accounting from treating its healthcare coverage contracts as one mass asset to separate assets. Pl.'s Cross-Mot. Br. at 21-24, 32-33. The defendant's argument that Highmark chose to treat its healthcare coverage contracts as one mass asset is ludicrous; no taxpayer in the history of the Internal Revenue Code has ever elected to treat its separate, distinguishable assets as a mass asset.

The crux of the defendant's argument, that "the choice to account for its contracts as a mass asset or as discrete assets involves a matter of timing" lacks merit. Def.'s Reply Br. at 22. First, the notion that Highmark had a choice to account for its contracts as one asset or multiple, discrete assets is wrong. The Government points to no authority for the proposition that a taxpayer has the option to treat its assets as one mass asset or separate assets. The law determines how a taxpayer ought to account for its assets. The defendant's claim that Highmark "points to no authority that requires it to treat its contracts as discrete assets" is yet another example of the defendant's ignoring authority unfavorable to its position. *See Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 566 (1993); *Capital II*, 431 F.3d at 127; *Trigon*, 215 F. Supp. 2d at 696 (holding that the Blue Cross/Blue Shield organization's healthcare coverage

contracts are to be treated as discrete assets). Furthermore, the defendant's reliance on *Diebold, Inc. v. United States*, 891 F.2d 1579, 1583 (Fed. Cir. 1990), *cert. denied*, 498 U.S. 823 (1990) assumes the conclusion that Highmark changed its method of accounting when it claimed loss deductions on its amended returns; however, as was explained in Highmark's Cross-Motion, Highmark did not adopt any method of accounting in its original tax returns for its healthcare coverage contracts from which it could have changed when it filed amended returns. *See Reaver v. Comm'r*, 42 T.C. 72 (1964) (silence or omission is not the adoption of a method of accounting).

B. Highmark Has Always Expensed the Costs to Create its Contracts

As was explained in Highmark's Cross-Motion , Pl.'s Cross-Mot. Br. at 33-35, Highmark has not in the past capitalized the costs of developing or maintaining its healthcare coverage contracts and currently continues to deduct such costs. Pl.'s Resp. DFOF 40. The Government argues that in determining the basis of its pre-1987 contracts under the Fresh Start Basis Rule Highmark is somehow changing the way it treats the costs it incurs to maintain or develop contracts. This is not so. Apart from the fact that the Fresh Start Basis Rule results in a positive adjusted basis in contracts created before January 1, 1987, Highmark treats all of its healthcare coverage contracts precisely the same way, whether they were created before or after January 1, 1987. For those healthcare coverage contracts created after January 1, 1987, the adjusted basis remains at zero, and for the healthcare coverage contracts created before January 1, 1987, the adjusted basis remains at the fair market value as of January 1, 1987, as mandated by the Fresh Start Basis Rule. Nowhere in this process did Highmark shift its "recovery" of its costs to develop its healthcare coverage contracts, as the defendant claims, because Highmark merely

followed Congress's intention that it step-up its basis in its assets (healthcare coverage contracts) on January 1, 1987. Def.'s Reply Br. at 29.

## CONCLUSION

For all of the reasons set forth above, plaintiff Highmark requests that this Court deny the Government's Motion for Summary Judgment and grant Highmark's Cross-Motion for Partial Summary Judgment. Both Motions put identical issues before the Court.

Respectfully submitted,

/s/ Arthur Newbold
ARTHUR NEWBOLD
Attorney of Record
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Phone: (215) 994-2624
Fax: (215) 655-2624

Counsel for plaintiff

Date: May 21, 2007

Of counsel:

Frederick J. Gerhart
James J. Spadaro, Jr.
David N. Sontag
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

CERTIFICATE OF SERVICE

I certify that service of the foregoing document has, this 21st day of May, 2007, been made on the Defendant's attorney electronically, and by mailing a copy thereof to the following address:

Karen E. Servidea, Esquire
U.S. Department of Justice
Tax Division Court of Federal Claims Section, JCB/8804
555 4th Street, N.W.
Washington, D.C. 20001

David N. Sontag