Case 1:05-cv-01030-LSM Document 44-3 Filed 05/21/2007 Page 1 of 25

# SEIDMAN'S LEGISLATIVE HISTORY *of* FEDERAL INCOME TAX LAWS

## 1938-1861

*by*

J. S. SEIDMAN

*Member, the New York Bar; Partner,*
*Seidman & Seidman, Certified Public Accountants*

T
S45 ✓

NEW YORK : 1938
PRENTICE-HALL, INC.

COPYRIGHT, 1938, BY
PRENTICE-HALL, INC.

*All Rights Reserved.*

First printing . . . . . December, 1938

PRINTED IN THE UNITED STATES OF AMERICA

**[BASIS FOR DETERMINING GAIN OR LOSS, DEPLETION, AND DEPRECIATION.]** Sec. 204(a)(11)

[Sec. 204. (a) The basis for determining the gain or loss * * *]

(11) If substantially identical property was acquired after December 31, 1920, in place of stock or securities which were sold or disposed of and in respect of which loss was not allowed as a deduction under paragraph (5) of subdivision (a) of section 214 or paragraph (4) of subdivision (a) of section 234 of this Act or the Revenue Act of 1921, the basis in the case of the property so acquired shall be the basis in the case of the stock or securities so sold or disposed of, except that if the repurchase price was in excess of the sale price such basis shall be increased in the amount of the difference, or if the repurchase price was less than the sale price such basis shall be decreased in the amount of the difference.

## Committee Reports

**Report—Ways and Means Committee (68th Cong., 1st Sess., H. Rept. 179).**—(7) Paragraph (11) of the bill corresponds to section 202 (d) (3) of the existing law. The rule laid down in the existing law is the correct one only if the stock or securities sold are repurchased for the same amount as that for which sold. In all other cases the rule prescribed in the existing law is wrong. In the proposed draft provision is made for the case in which the repurchase price differs from the price for which the securities were sold. (p.18)

**Report—Senate Finance Committee (68th Cong., 1st Sess., S. Rept. 398).**—Same, except for clerical changes, as Ways and Means Committee Report. (p.19) In addition there is the following:

[1] Example: A purchased a share of stock for $100. He sold it for $80, and within 30 days thereafter repurchased it for $90. No loss from the sale is recognized. Under the bill the basis of the new share is the basis of the old, $100, increased by $10, the amount of the difference between the price for which sold, $80, and the repurchase price, $90. The resulting basis is $110.

Proof: Suppose A subsequently sells the share of stock for $120. His total investments in the property are $100, the cost of the original share, plus $90, its repurchase price, a total of $190. He has received from the transaction $200; that is, the $80 for which the share was originally sold, plus the $120 for which it was sold the second time. On the whole transaction there is a gain of $10, the excess of the amounts received from the transaction over the amounts expended. This result is reached under the paragraph since the basis of the new share of stock is placed at $110. (p.14-15)

[1] From statement (Mar. 6, 1924) prepared for use of Senate Finance Committee by Treasury Department in explanation of proposed changes in the Revenue Act of 1921.

**[BASIS FOR DETERMINING GAIN OR LOSS, DEPLETION, AND DEPRECIATION.]** Sec. 204(b)

(b) The basis for determining the gain or loss from the sale or other disposition of property acquired before March 1, 1913, shall be (A) the cost of such property (or, in the case of such property as is described in paragraph (1), (4), or (5), of subdivision (a), the basis as therein provided), or (B) the fair market value of such property as of March 1, 1913, whichever is greater. **(16)** *In determining the fair market value of stock in a corporation as of March 1, 1913, due regard shall be given to the fair market value of the assets of the corporation as of that date.*

## Committee Reports

**Report—Ways and Means Committee (68th Cong., 1st Sess., H. Rept. 179).**—(8) Subdivision (b) provides that the basis for determining the gain or loss from the sale or other disposition of property acquired before March 1, 1913, shall be the cost of the property or its fair market value as of March 1, 1913, whichever is higher. This provision changes the existing law in the interests of the taxpayer. It simplifies exceedingly the rule in effect under the present law without appreciable loss to the Treasury. (p.18)

**Report—Senate Finance Committee (68th Cong., 1st Sess., S. Rept. 398).**—Same, except for clerical changes, as Ways and Means Committee Report. In addition there is the following:

