IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HIGHMARK, INC., SUCCESSOR IN INTEREST TO PENNSYLVANIA BLUE SHIELD AND SUBSIDIARIES, | ) | |
| Plaintiff, | ) | No. 05-1030 T |
| | ) | (Judge Margolis) |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO AMEND THE PRETRIAL SCHEDULE

Defendant, the United States, respectfully moves the Court to amend the April 10, 2007, Scheduling Order to extend the deadline for defendant to submit its expert reports by thirty-two days to and including November 13, 2007. Counsel for plaintiff has informed us of its intent to oppose the instant motion.

In support of this motion, defendant states as follows:

Expert testimony is needed in this case to determine the fair market value as of January 1, 1987, of hundreds of thousands of health insurance contracts that plaintiff held on that date. In compliance with the current Scheduling Order, plaintiff submitted its opening expert report to defendant on July 20, 2007. Since then, defendant's experts have been working steadily to understand the data manipulations and computations, and actuarial and valuation techniques used by plaintiff's expert, so that they can opine on whether such methods and techniques are valid

and develop their own opinion as to the fair market value of the contracts. That effort has taken longer than anticipated due to several factors.

First, the expert report itself omits details about important aspects of the expert's analysis, such as how the expert determined (1) which contracts existed on January 1, 1987, (2) the premium paid by each group during 1986, (3) how many employees were insured under each group contract, and (4) the termination date of each contract.[1] Second, because of the lack of information provided by the report itself, defendant's attorneys and experts have had to spend a large amount of time searching through the expert's workpapers to determine the basis for the expert's conclusions. Such workpapers consist of more than 2,700 Excel spreadsheets, Access databases, and word processing documents; 20,000 scanned pages; and thousands of emails. The organization of these files is not evident, and neither plaintiff nor plaintiff's expert has provided an index or other organizational directory to help defendant search through them. Moreover, some of these files were not produced to defendant until as late as August 31, 2007. Finally, defendant's attorneys and experts spent substantial amounts of time preparing for defendant's deposition of plaintiff's expert, which was taken on September 5, 2007, with the expectation that

---

[1]Plaintiff's expert used a variation of the discounted cash flow method to value the contracts (*i.e.*, a technique that takes the 1986 income earned by each contract to project expected cash flows over the expected life of each contract). In addition to being a factual predicate to plaintiff's claim in this case (*i.e.*, nonexistent contracts can generate no deduction), the determination of which contracts existed on January 1, 1987, affects the starting assumptions for projecting the contracts' future cash flows. The premium paid by each group during 1986 is also a critical input to the valuation model because that is the number that gets projected forward over the estimated life of each contract. The number of employees insured under each group contract is important to the valuation analysis insofar as plaintiff's expert used that number to approximate the 1986 premium for contracts that are missing premium information in plaintiff's records. The termination date of each contract is critical to plaintiff's claim because I.R.C. § 165 allows a deduction only in the year that a loss is actually sustained. *See* Treas. Reg. § 1.165-1(d).

the testimony would fill in the gaps in their understanding of the analysis of plaintiff's expert. Their efforts proved substantially futile, however, when plaintiff's expert was unable to explain several parts of his analysis or to locate the details and data sources of such analysis among his workpapers.[2]

The frustration of defendant's efforts to ascertain the details of the work performed by plaintiff's expert has impeded the preparation of defendant's own reports more than might otherwise be expected because of the substantial overlap between the factual and the expert issues in this case. For example, all of the determinations noted above (about which plaintiff's expert failed to provide detailed analysis) involve fundamental matters of fact. Defendant's attorneys sought all such material in the course of fact discovery. But plaintiff's expert report, for the first time, discloses a comprehensive list of the contracts that plaintiff claims to have existed on January 1, 1987, and a description of their characteristics (*e.g.*, contract type, 1986 premium, number of participants, and termination date). The apparent reason for plaintiff's delay in the production of such a list is that plaintiff expects its expert's analysis, synthesis, and

[2] The following are just a few examples of the inability of plaintiff's expert to explain parts of his analysis or where among his workpapers such analysis can be found: When asked how he developed the 1986 premium for each of plaintiff's experience-rated group contracts, plaintiff's expert recalled that he derived such information from a certain file that contains records related to rate renewals, but was unable to explain the logic he used to derive 1986 premiums from the file. Plaintiff's expert was also unable to recall the name of the file, provided to him by one of plaintiff's employees, that he used to derive the list of community-rated group contracts that existed as of January 1, 1987. Finally, plaintiff's expert failed to recall how he determined the average-age attribute of group contracts for which plaintiff's records contain age data for some, but not all, of the group's members.

manipulation of various data sources, and the expert's extrapolations from those sources, to paper over lacunae in plaintiff's records.[3]

Once defendant obtained plaintiff's final list of contracts and their characteristics (from the report of plaintiff's expert), it was important for our own experts to determine whether that information was sufficiently reliable to use as the basis for our own valuation analysis. This process has consumed enormous amounts of our experts' time.

Finally, defendant notes that, during the deposition of plaintiff's expert, the expert testified that, after he submitted his report, he discovered a "glitch" in his valuation model that resulted in the inclusion of contracts that actually terminated before 1987. Notwithstanding defendant's request, plaintiff has yet to provide a revised version of the expert's report. Thus, at this late stage of this litigation, defendant still does not have a list of the contracts for the loss of which plaintiff claims deductions.

The additional time requested will enable defendant's experts to finish reviewing the analysis performed by plaintiff's expert and to complete their own expert reports.

---

[3] During fact discovery, plaintiff did provide defendant with dozens of "native" files – Access databases, Text files, and Excel spreadsheets, containing hundreds of data fields and millions of data records. Presumably, defendant's attorneys and experts could have determined how to cross-reference the data fields across the various files to develop an in-force database if they, like plaintiff's expert and his team, had had unlimited access to plaintiff's employees who understand the nature and meaning of the data and several years to work with the data.

If the current Scheduling Order is amended to allow an additional thirty-two days for defendant to file its expert reports, and all of the remaining dates are correspondingly adjusted, the new schedule would be as follows:

| Event | Deadline |
| --- | --- |
| Defendant's Expert Report (s) | November 13, 2007 |
| Plaintiff's Rebuttal Report(s) | January 15, 2008 |
| Defendant's Surrebuttal Report(s) | January 31, 2008 |
| Expert Depositions and Further Expert Discovery | March 14, 2008 |

WHEREFORE, defendant respectfully requests that the Court grant this motion.

Respectfully submitted,

s/ Karen Servidea
KAREN SERVIDEA
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 616-3423

RICHARD T. MORRISON
Acting Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
W.C. RAPP
Senior Trial Attorney

September 25, 2007
Date

s/ W.C. Rapp
Of Counsel