A provision is inserted providing that in determining the fair market value of stock in a corporation, as of March 1, 1913, due regard shall be given to the fair market value of the assets of the corporation as of that date. It is alleged that the Treasury Department in valuing the stock of close corporations, as of March 1, 1913, has given insufficient weight to the value of the assets as of that date and too great weight to forced or isolated sales of comparatively small blocks of the stock. This provision is to prevent such practice by the department in the future by providing specifically that in determining the value of the stock due regard shall be given to the value of the corporate assets. (p.19-20)

**Report—Conference Committee (68th Cong., 1st Sess., H. Rept. 844).**—Amendment No. 16: This amendment provides that in determining the fair market value of stock in a corporation as of March 1, 1913, due regard shall be given to the fair market value of the assets of the corporation as of that date; and the House recedes. (p.15)

## Committee Hearings

**Hearings—Ways and Means Committee.**—Making basic date Mar. 1, 1913 or four years prior to sale. (H. R. Ennis, p.518-519)

Sec. 204(c) [BASIS FOR DETERMINING GAIN OR LOSS, DEPLETION, AND DEPRECIATION.]

(c) The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the same as is provided in subdivision (a) or (b) for the purpose of determining the gain or loss upon the sale or other disposition of such property, except that in the case of mines, oil and gas wells, discovered by the taxpayer after February 28, 1913, and not acquired as the result of purchase of a proven tract or lease, where the fair market value of the property is materially disproportionate to the cost, the basis for depletion shall be the fair market value of the property at the date of discovery or within thirty days thereafter; but such depletion allowance based on discovery value shall not exceed 50 per centum of the net income (computed without allowance for depletion) from the property upon which the discovery was made, except that in no case shall the depletion allowance be less than it would be if computed without reference to (17) ~~this paragraph~~ *discovery value.* (18) [*Discoveries shall include minerals discovered or proven in an existing mine or mining tract by the taxpayer after February 28, 1913, not included in any prior valuation.*]

Westlaw.



H.R. CONF. REP. 99-841, H.R. Conf. Rep. No. 841, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N. 4075, 1986 WL 31988 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 99-841, 1986 U.S.C.C.A.N. 4075)**

P.L. **99-514**, ****4075** TAX REFORM ACT OF 1986
DATES OF CONSIDERATION AND PASSAGE
House: December 17, 1985; September 25, 1986
Senate: June 24, September 27, 1986
House Report (Ways and Means Committee) No. 99-426,
Dec. 7, 1985 [To accompany H.R. 3838]
Senate Report (Finance Committee) No. 99-313,
May 29, 1986 [To accompany H.R. 3838]
House Conference Report No. 99-841,
Sept. 18, 1986 [To accompany H.R. 3838]
Cong. Record Vol. 131 (1985)
Cong. Record Vol. 132 (1986)
The Conference Report is set out below.

HOUSE CONFERENCE REPORT NO. 99-841
September 18, 1986

***III **4076** JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

H.R. CONF. REP. 99-841, H.R. Conf. Rep. No. 841, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N. 4075, 1986 WL 31988 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 99-841, 1986 U.S.C.C.A.N. 4075)**

2. Tax-exempt organizations engaged in insurance activities

Present Law

Present law (sec. 501(c)) specifies various standards that an organization must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

meet in order to qualify for exemption from Federal income taxation. These standards vary depending on the basis on which the entity is seeking exemption. Certain insurance activities performed by an organization may make it ineligible for tax exemption.

At least one major organization (described in sec. 501(c)(3)), which provides life insurance and annuities to employees of tax-exempt educational institutions, has been recognized as a tax-exempt charitablecharitablecharitablecharitable ****4433** organization by the IRS. At least one major health insurance provider has been treated as a tax-exempt social welfare organization.

A fraternal beneficiary society, order, or association (sec. 501(c)(8)) is entitled to tax exemption if it operates under the lodge system or for the exclusive benefits of the members of a fraternity itself operating under the lodge system, and provides for the payment of life, sick, accident, or other benefits to the members of such society, order, or association or their dependents.

House Bill

Under the bill, an organization described in sections 501(c)(3) and (4) of the Code is exempt from tax only if no substantial part of its activities consists of providing commercial-type insurance.

In the case of such a tax-exempt organization, the activity of providing commercial-type insurance is treated as an unrelated trade of business (sec. 513), but in lieu of the usual tax on unrelated trade or business taxable income, the unrelated trade or business activity is taxed under the rules relating to insurance companies (subchapter L).

For this puprose, commercial-type insurance generally is any insurance of a type provided by commercial insurance companies. The House bill provides that the issuance of annuity contracts is treated as providing insurance.

Several exceptions are provided to the definition of commercial-type insurance. Commercial-type insurance does not include insurance provided at substantially below cost to a class of charitable recipients. Commercial-type insurance also does not include health insurance provided by a health maintenance organization that is of a kind customarily provided by such organizations and is incidental to the organization's principal activity of providing health care. Similarly, organizations that provide supplemental health maintenance organization-type services (such as dental services) are not affected if they operate in the same manner as a health maintenance organization.

In addition, commercial-type insurance does not include property and casualty insurance (such as fire insurance) provided directly or through a wholly owned corporation by a church or convention or association of churches for the church, convention or association. This exception does not apply if the insurance is provided not only to the church, convention or association, but also to other persons.

In the case of activities of Blue Cross and Blue Shield and their affiliates with respect to high risk individuals and small groups, the House bill authorizes the Treasury Department to issue regulations providing for special treatment to such organizations in connection with the unique activities (such as open

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

enrollment) of Blue Cross and Blue Shield and their affiliates for high risk individuals and small groups. The special treatment is not available to the extent the activities are required by applicable law.

The House bill requires that the Treasury Department audit and study fraternal beneficiary organizations (described in sec. 501(c)(8)) that received gross insurance premiums in excess of $25 million in taxable year 1984.

****4434** The provision is effective for taxable years beginning after December 31, 1985. A special rule for Mutual of America provides that this provision shall not apply with respect to that portion of its business attributable to pension business. Another special rule for Teachers Insurance Annuity Association-College Retirement Equities Fund provides that this provision does not apply to taxable years beginning before January 1, 1988, with respect to that portion of its business attributable to pension business.

Senate Amendment

No provision.

Conference Agreement

The conference agreement follows the House bill with respect to the treatment of commercial-type insurance activities of organizations described in sections 501(c)(3) and (4), with modifications.

In general

Under the conference agreement, commercial-type insurance does not include property or casualty insurance provided directly or through an organization described in sec. 414(e)(3)(B)(ii) by a church or convention or association of churches for the church, convention or association. It also does not apply to the provision of retirement or welfare benefits by such organizations directly or indirectly through an organization described in sec. 414(e)(3)(A) or 414(e)(3)(B)(ii) for the employees of such organizations, or for employees' beneficiaries. This exception is not intended to apply if insurance is provided to persons other than the church or convention or association of churches and their employees.

The conference agreement does not alter the tax-exempt status of health maintenance organizations (HMOs). HMOs provide physician services in a variety of practice settings primarily through physicians who are either employees or partners of the HMO or through contracts with individual physicians or one or more groups of physicians (organized on a group practice or individual practice basis).

Certain health insurance providers

In lieu of the provision in the House bill authorizing Treasury regulations with respect to high risk individuals and small groups in the case of activities of Blue Cross and Blue Shield and their affiliates, the conference agreement provides

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the following treatment of existing Blue Cross or Blue Shield organizations and other organizations that meet certain requirements and substantially all of whose activities are providing health insurance. Health insurance includes insurance that provides coverage of medical expenses.

The treatment applies to Blue Cross and Blue Shield organizations providing health insurance that (1) were in existence on the date of conference action (August 16, 1986), (2) are determined at any time to be tax-exempt under a determination that has not been ****4435** revoked, [FN88] and (3) were tax-exempt for the last taxable year beginning before January 1, 1987, provided that no material change occurs in the structure or operations of the organization after August 16, 1986, and before the close of 1986 or any subsequent taxable year. The conferees intend that the following principles will be applied by the Secretary in determining whether or not a material change in operations or structure has occurred.

First, the merger or split up of 1 or more existing Blue Cross/Blue Shield organizations will not constitute a material change in operation or structure.

Second, if an existing Blue Cross/Blue Shield organization acquires a new line of business or is acquired by another business (other than a health business), the acquisition does not constitute a material change in operations or structure of the organization if (1) the assets of the other business are a de minimis percentage (i.e., less than 10 percent) of the assets of the existing Blue Cross/Blue Shield organization at the time of the acquisition, or (2) the taxpayer can demonstrate to the Secretary of the Treasury that, based on all the facts and circumstances, the acquisition does not constitute a material change in operations or structure of the existing Blue Cross/Blue Shield organization.

Third, a material change in operations occurs if an existing Blue Cross/Blue Shield organization drops its high risk coverage or substantially changes the terms and conditions under which high risk coverage is offered by the organization from the terms and conditions in effect as of August 16, 1986. A change in high risk coverage is considered substantial if the effect of the change is to defeat the purpose of high risk coverage. High risk coverage for this purpose generally means the coverage of individuals and small groups to the extent the organization (1) provides such coverage under specified terms and conditions as of August 16, 1986, or (2) meets the statutory minimum definition of high risk coverage for new organizations. A material change in operations does not occur if an existing organization alters its operations to provide high risk coverage that meets the minimum standards under the conference agreement for new Blue Cross/Blue Shield organizations.

For example, if an existing Blue Cross/Blue Shield organization provides open enrollment to all individuals and small groups of less than 5 individuals, the organization could redefine a small group for purposes of this coverage to mean the lesser of 15 individuals or the minimum number of individuals required for a small group under State law. Such a redefinition of a small group (from 5 to 15 individuals) would not be considered a material change in operations because the organization would meet the minimum standard for a new organization with respect to small group coverage.

On the other hand, if an existing Blue Cross/Blue Shield organization provides,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as of August 16, 1986, high risk coverage to individuals and small groups without a premium price differential to take account of the high risk nature of the business, a change in ****4436** premium structure for such individual and small group coverage that has the effect of creating a significant price differential to take account of the high risk nature of the business would be considered a material change in operations.

The conferees intend that, to the extent such determinations of tax exemption for any taxable year beginning before 1987 were not under audit or in litigation before the date of conference action (August 16, 1986), the Internal Revenue Service will not seek to revoke such determinations.

The conference agreement provides that such existing Blue Cross and Blue Shield organizations and other organizations eligible for this treatment are subject to tax as stock property and casualty insurance companies under Part II of Subchapter L of the Code, as amended under the conference agreement. Thus, such organizations are generally subject to the provisions applicable to property and casualty insurance companies in this conference agreement, except as otherwise provided.

A special deduction is provided to such organizations with respect to their health business equal to 25 percent of the claims and expenses incurred during the taxable year less the adjusted surplus at the beginning of the year. This deduction is calculated by computing surplus, taxable income, claims incurred, expenses incurred, tax-exempt income, net operating loss carryovers, etc., attributable to health business. Thus, the deduction is not allowable with respect to such items attributable to, for example, life insurance business. The expenses attributable to health business are those incurred during the taxable year in connection with the administration, adjustment or settlement of claims under health business. The deduction may not exceed taxable income attributable to health business for the year (calculated without regard to this deduction).

For organizations eligible for this deduction in the first taxable year beginning after December 31, 1986, the amount of the adjusted surplus to be applied in the first year for which the deduction is allowable is the surplus reported on the organization's annual statement (i.e., the annual statement approved by the National Association of Insurance Commissioners) at the close of the preceding year, adjusted by not taking into account distributions (such as distributions to shareholders, or contributions or loans to affiliates that reduce surplus, but not including ordinary and necessary expenses or deductible policyholder dividends) after the date of conference action (August 16, 1986). For organizations that first become eligible for the provision in a later taxable year, the amount of the adjusted surplus for the first year of the deduction is the surplus reported on the annual statement at the close of the preceding year.

The initial surplus amount is adjusted under the provision at the close of each taxable year by adding the taxable income or loss [FN89] of the organization for the year (determined without regard to net operating loss carryovers and without regard to the deduction under ****4437** this provision), plus net tax-exempt income for the year. Net tax-exempt income means dividends for which the dividends received deduction was allowed, and interest that is tax-exempt, less the expenses of earning the tax-exempt interest that were disallowed under sec. 265, and less

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the adjustment that was made for proration of tax-exempt income under sec. 805(a) or sec. 832(b)(5) (as amended by the conference agreement). If an organization eligible for the deduction under this provision does not take the deduction in any year, adjusted surplus must be calculated for the intervening years between the last year the organization took the deduction and the next year in which it takes the deduction, so as to take account properly of the calculation of the deduction in the later year.

For example, assume a calendar year Blue Cross organization engaged only in health business, the State law surplus (as adjusted) of which was $100 million on January 1, 1987. In 1987, the organization has health claims and expenses incurred of $880 million and adjusted taxable income of $160 million (including net tax-exempt income of $10 million). In 1987, the organization would be entitled to a special deduction of $120 million, that is, the excess of $220 million (25 percent of the 1987 claims and expenses paid) over $100 million (the 1987 opening surplus).

As a further example, assume that in 1988, the organization has health claims and expenses incurred of $1.2 billion. Its special deduction for 1988 would be $40 million, that is, the excess of $300 million (25 percent of the 1988 health claims and expenses incurred) over the opening 1988 adjusted surplus balance of $260 million. The opening 1988 surplus is calculated by taking the sum of (a) 1987 opening surplus of $100 million, plus (b) 1987 adjusted taxable income of $160 million (including 1987 net tax-exempt income of $10 million).

The deduction applies only for regular tax purposes. Therefore, the deduction is treated as as preference item for purposes of the corporate minimum tax.

In addition to this special deduction, such organizations are given a fresh start with respect to changes in accounting methods resulting from the change from tax-exempt to taxable status. No adjustment is made under section 481 on account of an accounting method change.

Such organizations are not subject to the treatment of unearned premium reserves generally applicable to property and casualty insurance companies under the conference agreement. The conferees believe that during the period such organizations were tax-exempt, any mismatching of currently deductible premium acquisition expenses and deferred premiums (resulting from the unearned premium reserve deduction) had no significant tax impact, and therefore it is not appropriate to require these organizations to include in income a portion of the outstanding balance of the unearned premium reserve. To ease the transition from tax-exempt to taxable status, the conferees believe that it is appropriate to give such organizations relief from the requirement that 20 percent of the increase in unearned premium reserves be included in income.

Finally, the basis of assets of such organizations is equal, for purposes of determining gain or loss, to the amount of the assets' fair **4438 market value on the first day of the organization's taxable year beginning after December 31, 1986. Thus, for formerly tax-exempt organizations utilizing a calendar period of accounting and whose first taxable year commences January 1, 1987, the basis of each asset of such organization is equal to the amount of its fair market value on January 1, 1987. The basis step-up is provided solely for purposes of determining gain or loss upon sale or exchange of the assets, not for purposes of determining

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

amounts of depreciation or for other purposes. The basis adjustment is provided because the conferees believe that such formerly tax-exempt organizations should not be taxed on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation.

The foregoing special provisions apply to existing tax-exempt Blue Cross and Blue Shield organizations and and to those other organizations that satisfy the additional criteria described below.

Other organizations substantially all of whose activities are providing health insurance, in order to receive the treatment under the provisions described above, must meet certain requirements.

First, at least 10 percent of the health insurance (determined as a percentage of the total number of individuals covered annually) provided by the organization must be provided to individuals and small groups (disregarding Medicare supplemental coverage). A small group is defined as the lesser of 15 individuals or the number of individuals required for a small group under the State law where the covered groups are located.

Second, the organization is required to provide continuous full-year open enrollment for individuals and small groups. Open enrollment is intended to included conversions from group to individual coverage (for example, upon separation from service with an employer who provides group coverage), without a lapse in coverage, provided the individual seeking to convert from group to individual coverage notifies the organization providing group coverage of his conversion request by the date of his separation from service. Conversion includes any change in the type of coverage (e.g., from one type of group to another).

Third, any individual seeking health insurance is required to be offered coverage which includes coverage of pre-existing conditions, and the coverage becomes effective within a reasonable waiting period after the time such coverage is sought. A reasonable waiting period is intended to be not more than three months. Further, health insurance coverage must be provided without regard to the age, income, or employment status of persons under age 65.

Fourth, at least 35 percent of the organization's health insurance premiums are determined on a community-rated basis. This percentage is determined as a percentage of the total number of persons covered on an annual basis. Community rating means that premiums are determined on the basis of the average annual cost of health insurance over the population in the community.

Fifth, the organization must be organized and operated in a manner such that no part of the net earnings inures to the benefit of any private shareholder or individual.

The conference agreement requires that the Treasury Department audit and study fraternal beneficiary organizations (described ****4439** in sec. 501(c)(8)) that received gross insurance premiums in excess of $25 million in taxable year 1984. The Treasury study is due by January 1, 1988.

Effective dates

The provision is effective for taxable years beginning after December 31, 1986.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 99-841, H.R. Conf. Rep. No. 841, 99TH Cong., 2ND Sess. 1986, 1986 U.S.C.C.A.N. 4075, 1986 WL 31988 (Leg.Hist.)

**(Cite as: H.R. CONF. REP. 99-841, 1986 U.S.C.C.A.N. 4075)**

Special rules for Mutual of America and for Teachers Insurance Annuity Association-College Retirement Equities Fund provide that this provision does not apply with respect to that portion of their business attributable to pension business. For this purpose, the conference agreement provides that pension business means the administration of qualified pension plans (sec. 401(a) or 403(a)), tax-sheltered annuities (sec. 403(b)), unfunded deferred compensation plans of State and local governments (sec. 457), and individual retirement arrangements (IRA's.)

Additional special rules provide that this provision does not apply to the YMCA retirement fund, to administrative services performed by tax-exempt municipal leagues, to the Missouri Hospital Association, or to dental benefit coverage by Delta Dental Plans Association through contracts with independent service providers so long as the provision of such coverage is the principal activity of such Association. No inference is intended, under this provision, as to whether the performance of administrative services by tax-exempt municipal leagues, without more, constitutes commercial-type insurance activities. Generally, however, the performance of administrative services with respect to insurance contracts by tax-exempt organizations may be subject to unrelated business tax.

**Treasury Regulations (26 C.F.R.):**

**§ 1.83-4. Special rules**

**(b) Basis**

**(1)** Except as provided in paragraph (b)(2) of this section, if property to which section 83 and the regulations thereunder apply is acquired by any person (including a person who acquires such property in a subsequent transfer which is not at arm's length), while such property is still substantially nonvested, such person's basis for the property shall reflect any amount paid for such property and any amount includible in the gross income of the person who performed the services (including any amount so includible as a result of a disposition by the person who acquired such property). Such basis shall also reflect any adjustments to basis provided under sections 1015 and 1016.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| HIGHMARK, INC., SUCCESSOR IN INTEREST TO PENNSYLVANIA BLUE SHIELD AND SUBSIDIARIES,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | Civil Action No. 05-1030 T<br>Judge Margolis |

**<u>DECLARATION OF ARTHUR NEWBOLD</u>**

I, Arthur Newbold, declare, to the best of my knowledge, information and belief the following documents are true and correct copies of what they purport to be:

Exhibit 1 Letters dated April 26, 2007 and April 30, 2007 from David Sontag to Karen Servidea regarding documents produced by Highmark to the Government. (A- __ through A-__).

Exhibit 2 Affidavit of Todd B. Vanerstrom of Highmark, Inc. (A-__ through A-__).

Executed in Philadelphia, Pennsylvania on May 21, 2007.

/s/ Arthur Newbold
ARTHUR NEWBOLD
Attorney of Record
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Phone: (215) 994-2624
Fax: (215) 655-2624

Counsel for Plaintiff

# Plaintiff's Reply
# Exhibit 1

Dechert LLP

'ra Centre
.:)29 Arch Street
Philadelphia, PA 19104-2808
+1 215 994 4000 Main
+1 215 994 2222 Fax
www.dechert.com

DAVID N. SONTAG

david.sontag@dechert.com
+1 215 994 2576 Direct
+1 215 655 2576 Fax

April 26, 2007

**VIA FIRST CLASS MAIL**

Karen E. Servidea
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
555 4th Street N.W.
Washington, DC 20001

Re: Highmark, Inc. v. United States of America,
In the U.S. Court of Federal Claims, No. 05-1030 T

Dear Karen:

This letter is to respond to the concerns you expressed about Highmark's responses to Defendant's Interrogatories-Set No. 1 and Defendant's Requests for Admission-Set No. 1 in your March 28, 2007 letter to my colleague, Arthur Newbold. For the sake of clarity, the order of the responses below follows the order of the issues as you raised them in your March 28 letter.

First, Highmark cannot provide definitions for terms used by PricewaterhouseCoopers ("PWC") in its 1998 analysis of Pennsylvania Blue Shield's ("PBS") intangible assets. Highmark's knowledge of the terms in PWC's report is limited to what is stated in the report, which you have. Below, however, we have provided the definitions Highmark would today, in 2007, give to the terms you identified. These may or may not be consistent with how PWC defined these terms for purposes of its 1998 PBS valuation report. Again, these *are not* definitions of these terms as they are used in the 1998 PWC report: only PWC can provide those definitions.

a. LOC – Location. These codes (contained in various charts supporting the PWC valuation study) generally reflect the region, or location, in which services were performed. For example: 361 = Central Pennsylvania; 362 = Eastern Pennsylvania; 363 = Western Pennsylvania; 364 = Northeast Pennsylvania.

b. Effective Date – The date on which the enrollment was first effective. If the coverage is cancelled at any time, this date does not change.



U.S. Austin Boston Charlotte Harrisburg Hartford New York Newport Beach Palo Alto Philadelphia Princeton San Francisco Washington DC EUROPE Brussels London Luxembourg Munich Paris

c. Group Number – A unique identifier assigned by an enrollment source to a body of related subscribers (applicant subscribers and dependents) and to a specified subdivision of the subscribers.

d. Contract # – It appears you are inquiring about this term because it appears in PBS-001394 through PBS-001907. On these pages, the term appears to mean: the number of individual applicant subscriber contracts held within the corresponding group.

e. 1986 Premium – The premiums from 1986 allocated to a particular group.

f. Group Remittance – It appears you are inquiring about this term because it appears in PBS-001394 through PBS-001909. On these pages, the term appears to be another way of referring to the community-rated book of business, which involved small group contracts (i.e., less than 100 subscribers – generally members of a small business or other persons sharing a common bond that band together to receive benefits at a group rate). Rates for "community-rated" contracts are determined based on the experience of the relevant community, as opposed to the particular group or individual subscribers.

g. Corporate Experience Rated – It appears you are inquiring about this term because it appears in PBS-001360 through PBS-001393. On these pages, the term appears to mean: the experience-rated book of business, which involved large group contracts (i.e., 100 or more subscribers – generally members of a large business). Rates for "experience-rated" contracts are determined by the group's previous cost and utilization experience.

Second, Highmark *has* given you more complete information about the contracts at issue beyond what is in the PWC valuation report. The terms, abbreviations and codes in the files PBS-NAT0000001 through PBS-NAT0000014 are not undefined and meaningless. Specifically, the ".mdb" (Microsoft Access file) and ".txt" native files (i.e., electronic and manipulable files) have accompanying layout files that explain the terms, abbreviations and codes. It should be clear from the names of the files which layout files apply to which native files. For example, PBS-NAT0000002 is entitled, "deprecwithbthdte.mdb," and PBS-NAT0000001 is entitled, "deprecwithbthdte.mdb layout." So, PBS-NAT0000001 explains the layout of the data in PBS-NAT0000002. Also, please note that the .txt file entitled, "Tax file data found" (PBS-NAT0000012) has two layout files: "Tax file data found layout" (PBS-NAT0000010) and "Tax file data found layout_Cancel Codes" (PBS-NAT0000011). The ".xls" (Microsoft Excel file) native files do not have separate layout files, but rather each file has a tab within the file itself that explains the layout of the tabs within the file containing data. For example, in PBS-

Dechert LLP



NAT0000005, the first tab in the bottom left corner is entitled, "File Layout," and explains the layout of the data contained in the data tabs ("Summary Report by Year," "AccountDetail1, and "AccountDetail2"). If you have any questions about how to use these native file layouts, please contact me.

Third, the documents responsive to Document Request #13 from Defendant's First Set of Document Requests (data, studies, or similar documents plaintiff has prepared, caused to be prepared, received, reviewed, or relied on any time since January 1, 1977, that pertain to the length of time health insurance subscribers have maintained a relationship with plaintiff or any other health insurer) are included in the electronic documents labeled PBS-NAT0000001, PBS-NAT0000002, PBS-NAT0000005, PBS-NAT0000006, PBS-NAT0000008, PBS-NAT0000009, and PBS-NAT0000010 through PBS-NAT0000014. To the extent any other documents exist that are responsive to this request, they were produced in response to previous document requests.

Finally, the pages from the previously produced documents that you identified as partially illegible or missing have been gathered. We will send you complete versions of these documents, with new Bates labels, very shortly.

Please call me if you have any questions about the information above.

Sincerely,

David N. Sontag

cc: Arthur Newbold

Dechert LLP

DAVID N. SONTAG

david.sontag@dechert.com
+1 215 994 2576 Direct
+1 215 655 2576 Fax

April 30, 2007

**VIA FEDERAL EXPRESS**

Karen E. Servidea
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
555 4th Street N.W.
Washington, DC 20001

Re: Highmark, Inc. v. United States of America,
In the U.S. Court of Federal Claims, No. 05-1030 T

Dear Karen:

Enclosed please find a CD with Bates Numbers PBS-025194 to PBS-034197, which contains documents responsive to Defendant's Requests for Production of Documents-Set No. 1. Please note that some of these documents are also responsive to Defendant's Request for Production of Documents-Set No. 2, as explained in Highmark's Responses to such requests. Please also note that certain documents may be marked "Privileged and Confidential." Please disregard this designation. All documents which we intend to maintain as confidential are marked as set forth in the Protective Order signed by Judge Margolis.

Also, enclosed please find a CD with Bates Numbers PBS-NAT0000015 to PBS-NAT0000042. The first folder on the CD contains Bates Numbers PBS-NAT0000015 to PBS-NAT0000036, which contains documents responsive to Defendant's Requests for Production of Documents-Set No. 1. Again, please note that some of these documents are also responsive to Defendant's Request for Production of Documents-Set No. 2, as explained in Highmark's Responses to such requests. The second folder on the CD contains Bates Numbers PBS-NAT0000037 to PBS-NAT0000042, which contains documents responsive to Defendant's Requests for Production of Documents-Set No. 2. Specifically, these documents are electronic and manipulable versions of documents PBS-001358 through PBS-002316, which were originally produced in a different format in response to Defendant's Requests for Production of Documents-Set No. 1.

Please also note that each .txt and .xls file on the PBS-NAT CD has a companion "layout" file, which explains the layout of the data in the accompanying files. It should be clear from the names of the files which layout files apply to which native files, but if you have questions about this, please contact me.

Dechert LLP

Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
+1 215 994 4000 Main
+1 215 994 2222 Fax
www.dechert.com



Finally, this letter is to notify you that 272 boxes containing archived records from Records Retention will be made available for your inspection and copying at Highmark's headquarters in Camp Hill, Pennsylvania. These documents are responsive to Defendant's Requests for Production of Documents-Set No. 1.

Please call me if you have any questions about the documents on the enclosed CDs or would like to arrange a time to inspect and copy the boxes of documents.

Sincerely,

David N. Sontag

Enclosure

cc: Arthur Newbold (w/out enc.)



11777272.1.TAX

U.S. Austin Boston Charlotte Harrisburg Hartford New York Newport Beach Palo Alto Philadelphia Princeton San Francisco Washington DC EUROPE Brussels London Luxembourg Munich Paris

# Plaintiff's Reply
# Exhibit 2

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HIGHMARK, INC., SUCCESSOR IN INTEREST TO PENNSYLVANIA BLUE SHIELD AND SUBSIDIARIES<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Civil Action No. 05-1030 T<br>Judge Margolis |

**AFFIDAVIT OF TODD B. VANERSTROM**

I, Todd B. Vanerstrom, swear and affirm, upon penalty of perjury, to the following facts to the best of my knowledge, information and belief:

1. I am Vice President of Investor Relations, Tax & Business Development for Highmark, Inc. ("Highmark"), the successor in interest to both Veritus, Inc., which did business as Blue Cross of Western Pennsylvania ("Veritus"), and Medical Service Association of Pennsylvania, which did business as Pennsylvania Blue Shield ("PBS"). I have been employed in that position since 2003.

2. I held the position of Director of Corporate Tax with Highmark from 1996 to 2003.

3. As part of my job responsibilities with Highmark, I am required to be familiar with the preparation and filing of Highmark's federal income tax returns. I have familiarity with that process from my personal knowledge for at least the last 11 years.

4. Highmark never treated its healthcare coverage contracts as one mass asset.

5. For the years 1987 through 1990, PBS sustained net operating losses and consequently paid no regular federal income tax for those years. The 1987-1990 losses contributed to net operating loss carryforwards which substantially eliminated PBS's income for 1991 through 1994. Had PBS claimed additional deductions relating to the loss of its healthcare coverage contracts in 1987-1994, such deductions would only have added to its losses. This was an important reason PBS did not claim section 165 loss deductions relating to the termination or cancellation of its healthcare coverage contracts on its original returns for the 1987 through 1994 years.

Todd B. Vanerstrom

TODD B. VANERSTROM

Sworn to and subscribed before me
this 16th day of May, 2007

Sara M. Malara

NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Sara M. Malara, Notary Public
City Of Pittsburgh, Allegheny County
My Commission Expires Sept. 12, 2010
Member, Pennsylvania Association of Notaries

CERTIFICATE OF SERVICE

I certify that service of the foregoing document has, this 21st day of May, 2007, been made on the Defendant's attorney electronically, and by mailing a copy thereof to the following address:

Karen E. Servidea, Esquire
U.S. Department of Justice
Tax Division Court of Federal Claims Section, JCB/8804
555 4th Street, N.W.
Washington, D.C. 20001

David N. Sontag